CV 12-2439

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------

ANDREW OSTROWSKY, PLAINTIFF

- against -

DEPARTMENT OF EDUCATION OF NYC UNDER THE
CONTROL OF MICHAEL BLOOMBERG MAYOR, IN
HIS OFFICIAL AND INDIVIDUAL CAPACITY;
DENNIS WALCOTT, CHANCELLOR; DONNA FINN,
PRINCIPAL; SOFIA APOSTOLIDIS, ASSISTANT
PRINCIPAL; THERESA EUROPE, DEPUTY GENERAL
COUNSEL; ALL IN THEIR OFFICIAL AND INDIVIDUAL
CAPACITIES; UNITED FEDERATION OF TEACHERS;
MICHAEL MULGREW, PRESIDENT; IN HIS OFFICIAL
AND INDIVIDUAL CAPACITIES

DEFENDANTS

--------------------------------------------------------------------

COMPLAINT

DOCKET # 12-CV-

JURY TRIAL DEMANDED

SUMMONS ISSUED

WEXLER, J.

BROWN, M. J.

## INTRODUCTION

1. The Plaintiff makes a facial attack on the 2000 amendment to NYS Ed. L. 3020 that solely modifies the statute it enables, Ed. L. 3020-a, for the City School District of the City of New York ("DOE"), and leaves both statutes unmodified for all the School Districts in the other 57 counties of the State.

2. The Ed. L. 3020 and 3020-a statutes were rendered unconstitutionally vague and subject to denial of the very due process they were originally enacted to protect, in violation of the United Federation of Teachers ("UFT") fiduciary duty and duty of fair representation to its members and cosponsored in bad faith, to protect the then desired privacy of the sexual orientation of the UFT President in 2000.

3. In order to obtain almost all later UFT concessions, the DOE extorted this and together the UFT and the DOE conspired to cover-up a scandal involving the currently incumbent President of the UFT.

4.       All of those changes to the working conditions of some 80,000 teachers (in 2001) abridged the value of the property interests of the UFT membership in their tenure step by step, most changed *de facto* rather than *de jure* and both will be described in detail in the allegations of this Complaint.

5.       The UFT acted in its leadership's self interest 1) to protect Weingarten's privacy in a matter she disclosed herself when she felt the political climate was propitious to do so; 2) to protect the career of the "being groomed" for possible future full-time UFT leadership, now President Mulgrew at a time when, though a member of the inner circle of the long incumbent Unity Party of which both he and Weingarten were members, he was encountered *"flagrante delicto"* on the premises of the DOE school to which he was assigned as a teacher with a female guidance counselor also assigned to the same school; 3) in return for Mayor Bloomberg's nomination and support for Weingarten to be appointed to the vacancy in the U.S. Senate left by Hillary Rodham Clinton's confirmation as Secretary of State of the United States.

6.       The UFT's capitulations were for personal considerations of its leaders and therefore corrupt; the DOE exaction of cosponsorship of a bill before the legislature, waiving of discipline where two employees were to be disciplined, or promotion of candidacy for political office specifically to abridge due process and equal protection of its employees was both in violation of state law, and to change the state law to implement its goals was in violation of the 14th Amendment because the DOE was using bad faith, coercion, extortion and accepting non-monetary bribes.

7.       The process through which the UFT has gone from the pinnacle of organized labor headed by Al Shanker and then Sandra Feldman, down to the nadir of that "slippery slope" started on its descent by Randi Weingarten and now at the very lowest point under the direction of Michael Mulgrew, UFT leadership was extorted by the DOE commencing by the coercive tactics of the DOE to withhold concessions to the UFT to which the DOE had already agreed, on organizational

grievances and class sizes, until the amendment to Ed. L. 3020 was enacted in a specific effort to deny due process to protect the property interests in their tenure of its incumbent employees.

8.    The amendment provides that for NYC alone, any modification to the due process requirements of Ed. L. 3020-a (regarding the disciplining of tenured teachers) embodied in the Collective Bargaining Agreement ("CBA") between the DOE and the UFT, the CBA will supercede the statute, and there shall be no individual right of election.

9.    The Ed. L. 3020-a statute specifically provides for there being an individual right of election in writing, i.e., where the CBA agreement provides for alternate disciplinary procedures, from the statute as written, each respondent, a tenured pedagogical employee to be brought up on charges, would have to elect in writing whether they wished to proceed with the procedures under Ed. L. 3020-a as written, or under the procedures embodied in their School District's CBA.

10.   The 2000 amendment to Ed. L. 3020, specifically would deny the individual right of election, leaving only what would be embodied in the CBA's of educators' unions as what would be available to educators working for the City of New York.

11.   The legislature could not predict what would be sooner or later be embodied in the CBA, but based on the strength of the UFT under Conan, Shanker, and Feldman, the UFT's cosponsorship led to enactment of the amendment, without consideration of the vulnerability of the then President Weingarten or the future President Mulgrew and without debate or hearing enacted the amendment.

12.   Because what due process will be accorded, if any, to a group of employees, instead of an exquisitely detailed set of procedures guaranteed by the Ed. L. 3020-a statute protecting the rights of tenured teachers, to a group of NY teachers, i.e. those in NYC, we allege the amendment to Ed. L. 3020 renders Ed. L. 3020-a unconstitutionally vague, as well as enacting the denial of both due process and equal protection to NYC public school educators

13.     The enactment of the amendment *de jure* immediately led to the change in the way arbitrators at disciplinary hearings would be selected and maintained which was already formulated as the impetus for the amendment. Instead of the restrictions on the number of cases a single hearing officer could perform for a single School District in a year (2) so as to maintain financial independence of the hearing officers, the NYC CBA already proposed before the amendment to Ed. L. 3020 was proposed that the hearing officer be made permanent.

14.     Thereafter, many changes were made, *de facto,* by memorandum, and went beyond the area of discipline of those brought up on charges, to make it easier to bring teachers up on charges and other related areas, and therefore were never ratified by the membership, but were merely agreements between the Schools Chancellor and the UFT President. The way some of these changes have been administered has been in violation of state and federal law as will be alleged.

15.     Still others were made to look favorable in the CBA and the membership ratified a CBA, containing said provision but the DOE would change some other policy internally for which it did not need UFT consent, and when combined the interaction of the two was detrimental to the UFT membership. i.e. "open market transfers" replacing "seniority transfers" seemed neutral and were ratified, after which, for the first time, individual teacher salaries began to be included in each school's budget for which the Principal would be held accountable. Previously salaries were centralized, only pedagogical lines, by license area, were allocated to schools. Only with the second change was there a total reversal of instead of the best educated and most experienced teachers being preferred by Principals, only the least educated and least experienced were chosen so the Principal would be rewarded by a bonus for reducing school costs and the money would stay in the school as discretionary (because the DOE recaptured the 60% benefits costs especially retirement contributions).

16. When Mayor Bloomberg ran for his present position he proposed that the NYC schools did not need 80,000 teachers, 50,000 would be the goal. However as the rest of the allegations will demonstrate, the way that goal has mostly been achieved, and is being stepped up to be completed by the time the Mayor leaves office in January 2014, is misuse of the disciplinary process to terminate teachers who have been framed for misconduct they did not commit, for complaints of classroom mismanagement that was no different, or was better managed than for the most of the other teachers in the school, Principals work with DOE attorneys to target teachers perceived as vulnerable and "set them up," thus meeting their quotas to receive bonuses for reducing payroll by removing teachers whose pay is well above the mean and replacing them with teachers well-below the mean.

17. While this is frowned upon for long loyal "at will" employees, it is illegal as well as unconscionable for long loyal and tenured teachers who have delivered outstanding instruction, as has Plaintiff here, for whom it shall be alleged with specificity has been set-up all year, for no reason, as he is performing in the same highly superior manor as he has for well over a decade in the same school.

## NATURE OF THE CASE

18. Plaintiff, a highly commended math teacher in his eleventh year of satisfactory service to the DOE, is the most senior teacher in the school, teaching there since the inception of Frank Sinatra School of the Arts ("FSSA"), though he has not yet reached his 36th birthday, has been harassed, criticized, warned, and ridiculed since his salary rose above $80,000.00 *per annum.*

19. He makes claims under 42 USC 1983, for the piecemeal dismantling of the tenure system, in bad faith, in violation of his contractual, statutory, and constitutional rights, both under color of state

law, by the DOE, and in bad faith and in dereliction of their fiduciary and fair representation duties of his Union in violation of state and federal law.

20.     He makes a facial attack on the change in the law that began the entire stepwise process of unlawful abrogation of his tenure rights until he is *de facto* an "at will" teacher compared to the rights vested in him when he began employment with the DOE, or was tenured by it, or enjoyed by the teachers for whom the law was not amended in the other 57 NY counties including the county in which he resides.

21.     Now at the bottom of the slippery slope, the right to grieve unfair letters, and classroom observations, to prevent these subjective, often orchestrated instruments from becoming part of his permanent personnel file, has ended.

22.     The DOE can write him up negatively each day, when it used to write him up only for accolades for doing exactly what he does now, rate him unsatisfactory at the end of the year, which has never happened before, charge him with incompetence or misconduct or both, and have a permanent hearing officer receiving up to $2000.00 *per diem* guaranteed for 74 hearing days per year, who does not want to lose this job, preside over the hearing and fire him for nothing.

23.     This is not what tenure meant when he accepted employment with the DOE; this is not what he understood tenure to be when he was granted tenure years ago.

24.     The erosion of his property interests during his tenure in office has been done in violation of law, in bad faith, and in detriment to the education of the city's students.

**JURISDICTION AND VENUE**

25.     Plaintiff asserts claims of violation of his U.S. Constitutional due process and equal protection rights under the 14th Amendment and makes a facial attack of the unconstitutionality of a state law. thus the Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4).

26.   Plaintiff's claim for declaratory relief is authorized by 28 U.S.C. §§2201 and 2202.

27.   The Court's supplemental jurisdiction is invoked under 28 U.S.C. §1367(a) for state contract violation claims herein, and to set aside all inaccurate, prejudicial and made in bad faith letters and observations placed in his file.

28.   Plaintiff filed the instant complaint within three years since the harassment was begun by Defendant Apostolidis and within one year of it being stepped up to orchestrate the bad faith actions, inaccurate reports, and biased classroom observations now placed in his file in an attempt to make him one of the 30,000 teachers that Mayor Bloomberg has fired or plans to fire to fulfill his campaign proposal, mostly by unlawful means by misuse of the disciplinary system.

29.   The principal place of business for pedagogical management of the Department of Education, is 65 Court Street, Brooklyn, New York 11201; while the acts complained of took place mostly in Queens County, State of New York, many were reported to him at his place of residence in Nassau County.  Plaintiff as a resident of Nassau County, is entitled to have his claims against an agency purportedly acting under NYS law heard by a jury of his peers in Nassau or Suffolk County. Therefore, venue properly lies in the United States District Court for the Eastern District of New York, at its Central Islip Courthouse pursuant to 28 U.S.C. §1391.

**PLAINTIFF**

30.   Plaintiff, Andrew Ostrowsky, is a citizen of the United States and a resident of Nassau County, New York.  Plaintiff was first employed by the DOE as a teacher of mathematics, in 2001 at the opening of FSSA and has taught there ever since.

**DEFENDANTS**

31.   The Department of Education is empowered to be the governing body of the City School District of the City of New York ("District") and existing under the laws of the State of New York, and the Unites States Constitution and to submit, lobby for and seek enactment of NYS laws that are

7

consistent with the U.S. Constitutional requirements for due process and equal protection, and are not intentionally vague and in bad faith to defeat those requirements.

32.    Defendant Michael Bloomberg, was inaugurated to the office of Mayor of the City of New York in 2002 and began to lobby for legal authority to control the public schools of NYC, disband its Board of Education, and implement reform he envisioned and campaigned for without offering specifics other than he planned to improve schools with 30,000 fewer teachers than he found upon taking office. The methods that he used have not improved the schools but have destroyed the lives and careers of the majority of the most talented, best educated and highly experienced tenured teachers, in an effort to destroy their union the UFT, which he has rendered powerless through subterfuge, deceit, coercion and extortion; and to end tenure which he has done by stealing the property interests in their tenured employment of tenured teachers, in violation of the due process and equal protection that were embodied in Ed. L. 3020 and Ed. L. 3020-a as they existed when the Mayor took office and were unlawfully amended, not-complied with, or by-passed entirely. It is the reinstatement and enforcement of one exemplary teacher's rights and protections that is the subject of this Action.

33.    Defendant Dennis Walcott has been the Chancellor of the District for the most immediate relevant period, when the unlawful conduct against Plaintiff has been stepped up and, as such, is responsible for the operation of the District and its chief executive officer. Any specific policy signed by him, promulgated or implemented so as to accrue to Plaintiff's claims are alleged as "Monell" claims against the Chancellor, officially and personally, since at all times he carried out his lawful duties under color of state law; violation of state law is not one of his duties and there *ultra vires* and personal.

8

34.   Defendant, Donna Finn was at all times relevant hereto, employed by the Department of Education as Principal of FSSA and its CEO responsible for implementing the general and specific policies of the Chancellor at her FSSA building at which she is autonomous in controlling the pedagogical personnel therein appointed and retained; she further promulgated and implemented additional policies of her own, and omissions.

35.   Defendant Sofia Apostolidis is the Assistant Principal (Instruction) at FSSA, who arrived over four years ago and has been harassing the plaintiff in an increasing manner since she arrived.  Though Principal Donna Finn and the Plaintiff worked well together before her arrival, Finn has delegated the treatment of Plaintiff to Apostolidis, and is acquiescent of the unfair, and undeserved treatment plaintiff is receiving from Apostolidis.

36.   Defendant Theresa Europe is the Director of the Administrative Trials Unit ("ATU") and supervises dozens of attorneys whose sole role is to work with Principals to remove and terminate unwanted teachers by whatever means necessary.  The Attorneys of this unit are available to work with Principals to draft letters to file, and elements of an observation report even before the observation, in order to "set-up" any teacher the Principal wants removed from the school.  Europe works closely with her staff on each case to assure early involvement of the attorney in building the case that will be successfully prosecuted.  Defendant Europe has responsibility to advise Principals on the bringing of charges, and she oversees the DOE's prosecutorial interests in the disciplinary hearings.  She acts under State Law and has constructive knowledge of Educators' due process rights and sets the policies for all DOE attorneys' conduct in disciplinary actions.  All claims of Plaintiff relating to the bringing of charges and the DOE's position in any disciplinary process which are *ultra vires* accrue as "Monell" claims against her; she is personally involved in each case, reviewing it with supervising and prosecuting attorneys she has assigned it to, and

directs the approach, methods and posture, and settlement offers of the Department. Her name appears on all privilege logs as having sent and received feedback as to several directives early in the prosecution of each case.

37.    Defendant United Federation of Teachers, was at all times relevant hereto, the designated labor Union representing the NYC teachers. It was Mulgrew's wrong doing on DOE premises that led his predecessor Randi Weingarten, to hire him and his co-respondent to UFT staff after their resignation from the DOE to avoid their being brought up on disciplinary charges, and to cover up their wrong doing and make numerous concessions to the DOE to actively participate in the cover-up, which was in dereliction of her fair representation of all other members and in favor of two members.

38.    Defendant Michael Mulgrew is now President of the UFT. Once Mulgrew himself became UFT President, the DOE could extort even more from him directly as exemplified by the April 15, 2010 agreement between former Chancellor Klein and Mulgrew ostensibly closing the so-called "Rubber Rooms" but in reality making it possible to remove thousands of teachers without notice by the press or present counsel by dispersing them throughout the 1500 or more sites controlled by the DOE, whereas when aggregated in fewer than a dozen sites they could be interviewed, organized, communicated with for the purpose of litigation for their rights and claims, *inter alia* much to the consternation of the DOE.

## FACTUAL ALLEGATIONS

### Stepwise Bad Faith and Unlawful Changes Affecting all NYC Teachers Including Plaintiff

39.    Overview of categories alleged include:

    a.    1) amendment to Ed. L. 3020 allowing NYC DOE to bring any tenured teacher up disciplinary charges for any reason and give or deny due process before termination (or

other discipline) as long as their Union consented (it at first meant the change had to appear in the CBA, soon changes were made by memorandum, then DOE implemented actions unilaterally without protest of litigation by UFT.  All the step wise actions have been implemented sequentially since January 2000.

b.      The loss of seniority transfer came in July 2005.  Before that, all projected teacher vacancies were listed and all teachers who had earned satisfactory Annual Professional Performance Ratings ("APPR") for all of the prior three years could rank six vacancies to which they wished to apply, and would be matched to the highest of their ranked choices that had not already been filled by an applicant with greater seniority with the DOE in that license area.  This enabled better commutes with accrued service, better student demographics, participation in specialized programs in one's field of expertise, and was a means of escape for good teachers from overbearing or prejudicial supervisors who appeared on the scene.

c.      The end of "bumping" a teacher in another school in one's district with less seniority if you were "excessed" from your school due to changes in demographics, or changes in program emphasis and course offering, or change in grades taught, or deliberately excessed by a supervisor by whom you were disfavored, oftentimes unfairly.

d.      Going from central payroll with teacher-lines by licenses allocated to schools (salary level of no consequence in hiring decisions by Principals, everyone progressed on a single salary matrix by accruing years of experience with the DOE and level of graduate education)  to teacher payroll level accountable by each school as part of that school's budget.

e.      Only open market hiring with no longer a central placement process, whereby though Principals could receive individual applications and hire, most applicants went through

central staffing previously, a Principal was expected to hire one of three candidates referred to her unless she could justify otherwise; justifications were time-consuming and the DOE had the ability to simply fill a vacancy without her consent, thereafter. Central staffing was disbanded; Principals now make all teacher hiring decisions with virtual necessity to hire only the lowest salaried teachers to reach their cost control goals.

f.      The computer-age brought in the open-market as the only mechanism by late 2005. Applicants place a single resume on line, their teaching licenses are centrally verified, teachers applied (by check mark next to the vacancy listing) to as many on-line vacancies as they wish. Principals review the applicants and call in those they wish to interview.

g.      Overnight the preference for the best educated and most experienced teachers available reversed 180°, to the least educated and experienced as the allocation was no longer a ceiling on the number of teacher-lines allocated to each school, but a school and the Principal would be rewarded for cost-savings, yet as many teachers could be hired as the budget allowed if the cost per teacher was reduced.

h.      This went *pari-passu*, with the then Chancellor Klein announcing that the NYC Schools needed "young blood," "young ideas," "teachers not set in their ways, but malleable," suddenly the value of the veteran teacher who had empirically developed the best ways to explain difficult concepts, the best metaphors to bring the idea to the students' every day life, the most interesting and enlightening teaching material collection accrued over decades, and the most contacts in the community to expand the horizons, remediate the struggling, or heal the dysfunctional to optimally actualize their march to adult achievement, character, and fulfilment were suddenly old incompetent hags according to Klein and people forgot that so many successful people owed their success to the

12

inspiration of a mature teacher, not a novice and "bought" the Klein-Bloomberg line which never mentioned that they planned to ruin the lives of the mature long-tenured teachers in order to save over three billion dollars per annum.

i. When Bloomberg ran for office stating the city should have 50,000 not 80,000 teachers, attrition and hiring fewer new teachers was the assumed mode, not the stealing of the property rights of long tenured teachers, by defamation, ridicule, targeted harassment and "harsh methods" to destroy the lives of as many as 60,000 professional all the while, hiring and putting in the classroom entry level people specifically from all fields with little if any pedagogical experience to question the practices they observed upon arrival.

j. Then the No Child Left Behind act ("NCLB") was the perfect framework in which to use a cryptic algorithm of objective (standardized test scores) and subjective (undisclosed) factors to give schools letter grades and aggressively close schools, albeit the closed schools reopened in the same building, with the same student, the same Principal, but only 50% of the incumbent teachers who were cheapest and untenured while making Absent Teacher Reserves ("ATR's) (i.e. tenured substitutes) of the highest paid tenured teachers and imploring the legislature each and every year to allow "lay off" of 6000-8000 teachers, not by reverse seniority, but by subjective evaluation.

k. Large secondary schools were broken up into several smaller schools touted by the Chancellor and the Mayor as superior to large impersonal schools [not only to get rid of half the teachers, but also to replace discipline-specific AP's "supervision" in each department, with a single AP "instruction" who does not know the subject and can only come in and criticize "class-tone," "lack of engagement of 1-2 students" (rather than notice the rapt engagement of the other 25)].

l.    While it may assist the students victimized by the most dysfunctional home environments, achieve minimum required skills, it deprives achieving students of the electives and special programs that require the economies of size to achieve enrollments mandating a class in *e.g.* video production, astronomy, or classical Greek, be offered.

m.   Amazingly, when the legislature said no layoffs except by reverse seniority, the UFT and the DOE would each year announce "together we found a way for no lay-offs" when the only reason the schools were closed in the first place was to deselect and displace the highest paid, tenured workforce replacing them with entry level teachers.

n.    Finally, in 2011 the DOE spent a fortune, in public advertizing, to press the idea that Principals could identify "great teachers" and that the "keepgreatteachers.com" initiative would incite pressure on the legislature to finally agree to said lay-offs that were so very necessary in such hard economic times for the city.  The legislature was not duped.

o.    However, for the five previous years the Mayor and the Chancellor had busied themselves replacing Principals who were educators [the Principals who were not already tenure-tracked by 1997 voted to give up their own future-tenure for the possibility of a 45% increase in pay (including reaching incentive benchmarks) and autonomy over their buildings for which they would become completely accountable], with "bottom-line" "tight ship" individuals from the corporate sector who disdained professional educators as having chosen or defaulted to the academic discipline with the least status.

p.    Klein had also instituted a "Leadership Academy" for training new Principals who were "bottom line business achievers" rather than educators, they learned little about pedagogy but were taught in exquisite detail how to fire tenured teachers.

q.   A manual ***How to Fire Tenured Teachers*** was developed in October 2004 for use in the Leadership Academy and is also distributed to all Principals. It gives examples, sample letters, keeping observations totally narrative and subjective. What is specifically left out of the manual and unwritten but taught verbally is the advice of the Regional and Administrative Trials Unit Counsel on how to write up everything the Principal can criticize in an unwanted, targeted, and personally disfavored, tenured educator (whose performance is on a par or superior to other teachers not targeted in the building). [What counsel lawfully should be advising instead, is that all pedagogical staff must be treated with the same even-handed criticism and support, and there must be uniform discipline for the same "infractions"].

r.   The ATRs would all be the first to be laid off along with the burgeoning rolls of tenured teachers who had been removed from their assigned classes awaiting disciplinary charges or their adjudication.

s.   Teachers were removed for incompetence (usually "classroom management," i.e. not every one of the students in the class were sufficiently enraptured, such that the supervisor observed a student day dreaming, etc. or they were too enraptured such that a few were observed excitedly blurting out their comments, question or answer before being recognized by the teacher, or they all awaited recognition by teacher and the lesson was faulted for being too "teacher-centered"; likewise either too much time was spent reviewing the homework to the detriment of new work or too little time was spent reviewing the homework; how could the teacher assess if the students understood yesterday's lesson and were ready to go on).

t.   Teachers were removed for misconduct [this included offering incentives to students who achieved certain academic benchmarks (an inexpensive watch from a family business); bringing a large plant to school for decoration without prior approval (it was not even a live plant but a good silk plant); inadvertently block printing the title "MS." followed by the Principal's last name also in block letters, in both the form-box requesting Principal's name and again in the box requesting Principal's signature, by a teacher who was required to complete an incident report for a very painful injury just before leaving the building to seek medical assistance).

u.   In 2008 the City offered nine seats on the 15 member Panel for Educational Policy ("PEP") [the appointed body which replaced the NYC Board of Education concomitant to the Mayoral control of NYC schools won in 2003 for five years] to be appointed by the UFT in order to gain UFT support for renewal of Mayoral control of the schools until 2013.

v.   However at the last minute UFT President Weingarten waived that extremely important concession which would have enabled the UFT to stop the *ultra vires* practices and policies being committed by the DOE, we allege that the DOE threatened exposure of an old scandal in which Weingarten covered-up Mulgrew's wrong doing, and in return for Mayoral support for her candidacy for appointment to the U.S. Senate seat expected to be vacated by the junior senator from NY.

w.   Once the appointment went to Kirsten Gillibrand, despite the City's support for Weingarten or because she was double-crossed by the Mayor who may have switched to support Carolyn Kennedy when she announced she was also interested in appointment to the U.S. Senate, Weingarten left town, gave up the UFT Presidency (she held the UFT and AFT Presidencies simultaneously for a good part of 2008 and the first days of 2009) and Michael

Mulgrew was installed as interim successor and soon ratified as President by the membership.

x.    Mulgrew announced the close of the infamous "rubber rooms," not because of pressure from present counsel's litigative efforts or the press, but because the April 15, 2010 memorandum allowed the DOE to go from hundreds of disciplinary cases a year to thousands of cases a year all hidden from me and the press because instead of being in fewer than a dozen sites where the warehoused teachers could be found, they are in 1500+ locations where they cannot be organized and the DOE is not revealing the roster to any outsider, even fighting all discovery pursuant to FRCP 26 demands for numbers and locations.

y.    The time was right for Bloomberg to end his term, sufficiently ending tenure, unlawfully such that whatever remnants remained could be voted away by a combination of small incentives that were not worth a lot after what had been done unlawfully and in bad faith collusion between the union and the DOE over the prior twelve years, ten of which were on this Mayor's watch.

**Bad Faith Stepwise Undermining of the Disciplinary Process So that Any Teacher can be Targeted**

40.    The 2000 amendment to Ed. L. 3020, permitted only the City of New York to replace any of the exquisite specific due process-protecting provisions of Ed. L. 3020-a by an alternate procedure specified in the DOE-UFT CBA without any restriction on what could be agreed upon and incorporated into the CBA.

41.    Before the 2000 amendment to Ed. L. 3020, the provisions of Ed. L 3020-a included that for misconduct charges an impartial arbitrator would be jointly chosen by the teacher-respondent and

the employer school district from a list of 15 qualified labor arbitrators provided by the American Arbitration Association ("AAA").

42. Already slated to go into the CBA at the time the above amendment was adopted without hearings or debate, was the change from American Arbitration Association ("AAA") offering panels of 15 qualified labor arbitrators to both Complainant and Respondent from which they jointly would select an *ad hoc* arbitrator for that proceeding who was severely limited in the number of proceedings under Ed. L. 3020-a the arbitrator could preside (maximum of four cases over two years for a given School District), to a permanent arbitrator panel.

43. This allowed a twelve year honing by not renewing the annual renewable appointments of fair and impartial arbitrators, and renewing, *ad infinitum,* pro DOE arbitrators.

44. The CBA was written deceptively to indicate that there would be a rotating panel that would rotate every four cases (the maximum allowed by the provisions of Ed. L. 3020-a as enacted). There would be attorney teams of a prosecutor and a defense counsel paired with an arbitrator for four cases and then the threesomes would be changed to have other partners for the next four cases, but the arbitrators had to guarantee that they would be available 54 days a years and would complete as many cases as possible, often clearing more than 20 in two years (five or more times the statutory limit and thus very much beholden to the DOE for continued employment).

45. The rotation was last performed in 2006, perhaps because the last new CBA was issued then, so the threesomes have become even more enured to each other over the last six years.

46. At the time the new provision was enacted in 2000 there were then a number of arbitrators who were already regularly employed at AAA rates (allowed for AAA *ad hoc* arbitrators per 3020-a but many times the rate allowed for permanent arbitrators per Ed. L. 3020-a). Arthur Riegel who had been a NYC school Principal for several decades, attended law school (perhaps at night, the school

18

he attended has a large night division) while he was employed by the BOE, Eleanor E. Glanstein, a well-established pro-employer labor arbitrator, Jack Tillum, Eric Lawson, Earl Pfeffer, Paul Zonderman, Stuart Bauchner, Howard Edelman, Martin Schulman, *inter alia*. Their arbitral styles and temperaments were well known to the DOE and the DOE wanted to keep them permanently.

47.    The old-timers have now served for over two decades;  the DOE prefers the oldest arbitrators it can find, believing that they have wound down other endeavors and are more likely to be dependent on the income from the DOE, and less likely to be as moralistic as they once may have been

48.    However, the *ultra vires* act that was not authorized by either statute or CBA, was that the permanent panel arbitrators would be paid AAA level fees, not permanent panel fees limited by Public Law to $200.00/per day.

49.    When the UFT declined to renew Eleanor Glanstein, who fired virtually every teacher over whose case she presided,[1] almost a decade ago, the DOE made the following trade; the UFT would have an extra seat on the Collective Bargaining Committee ("CBC") for as long as Glanstein presided as a member of the permanent panel.  The contract negotiated six years ago has been in continuing clause status for the last three years.  Glanstein has fired or forced to resign likely more than a hundred teachers since she was scheduled not to be renewed, but the CBC has met only for one contract and the likelihood that any important provision would be won or lost by a single extra vote is minute.

---

[1] Two who Glanstein did not fire is one who was *pro se* but at the outset filed a complaint with the first department disciplinary committee, which thereafter kept a watchful eye on the proceedings; she ordered that Guidance Counselor be suspended for six months when the educator had proven she had done nothing wrong (she was known to be absent the day someone used her logon to impermissibly change a grade); the other was a teacher who had hired a high-profile attorney active with the press in behalf of his clients, who also was only accused of nonsense; i.e. there was little credible evidence that he had even made the joking flirtatious comment in front of a gym class of 50 students of which he was accused; he also received six months with no pay.

50.   The long time arbitrators know they can pad their research hours, expenses, etc., as long as they keep firing people and the new arbitrators are given "orientation" of the stats by Defendant Europe i.e. the outcome rate of the arbitrators who are there for years and the stats of the ones that were not invited back, by them.

51.   The New York State Unified Teachers ("NYSUT"), the statewide teachers union as opposed to the UFT a local of NYSUT provides the assigned counsel to defend most NYC teachers. Neither General Counsel nor subordinate Associate and Assistant General Counsels are ever seen at the DOE hearings or chatting up the Arbitrators, as the hearings are all held in DOE premises.

52.   Defendant Europe, on the other hand, is constantly present, entering the hearing rooms, endearing herself to the arbitrators, offering advice; most arbitrators see her as their supervisor rather than that they must be totally independent of her as managing counsel for only one side in adversary proceedings.

53.   Defendant Europe has also recruited a small army of attorneys to begin with Principals to identify targets and take the process all the way from building a case against a disfavored teacher who is yet to be accused of any act or omission perpetrated prior to the lawyer being assigned to the case, to the prosecution, and settlement, or if the teacher insists, trial for which the teacher is warned will invariably result in termination.

54.   The DOE lawyers recruited by Defendant Europe have become increasingly more vicious over the past six years; she seeks narcotics prosecutors and others who totally disdain and deny any humanity to the individuals they prosecute. They intimidate the new arbitrators and ignore the rulings of the old arbitrators, introducing and going back again and again to "evidence" that was ruled inadmissable until it appears in the record numerous times, refusing to provide documents and witnesses demanded by the respondent.

55.   NYSUT attorneys rarely put up more than a perfunctory argument; only a rare private attorney seeks relief in the state courts when the DOE attorney fails to comply with a ruling and the arbitrator is fearful of immediately dismissing the cognate specification/charge but takes it on advisement.

56.   NYSUT attorneys often counsel their clients not to even make application for certain exculpatory evidence and witnesses, stating "the arbitrator will never agree to that; she'll only get angry, and the last thing you want is to rile her" (with respect to a teacher wanting her prior Principal to testify in her behalf when it was more than three years before that they worked together, saying it was too long ago).

57.   The NYSUT lawyers do not point out to their UFT clients, that the settlement always includes waiving all access to the courts for subsequent summary firing without any due process.

58.   Most often the teacher would have stayed on the payroll longer by insisting on a hearing and awaiting a decision with full access to the courts, than to agree to most of the "settlement" offers.

59.   The misrepresentation that coerces many resignations is that the teacher's license will not be taken (if they resign), but it is the NYC license that is meant and the teacher remains on an ineligible/inquiry list blocking any NYC appointment in any event, so the license is rendered worthless.

60.   New York State Education Department ("NYSED") always has to offer a separate hearing proceeding if State Certification is to be rescinded.

61.   Ousted teachers who were forced to resign by this ruse are shocked to find the NYSED writing to them requesting the voluntary surrender of the license, if the allegations were in any way related to student abuse of any kind (i.e. if the gym teacher did not hire high-profile private counsel, he likely would have had to resign or be fired and the state would have requested the voluntary

surrender of the license for an alleged, unproven benign flirtatious remark that conflicting testimony reported was either totally benign and barely flirtatious or a rhyming comment which others say they heard, which was also benign but semi- flirtatious).

62.   One of the gravest practices to be instituted *ultra vires*, i.e., is contrary to both existing law and to the CBA is the practice of Defendant Europe's attorney group advising Principals (often new, not versed in education law, as Superintendents are) that the DOE attorney will write up the charges and the specifications and the Principal shall sign them and Defendant Europe will promulgate the process should the teacher respondent request a hearing within the statutory time.

63.   This is totally unlawful as Ed. L. 2590 j.7. specifies that only the Community School District Superintendent can bring the charges (i.e. find probable cause to bring the charges).[2]

64.   It also renders the Principal into the roles of 1) complainant, 2) investigator of the charges (if the lawyers are already on board, then the Special Commissioner of Investigation ("SCI") and the Office of Special Investigations ("OSI") are not called, the lawyer guides the Principal to what evidence needs to be found or created), 3) finder of probable cause and 4) "star" witness all in the same proceeding, hardly the paragon of due process, in fact the antithesis of due process.

65.   The Community School District Superintendents were vetting the charges recommended to them and, if fallacious, the Superintendent refused to sign the charges.

66.   Previously, such instances would have been solved by reassigning the teacher to another school to avoid the personality conflict that appeared to be responsible.

---

[2] In the remaining 57 counties of the state, "probable cause" must be found by a majority vote of the entire School Board before bringing charges. Between 1968 and 1975 the cognate version of this requirement of Ed. L. 3020-a was embodied in the then in force version of Ed. L. 2590 j. 7. placing the entire disciplinary procedure under the control of the school board. In 1975, i.e. the era of the Ocean Hill-Brownsville local control of community school districts, there was a purging of white teachers (as there is a purging now of tenured and high-pay teachers) and the original version of Ed. L. 2590 j 7 was struck down and later replaced by the present version, which specifically invests that power only in the Community School Superintendent.

67.   That was now impossible with Principals being rewarded for removing teachers and with totally open market hiring, where each Principal was totally autonomous in selection of placements in her school.

68.   In August 2008, then Chancellor Klein issued a memorandum addressed to the Principals in District 75 (the Special Education city-wide District), and District 79 (the Alternative Programs city-wide District for at-risk, incarcerated, returning older students *inter alia*) authorizing them to bring their own disciplinary charges against teachers in their school.  These are the only city-wide School Districts that were not even in existence in 1975 when the present version of Ed. L. 2590 j.7. was enacted.  These two districts are not Community School Districts and do not have Community School District Superintendents, but they do have School District Superintendents

69.   Nevertheless, Klein sent the memo and stated that it was addressed to Principals in those two school districts and that it was authorizing Principals in those two school districts to sign disciplinary charges.  This was not authorized by either the CBA or any statute.

70.   ATU attorneys under Defendant Europe were already instructing Principals in all Community School Districts to sign the charges themselves.

71.   The Memo appeared to be written to be some attempt to legitimize an illegal practice that had already been widely promoted by Defendant Europe's staff to by-pass School District Superintendents who were veteran and skilled educators.

72.   Thereafter, if challenged, the DOE attorneys would come up with some convoluted argument claiming the ability of the Chancellor to invest in himself any power of his subordinates and then the further ability to delegate it to any other subordinate.  But there is no statutory language enabling said conduct, the statute is specific Community School District Superintendents.

73.    Nevertheless, when private attorneys challenge it, challenging the very jurisdiction to hold the
       hearing *ab initio*, Defendant Europe's subordinates call in supervising attorneys to help them brow
       beat the arbitrator into legitimacy of their argument as if the Community School Districts specified
       in the statute were the same as the two city-wide districts.

74.    The arbitrators are not familiar with the 2000 page omnibus Ed. L. 2590 legislation enabling NYC
       schools to have their own set of statutes.  The DOE attorneys lied to one arbitrator who then wrote
       in her decision that Bronx High Schools was District 79, and therefore it was allowable.

75.    Even when there is private counsel to discern the difference, the Arbitrators have to accept the
       DOE's argument, if they want to preside over further cases.

76.    NYSUT counsel have been told not to address the area; it is considered an acceptable delegation.
       NYSUT counsel defends NYC UFT cases the was the UFT instructs them to defend them.

77.    Even when this issue is taken to state court the state courts have taken the DOE position on this and
       in other clearly black letter law issues.[3]

78.    Where requests are made by present counsel to certify these questions to the Court of Appeals, they
       are ignored or considered inappropriate.

79.    One more experienced and renown state justice held that he did not have to consider the issue
       because his job was to validate or vacate the arbitration, the manner of who brought the charges
       in the case before him, took place two years before the hearings were held; therefore His Honor did
       not consider it part of the "arbitration" His Honor was to review.

80.    Thus, one Principal received "Principal of the Year" award in 2007; he brought charges against
       nine "bad" teachers during the 2005-2006 school year.  The "bad" teachers were accused of leading

---

[3] Including the DOE contention that if a teacher's state certificate lapses between the time the provisional certificate
expired and the arrival of the professional/permanent certificate (which arrived before the summer vacation ended and
the teacher was to return to work, the teacher is reverted to a probationer, even after having been tenured for six years
in the same license in which she was continuing).

a social studies class in singing "Eyes on the Prize" during Black History Week; not administering a standardized test for which the all teachers in the Department had repeatedly requested the materials necessary to the administer the test but were not given them until it was too late.  The teachers are no longer employed by the DOE, most with their lives in disarray.

81.     Many new inexperienced Principals from the Leadership Academy having rid their schools of veteran teachers whom they feared because of the insecurity of the veterans observing how ill prepared they were to be good educators, are now bereft of resources to improve their schools.

82.     They wind up "scrubbing" the standardized test scores to get big bonuses so they can save before they too are out of a job.

**The Role of the UFT in the Total Capitulation to the Descent of NYC Schools to Chaos and the _de facto_ end of teacher tenure.**

83.     In the 1990's and early 2000's, Randi Weingarten was very circumspect about her long-term personal partnership with Liz Margolies, a psychotherapist; the 3020 change that began the descent down the "slippery slope" was in part to protect that privacy.

84.     In the Bloomberg years the desire to retain Weingarten's private life as private diminished both by cultural changes in society at large but moreover because another circumstance overshadowed it.

85.     There came a time when Mulgrew was already in Weingarten's inner circle in pictures in Unity party campaigns etc, really helping her get reelected when he was still a special ed teacher at William E. Grady Vocational H.S. near Sheepshead Bay/Graves end in Brooklyn.

86.     Michael Mulgrew and Emalina Comacho-Mendez (a guidance counselor) were encountered by the Custodian and the Principal "_flagrante delicto_" in the woodshop of the school. They were removed from the school. Weingarten interceded and the outcome was as follows.

87.     The two DOE pedagogical employees from Grady would both resign and be given UFT jobs (even

though the woman had never been active in the UFT yet she too would be rewarded with a highly paid executive position with the UFT), there would be no SCI report, no disciplinary charges, everyone who knew (only the Principal and the Custodian actually observed them--everyone else has only hearsay knowledge, but almost everyone in the school talked about it).

88. The upper echelons of the UFT knew and strategized how to contain it.

89.  There must be some record somewhere of their removal, an incident report, a time card at the rubber room, if only, for a day.

90.  The Principal and Custodian were sworn to secrecy and denial by the DOE leadership, who also would deny it was anything but rumor, in return for all the above cited insults and injuries to the UFT membership-at-large, almost all of which would have led to a litany of litigation in prior years, and surely under Shanker or Feldman.

91.  But Weingarten had exposure for a corrupt act by covering-up for the two them and for no other of her 160,000 members, and this violating her duty of fair representation.

92.  Mulgrew was embroiled in a meretricious scandal for which anyone else would have been fired ending his career as a educator in public education.

93.  In return, the DOE extorted most of the other concessions based on not revealing these facts and not destroying their careers.

94.  When checked out with contacts at that school and at the UFT; it seems everyone including teachers who worked in Queens, Manhattan as well as Brooklyn, long retired teachers, education attorneys all knew and opposing DOE counsel who complain if a copy of a letter for an extension in a motion due date is not received by them as if it were a *cause celebre*, made no comment when it first appeared in legal papers.

26

95.   The single act which compromised Weingarten's duty to the UFT membership most, occurred in the Spring of 2008.

96.   Mayor Bloomberg was looking to renew/extend Mayoral Control and sought UFT support just as Harold Levy, (an attorney, Chancellor, who succeeded Rudy Crew, an educator Chancellor) sought UFT support to amend Ed. L. 3020 nine years earlier.

97.   The agreement made provided that nine seats on the PEP would be nominated by the UFT and UFT would support continued Mayoral control.

98.   At the last minute, Weingarten said she waived the seats, "we'll get something else later."

99.   Her closest associates were flabbergasted. One of them stated that he did not know why she changed her mind; he felt she was smarter than her predecessor Sandra Feldman, why would she cede reclaiming the power the UFT once held under Cogan, Shanker and Feldman with no apparent consideration.

100.  Only recently was he reminded that in early 2008, Hillary Clinton was looking good for the Democratic Nomination and if she won the Presidency, her seat would be vacant and someone would be appointed to serve out the remaining four years of Clinton's term in the Senate.

101.  Thus it is alleged that the agreement changed, Bloomberg would support Weingarten for Hillary Rodham Clinton's U.S. Senate seat in return for her/UFT support for continued Mayoral support. And the PEP again went to 15 of Bloomberg's loyalists instead of going to better the schools and their teachers by nine educators of high quality being appointed to the betterment of the schools, students and their teachers.

102.  Weingarten gave her personal and union's endorsement in return for her own personal political gain rather than for the gain of her constituent UFT members and the students she always avowed always came first.

103.    The most recent and final step of the dismantling, of all rights of the tenure granted to Plaintiff long ago, has been the abridgement of the UFT-DOE grievance process.

104.    The process had three steps:

    a.    The first step is presided over by the Principal. and if not resolved,

    b.    The second step is presided over by a Superintendent's delegate, and if still not resolved

    c.    The third step was for the dispute to be presided over by an independent and impartial labor arbitrator.

105.    The first abridgement was for the UFT to limit the number of grievances which would be sent to independent arbitrators, each year first to 200 and then to 100.

106.    The UFT would chose which grievances would go to arbitration.

107.    The balance of the aggrieved teachers would remain aggrieved.

108.    Finally it was agreed that letters to file and classroom observations (the most frequently grieved items as being unfair and inaccurate) could no longer be grieved.

**The Current Status of Plaintiff**

109.    Plaintiff's supervisors can enter Plaintiff's classroom at any time for any reason and write plaintiff up for whatever they wish to write and plaintiff no longer has the ability to challenge the accuracy or fairness of what is written.

110.    Plaintiff is assigned to a small High School which does not have a Supervisor of Mathematics who is competent to understand the content of the Geometry, Statistics and Applied Mathematics that Plaintiff is assigned to teach.

111.    Instead she may comment on who is wearing a hat, who had a water bottle and took a drink from it, her view of whether too many or too few students were sent to the chalkboard to display their work, *inter alia.*

112.  It can all be the minutia of "class management" for a class, that overall, is quite well-behaved and attentive, but the derogatory comments are much harder to refute, than if the content taught was criticized which if incorrectly faulted can be easily refuted.

113.  Plaintiff can then be accorded a "U" APPR for the year, and brought up on charges of incompetency by the Principal.

114.  Then there are the corrupt procedures that follow as they have devolved over the past decade.

**The Unjustified Progression of Plaintiff from Lauded Teacher to Targeted Outcast without Recourse**

115.  Plaintiff began at the school at its inception and has served with distinction for its entire history. In addition to the numerous commendations and appreciation he received, he was the teacher selected to attend special workshops and training sessions, to become Math Coach and Lead Math Teacher for a school, both at increased pay.

116.  When the school (FSSA) found itself understaffed with regard to a math teacher due to the sudden and unexpected unavailability of a Math faculty member, Mr. Ostrowsky was selected to accept a sixth class each day (for extra compensation and retirement credits).

117.  This was in addition to the full-program of the five assigned classes that is contractual for high school teachers according to the CBA with Plaintiff's union, UFT.

118.  This extra class caries with it not only additional compensation, but additional retirement credits, which shall accrue interest over the next many decades and positively effect his pension benefit rate.

119.  Only the strongest teachers who show the stamina, organization, excellent student management and above all a nearly perfect attendance record are asked to accept a longer day, another class daily,

and the additional compensation for the extra duties.

120.    Plaintiff was tapped for such assignment, quite early in his tenured career

121.    In addition, when teachers are absent not for an entire term or year but for a several weeks or

longer, and an occasional substitute providing "generic" lessons would seriously negatively impact

instruction in a course, especially if the course ended in a Regents or Advance Placement exam,

then a licensed, experienced and highly proficient Math teacher, must be found to cover the classes

and maintain the same schedule, pacing, and content as for the other sections of that class in the

school.

122.    Extra compensation is provided. Plaintiff was drafted to accept such coverage.

123.    Plaintiff was also selected by the Principal to be the School Treasurer to receive and distribute non

DOE funds for special activities, fund-raisers and the like.

124.    Plaintiff never had anything negative occur to him or have said to him until the arrival of Sofia

Apostolidis ("Apostolidis"), AP for Instruction four years ago.

125.    Immediately, Plaintiff's outstanding reputation was bridling to her, or she picked Plaintiff to be

targeted in the City-wide policy to terminate as many tenured teachers, to be replaced by untenured

teachers; a widely disseminated policy that never mentioned tenure, or salary, but which the then

Chancellor Klein repeatedly announced would replace "old deadwood" with "new young vigor."

126.    Internally, it was postured as a drive to reduce the mean teacher salary from $70,000.00 to

$60,000.000.  Five years ago Plaintiff's base was $75,000.00 and is now about $80,000.00 and he

earns considerably more in extra session assignments.

127.    At that time, because Plaintiff's record was so very laudatory, Apostolidis convinced Principal Finn

("Finn") to ask the District Superintendent to request the DOE Medical Bureau to perform an Ed.

L. 2568 exam to determine Plaintiff's "mental/psychological fitness" for duty, which if determined

"not fit" by DOE's own Medical Bureau employees, can mean indeterminate removal from the

payroll until that determination is reversed to "fit," which may be, never, simply on the signature of a single DOE Medical Bureau employee.

128.    There is the right to medical arbitration, if the employee is dissatisfied with the determination. However, the Medical Bureau selects the outside physician who earns $1000.00 for the evaluation, covets return business, and is advised of the outcome that the DOE is seeking.

129.    The Medical Bureau is the route taken where there is no possibility of sustaining a disciplinary proceeding, as there is no evidence of incompetence or misconduct (however the tactics have become far more predatory and perjurious since that time, and the disciplinary process has since been used for a former awardee of "Teacher of Excellence" personally presented by the Mayor when the medical route first taken was foiled by that teacher as well).

130.    However, in order to bring some semblance of fairness to the Ed. L. 2568 exams, the DOE allows the employee to bring a single witness to the exam and or subsequent Medical Arbitration. This was insisted upon by the UFT to prevent the "brow-beatings" and abuse that was reported to the UFT many years ago.

131.    The UFT sent lay witnesses, albeit skilled in observing these exams, but nothing changed as far as "not fit" determinations of perfectly well-adjusted and highly-functioning professional educators.

132.    Finally DOE employees began to enlist the services of eminent Forensic Psychiatrists to accompany them as their witness to the Ed. L. 2568 exam.

133.    Alberto Goldwaser, MD an eminent forensic psychiatrist has been retained by at least five DOE teachers to evaluate them and then accompany them as their witness to either the initial exam or to the medical arbitration.

134.    DOE knew said noted professionals would not offer inaccurate diagnoses and risk their entire reputations, while the physicians employed by the DOE knew their opinions could not stand up to

a leader in the discipline in any proceeding, and even the experts retained for an arbitration would yield to arrive at a consensus in discussion with an eminent and respected colleague.

135.    Thus, as soon as one of these leading forensic psychiatrists accompanied a DOE employee to the Ed. L. 2568 exam, having become extensively familiar with the employee's functioning, and able to vouch for it, the Ed. L. 2568 exam segued to a perfunctory level, everyone shook hands, the employee and the doctor-witness left and the school was excoriated for misuse of the Medical Office (although absent an eminent witness, the Medical Bureau would have been glad to comply and possibly even harass the employee into confusion and dysfunction by highly pejorative techniques).

136.    The DOE put Plaintiff through such an ordeal, or at least planned to, until Plaintiff arrived at the exam with Dr. Goldwaser for an exam demanded several months after Apostolidis arrived at the school.

137.    On information and belief, the backlash from the Medical Department to FSSA, or to the Superintendent of District 30 and from that office to FSSA, must have been severe because Apostolidis, did not target Plaintiff again for more than three years.

138.    From that time until the penultimate observation by A.P. Apostolidis Plaintiff consistently and without exception was rated "Satisfactory" on each observation she conducted, which comprised a handful of the approximately 30 classroom observations all rated satisfactory which Plaintiff received during his DOE career to date.

139.    However the observation report dated January 27, 2012 based on the classroom observation which took place on December 7, 2011, was first verbally reported to Plaintiff as rated "unsatisfactory" on December 12, 2012 at the post-observation conference.

33

140.  Before the "post observation conference", the protocol at FSSA is that the teacher is to make a self-analysis or reflection of the lesson as the teacher perceives it.

141.  Plaintiff prepared such a "reflection" immediately after the lesson and brought with him and discussed at the post-observation conference held on December 12, 2012.

142.  Plaintiff was shocked to have his recollections of a perfectly satisfactory lesson much like the over 10,000 lessons he had delivered before it, in his teaching career, so distorted by misapprehensions, misunderstandings and outright misstatements that Apostolidis stated that she was going to rate the lesson "unsatisfactory."

143.  It was to be the first unsatisfactory observation rating ever in Plaintiff's career.

144.  Plaintiff knew he was being targeted for a second time by the same one individual who had targeted him about four years earlier.

145.  Finally after almost two months had elapsed, Apostolidis' written observation report was completed and transmitted to Plaintiff.

146.  Plaintiff drafted an eight page rebuttal refuting virtually every one of its comments.

147.  Because FSSA is a small high school, there is no A.P., for each academic discipline as there are in larger High Schools, where the supervising A.P. in each Department is licensed both as a teacher holding the subject matter teaching license of the department and an administrator, holding NYS School or District Administrative Licensure.

148.  Therefore it is routine practice, in similar small High Schools that a "content" specialist assigned to that School District and the A.P. and or Principal, jointly perform the teacher evaluation observations.

149.  In fact, the consultant-specialist for Math. at FSSA, is a retired 40-year veteran A.P. Mathematics who served at Franklin K. Lane H.S., one of the city's largest High Schools.

34

150.  At this penultimate formal observation, only Ms. Apostolidis, entered Plaintiff's classroom to conduct the observation.

151.  At the pre-observation, it was clear that Apostolidis did not understand the lesson she would be observing,[4] nor did she appear receptive to being taught the operations and concepts which she would require in order to follow what the lesson's objectives and activities were.

152.  Only then could the delivery of the expectations and directions of the supervisor be fairly evaluated and so too, only then could the expectations of the educational supervisor *per se*, be fairly evaluated.

153.  At the pre-observation conference, Apostolidis did not understand why Plaintiff was introducing Bernoulli's formula two days before the day she would observe it being used. Plaintiff, explained that the understanding and applications to probabilities would take three days to fully assimilate and use, especially with the group of students in the class she chose to observe.

154.  In fact, both Apostolidis and Finn sat-in on the entire class where Bernoulli's Formula was introduced. Thus, Apostolidis should have been able to comprehend and assimilate the unit as she did sit in on the lesson (two days before the one formally observed where the basic concepts were initially taught).

155.  The concepts were taught at the level of the class which was comprised of high school students, who were not programmed for the Regents Math track because of their chronic difficulties in math achievement.

---

[4] A meeting required by the collective bargaining agreement ("CBA"), at which the observer and the teacher plan the lesson together, setting the standards, that will be looked for, and the outcomes expected, much like a film director and an actor may plan the execution of a scene from the script together.

156. The particular class was both an inclusion class (with one or more special education students "mainstreamed" into the class)[5] and was a group identified as students struggling with Math and specifically programmed away from the Regents sequence by the Principal and A.P. Guidance.

157. Thus, the attention span and cognitive retention from day to day or even from the beginning of the class period to its end that a fair proportion of the students in that class exhibit, is significantly compromised. These students have also had long standing problems with Mathematics, or with school work in general, and have developed a variety of coping mechanisms to deal with their frustrations and undermining of self-esteem that their prior attempts and struggles have engendered.

158. To the observer there is a difference in drive, competition, and reaction to being called on to recite compared to the "go-getters" in more advanced Math classes–but that difference does not negate that the Plaintiff was able to involve the entire class in a class discussion where many students contributed comments, questions and solutions.

159. The students worked effectively in pairs helping each other, grasping the concepts and operations assisted by a classmate-partner; Plaintiff walked among the students to ensure that they were doing the work correctly and assisted them.

160. For this group, Plaintiff's experience has shown pairing to be a much more effective learning experience than when the glare of the spotlight of having to risk reporting an erroneous answer or thought process to the entire class.

---

[5] See for the Individual Educational Plan ("IEP") for a special education inclusion students in the Statistics class (redacted for name and other identifying data only). Apostolidis knew the first student (as she knew all other students in the class by name), but no where in her formal observation report does she mention students by name so that she can either be refuted by those who sat near the student, or that the conduct would have to be considered in light of a disabled student's diagnosis and symptoms that could not be and should not be reproached, but instead dealt with pharmacotherapeutically or in psychological counseling.

161.  In an advanced, Honors, or other high functioning class, or even merely a Regents Class[6],ego strength is sufficient that the student tolerates the whole class watching for his response and the student is able to work through and perform as expected despite the stress of dozens of eyes; thus students volunteering answers is less important and all students can be "called on."

162.  From over a decade of teaching Mathematics to students who are alternately math averse and have difficulties with the subject or absolutely love math and find each class a delight, Plaintiff has had great success with both types of classes, albeit the class tone in each class is different and different methods may be better suited to each group.

163.  The NYC DOE teachers employ several lesson models, most often dictated by Principal preference, however, often Principals do not express their expectations.

164.  It should not be a secret when an observer walks into the room whether the teacher is going to be rated on the development model , or the workshop model, or the cooperative model for a lesson, as each paradigm widely used in the NYC schools, would have different benchmarks, use different intervals in pacing segments of the lesson and have students and teachers performing different roles, although there would be similar outcomes of mastery of the objectives of the lesson.

165.  When Apostolidis finally wrote up her recollections of the observation some eight weeks later, there was no description or comment on the substance of the lesson (which A.P. Apostolidis, as an English Teacher, would not, in any event, be competent to rate), instead she elected to focus either on trivial and irrelevant matters (one student required a trip to the lavatory, another got up to deposit a paper in the waste basket) which she negatively criticized or misconstrued, and on which no other teacher would be rated or upon which comments would even be noted, and upon which the Plaintiff had never been faulted before.

---

[6] Course culminating in a statewide Regents Exam.

166.  Any constructive criticism that a supervisor noted where greater instructional efficiency was thought to be able to be achieved, were made as recommendations, and never led to an unsatisfactory rating.

167.  Always, there is the precís of the lesson, the analysis of technique, the commendations, and the recommendations for improvement. Finally there is the grade of either satisfactory or unsatisfactory for the lesson.

168.  Likely not understanding the applications of Bernoulli's formula (the application of which was the topic of the day), nor the derivation thereof (despite her attendance at the lesson two days earlier where it was introduced), Apostolidis was undoubtedly "at sea" observing the third lesson in this aspect of probability theory.

169.  Thus, since she observed a lesson devoted to the expansion of applications of the formula in order to reinforce and cement mastery as well as to perform slightly more complex operations in probability measurements than presented in the two immediately preceding class periods. Though she attended the first lesson in the unit, she was either behaving as a distracted student not attending to what was being taught as Plaintiff was teaching her as he taught the students, or she was deliberately just looking for student comportment indicia to negatively criticize, and did not plan to pay any attention to what was being taught.

170.  She had no intention of determining her own ability to understand and apply what was being taught, or to have witnessed how the Plaintiff introduced, proceeded, nor assisted students to master the concepts involved, which was the benchmark of the example of the formal observation.

171.  She was there only to find whatever she could to exaggerate what she could make out, of students being students.

172.    Had Apostolidis come in good faith, she would not likely have come without the Math specialist

(who happens to be a now retired, long established Mathematics A.P.), but had she found herself

there alone and not really understanding the content, she could have asked one or more of the

students to allow her to see their notebooks, and she could have reviewed the  lessons preceding

the one she was observing, in order to do several things.

    a.    She would have been exposed to the instruction that came before on the subject to better

understand the content and objectives of the lesson.

    b.    She would have ascertained whether there was on-going progressive instruction, where one

lesson builds on the one before and lays the groundwork for the one to follow–one of the

most important measures of good instruction.

    c.    She would have been able to assess, by looking at the notebooks of the students how many

were actually mastering the material and which students were just going through the

motions but not preparing notes and notation that were sufficiently complete and

intelligible to allow the student to learn and use the notes to assist in being able to do the

class work or the homework or go back and prepare for an exam, usually after other topics

had intervened in the class.

    d.    However, Apostolidis did none of these things.

173.    Instead, rather than commending that not one student was late to the class, a definite measure of

adherence to class routines, the desire to be on time, and respect for the expectations of the teacher,

she faulted that four students had not yet unpacked and had their notebooks and been at the ready

when the bell rang.  They were reading the instructions as to what to do written for them on the

chalkboard

174.   The fact that the last students to arrive were already all in their seats when the bell rang, and engaged in the instructions for the lesson, when students are given only three to four minutes to get from one class to another including packing up all of their belongings from the last class, and getting to the next class, getting to their seat and unpacking their books, reading the instructions on the board for them and all but the four who were just finishing reading the instructions as to what the first task required, in order to begin to work, was already evidence, of their industriousness and seriousness.

175.   It was further disingenuous for Apostolidis to say that students were speaking among themselves.

176.   She was given a lesson plan. She commented favorably on the lesson plan (the plan would have been there to refute her comments had she derided it). The lesson plan clearly called for students to work in pairs. The students were instructed by Plaintiff to work in pairs. Of course they would talk to one another as they worked together.

177.   Apostolidis, did not read the lesson plan but commented favorably, making her entire comments arbitrary and capricious. Thus, whether favorable or unfavorable, neither had any basis, in fact or knowledge that she acquired from the lesson.

178.   Therefore, she had no basis to evaluate whether the metaphors and examples used related to the students lives, and frame of reference, and engaged them by naming their favorite celebrities, pastimes and notable events for them in constructing the metaphors and examples they related to, identified with, and thus would be easily remembered.

179.   She acquired no information as to whether the concept and derivation was adequately presented sufficiently piecemeal and explained until there was feedback that everyone was understanding how to proceed with the operations involved, and what the result meant.

180. To a seasoned mathematics educator, as would be the supervisor in a larger school (likely with at least a Master's Degree in the subject), they could come in anywhere because of familiarity with the material, and even infer any pitfalls that had been missed in the earlier lessons by observing the types of difficulties that students where having and the errors they were making, if any.

181. Not having this facility or comprehension, Apostolidis, was in the position of being theater critic to a play performed in a language of which the critic had no comprehension.

182. Therefore, rather than evaluate the substance she could only comment on the "stage directions" and "props" as she understood them. Thus, the evaluation was not on the artistic performance, but akin to whether the performers walked as many paces to their appointed places to stand just so many paces from each actor as called for.

183. While the problem with all classroom observations are that they are totally subjective and in the eye of the beholder, this one was particularly arbitrary and capricious, malevolently critical, in that present counsel who has analyzed dozens of classroom observations, has never seen one in which the final rating appeared anywhere but the end. In this observation it appears three times.

184. That is akin to a judicial decision where the ruling is announced near the beginning in the middle and then at the end, when only the final ruling at the end of the decision could be based on the entire analysis.

185. This entire evaluation was based on subjective, exaggerated, incorrect statements about student comportment parameters and, contrary to fact, comments concerning engagement in the lesson (the latter of which Plaintiff also gives the benefit of the doubt in stating Apostolidis is not competent to evaluate a high school Mathematics class, rather than accuse her of bad faith in making sure that there was no other witness to her mendacious observation report, although Plaintiff believes the latter was the case).

186. Thus, her sole focus was on minor components supporting but not central to the core instruction that students and teachers engage in together, to assure comprehension, mastery, permanent assimilation of the lesson objectives *inter alia*.

187. Further, one of the announced objectives in establishing smaller schools, is that staff would know all the students by name, and become familiar with their progress, so as to more effectively interact with each student.

188. However, this knowledge was totally ignored during the observation. While Apostolidis knew the name of each student, she did not refer to who supposedly did what, as she alleged that students were "calling out," talking, not on task, and other untrue allegations she made in her report to cast aspersions on Plaintiff's ability to maintain a cohesive learning environment.

189. Was this so that she could not be easily refuted by statements of the students named or those sitting next to named students which contradicted her allegations.

190. Finally, she took no measure of the nature of the class that she was observing. This was an "inclusion class" which meant that special education student(s) were included in the class who were given additional services outside the class to support their functioning in a general education class.

191. At least one of the students in the class has been officially diagnosed with Attention Deficit Hyperactivity Disorder for which he is being treated; another has been more informally acknowledged to have the same affliction and spectrum of symptoms and also receives the same test accommodations.

192. Current psychological practice for such students for whom one of the manifestations of the disorder is poor impulse control is to reward instances where there is evidence of exhibited impulse control rather than to heighten the anxiety underlying the behavior by taking pejorative notice of, e.g.

"calling out" answers rather than waiting to be acknowledged. Thus, while Plaintiff did within two to three minutes subtly and quietly walk over to tell the student what he had done so that he would be aware of it and endeavor to work on improving when brought to his attention in a supportive non-judgmental manner, he was not reproached before the entire class.

193.    Had this student, relapsed more than very occasionally, the action taken would have been to contact the counselor (especially if regular in-school psychological counseling sessions by a licensed school psychologist, were part of his Individual Educational Plan) or the parent to inquire whether his medication was being optimally dosed.

194.    In fact, all the students in this particular class, were placed in the class because their progress in Mathematics had shown them to be struggling, in fact previously drowning, in the Regents Sequence of Mathematics courses, leading from algebra and geometry to trigonometry and advanced algebra, which has been the time-honored sequence of mathematics preparation for higher education until the advent of Advanced Placement courses which now include two different Calculus sequences as preparation for Advanced Placement Physics, in those more scientific oriented high schools.

195.    FSSA is an arts-oriented high school, in which students compete for entry with performance auditions, arts portfolios, videos they have produced, and the like.

196.    Thus, while there are many students who are capable in all their cognitive functions and excel in the Regents Mathematics Sequence, there are also many students for whom Mathematics is not their forte and the Principal has elected to remove them from the full Regents sequence to non-Regents Math courses, both to ease their anxiety over math, but moreover to keep the cohort which does take the Regents Exams passing them with both high grades and a very high percentage of those who attempt the Regents, pass the exams.

197. Such outcomes of percent passing the Math Regents, improves the overall ranking of the school, and attracts more competitive students to rank the school high on their computerized "matching" entry applications.

198. Thus, the class that Apostolidis chose to observe was not a typical class, but a class in which many of the students are repeaters in the course, oppositional about Math, in general, from long term negative reinforcement as something in which they exhibited long-term deficiencies.

199. It is no accident, that Apostolidis elected to make her formal annual observation in a non-Regents inclusion class, where students' ability to be organized in their Mathematical thought and performance differs from the advanced classes.

200. Apostolidis knew there might be more comportment issues to negatively criticize than if a Regents or Honors or other high functioning Math class was selected.

201. Apostolidis conduct is motivated by a city-wide pressure to "purge" the higher paid teachers, who are always the tenured teachers, with concomitant bonuses and rewards going to the supervisors themselves, and to the school's discretionary budget for removing them.

202. The observation reports are so subjective that at one deposition of an A.P. supervision, present counsel read half a dozen "recommendations for improvement" sections of observation reports to a supervisor which he had written himself and asked him which he, had graded satisfactory and which he rated unsatisfactory. He got each and every one wrong.

203. He testified he had likely rated all the ones he had rated "satisfactory" as unsatisfactory and that he would rate the one representing the Plaintiff in that case as satisfactory, when that was the only one he rated "unsatisfactory."

204. He also testified that he knew from the very beginning of his tenure as A.P. that the Principal did not want the teacher that he had rated unsatisfactory, to work in that school. [The teacher also

44

returned to the school after a leave granted by a prior Principal at the same time as the new A.P. began at the school – such that the Principal had never worked before that day with either the teacher nor the new A.P., but *ab initio* the Principal did not want the teacher who returned on this Principal's watch without this Principal having a say in the matter and let it be known from day one.]

205. The mechanisms that are used to make targeted teachers vulnerable, are to observe them in their lowest performing class, where comportment and engagement are more prone to be less than optimal, to assign teachers outside their license areas and then observe them and fault them, to assign teachers who previously taught Advanced Placement, to self-contained Special Ed classes (non-compliant with regulations if there is no Special Ed license but it is nevertheless done to target the disfavored teacher) and then fault the teacher for syntax and vocabulary over the heads of the assigned students, to assign them to unconventional spaces for their class, e.g. a portion of the library where there are distractions (and the assigned class was "RAMP-up" class of at-risk students with chronic truancy, etc.)

206. The object is to always observe only the class least likely to mandate that the subjective observation, be rated satisfactory, and then to distort, exaggerate, and outright misstate what was observed holding all classes to the same standards, whether the class includes disabled students, students chronically failing and at-risk of dropping out, or the best students all headed for prestigious colleges.

207. While high expectations are universally the goal, and Plaintiff does have the highest expectations for all of his students, to be effective, a teacher must recognize that on any given day different students and different classes are at different starting points and must be taken from where they are,

neurologically, academically, culturally, and many are with severe dysfunctional caretakers and deficient home environments including severe nutritional deprivation.

208. The only place a teacher can begin with a student is where the student is at today but with hopes that with the appropriate reinforcement they can all wind up with a first class education ready to promote a lifetime of learning in a broad spectrum of areas that will enrich and better their lives and options in life.

209. Not only was the observation report in disregard of the nature of the class that was being observed, but it was a malevolent, insidious display of disregard for sound educational principles simply to discredit Plaintiff whose teaching has been above reproach for over a decade, and still is above reproach, despite this one unfair and unreasonable assault, and its aftermath "disciplinary meeting."

210. In this case it was even worse, there are misstatements in the observation report that simply did not happen the way the supervisor portrayed them.

211. The Administration then used the one erroneous observation made in bad faith, as the point of departure to many other pejorative, subsequent actions against Plaintiff.

212. Once an unsatisfactory observation is on record, an entire galaxy of "remedial" measures can be aimed at the targeted teacher.

213. These are done both to harass and to build the case that the Supervisors were supportive and attempted to resurrect the teacher in order to sustain disciplinary charges to terminate the tenured Teacher's employment.

214. Thus, there have been several "mini-observations" in which it is clear that the object is to criticize solely what is hard to refute and which is called "classroom management." Classroom management is the ability to keep all students totally on-task, never distracted or gazing around, never calling out or speaking to another student (except when directed to interact in pursuit of completion of a

46

specified task and then to have only "accountable talk" that is for the purpose of accomplishing the assigned task), all students able to complete all assigned work in the time allotted (without finishing faster than allotted so as to be ever off-task), always having completed and submitted homework when due, never nibbling any food, never doodling or reading other than the assigned passage, never passing any item to another student, no wisecracks to take advantage of situations that present themselves for a moment of humor, no getting out of one's seat without permission, *inter alia.*

215.    Such comportment to be 100% complied with by 100% of the students for 100% of a six hour and forty minute day (or longer for many students for whom English is a second language or who have other unique program schedules) for 180 days during each school year is just not going to occur. In every class there is going to be some deviation.

216.    The total subjectiveness of the means of teacher evaluation, by a narrative classroom observation report which can include or exclude anything the observer elects to report, means that any and all inevitable departures from the ideal classroom – which indeed is an ideal that is never 100% attainable 100% of the time, with 100% of the students, in 100% of the classes.

217.    Yet the favored teacher, receives an observation which totally focuses on substantive instruction and totally ignores minor student comportment deviations (and in fact if there is an incident that cannot go unnoticed, excuses themself, and explains that the observation will be adjourned to another day.

218.    For the totality of the 21st century, the subjective classroom observation has been increasingly used to target higher paid, more competent tenured teachers who are less totally submissive to less knowledgeable, more threatened younger administrators (as the appointed favorites of former Chancellor Klein invariably are), while more objective checklist instruments are used with favored teachers.

219.   When a teacher has been tenured for eight years and has been appointed in the school for 11 years as Plaintiff in this case has, the contract between the DOE and the UFT mandates only a single formal observation per year.

220.   Thus, when Plaintiff was observed on May 10, 2012 and a District Superintendent's Designee was present (Math Specialist) it was an indication that the School was seeking to rate Plaintiff Unsatisfactory for the year, as corroboration by a District Designee is required before the teacher's "U" rating will be signed by the District Superintendent.

221.   Plaintiff now tenured for eight years, could receive an unsatisfactory rating for the year, using the false observation as the basis for the rating.

222.   However, the District Superintendent's Designee Jie Zhang, while offering a few constructive criticisms, over all, made many laudatory comments about the strength of Plaintiff's skills, the exquisite preciseness of his mathematical notations.  She stated that his student worksheet-handout for the lesson was the best she had ever seen.

223.   Jie Zhang also commented that with Plaintiff's skills he should be teaching at a Specialized School such as Stuyvesant High School.

224.   However Jie Zhang was silent about any classroom management issues, there is the nagging fear that Apostolidis is being left free to expand the classroom management issue with as much negative spin and vitriol as she can muster to wrongly fault and defame Plaintiff whom she has targeted, despite the Regents Geometry class that was observed showed exemplary decorum; everyone raised their hand and waited to be called on, no students spoke to other students, ergo it was stated that the lesson was too teacher-centered, a criticism with which Jie Zhang concurred.

225.   The School Personnel File of Plaintiff which until the December Observation Report and the April Disciplinary Meeting and letter to file memorializing it, had absolutely nothing unsatisfactory about

Plaintiff's classroom teaching, now contains two adverse documents, the first in eleven years at the school.

226. The April 3, disciplinary meeting titled "classroom management" was to further build "a case" where there is in reality no case to build.

227. One of the issues that Apostolidis began to harass Plaintiff on March 29, 2012 about, concerned a student whom Plaintiff had allowed to go to the cafeteria to get lunch from period 6 Statistics class.

228. The school rule is that a student who has no scheduled lunch period, may during one of the periods that other students are scheduled for lunch (typically from about 10:45AM to 2:20 PM), go with, permission, to obtain lunch and bring it back to the class.

229. Therefore, knowing this rule, it was Plaintiff [observing that the student looked pale and was behaving in a listless manner (this student has issues that likely stem from his home and personal life which may involve lack of adequate parenting)], who allowed him to go to the cafeteria and bring a meal back to the classroom, in hopes that some food would enable him to better focus on the lesson, than Plaintiff could get him to do before the suggestion.

230. Apostolidis excoriated him for having gone to the lunchroom from Plaintiff's class was told, by her, that he might go during only one specific class period of the four or five periods allowed other students similarly without a designated lunch period may go.

231. The student had taken longer than it should have taken to quickly obtain food and bring it back to the room. Barring any unexpected queue at the cafeteria line he should have been back sooner.

232. Apostolidis caught the student as he was returning to Plaintiff's class and spoke to the student in the hall. Plaintiff was planning on addressing the issue of the length of time it took the student to return, and that he must return with the food more quickly and consume it in the classroom in the future, by speaking with the student after the class was over.

233.  Apostolidis returned with the student and told Plaintiff, that this particular student may only go to the lunchroom during the 7th period while Plaintiff's class was during 6th period. The 7th period, the student was scheduled for a Regents Review tutorial for students who had failed an important Regents exam and were preparing to retake the exam.

234.  Apparently Apostolidis felt, that even a non Regents math class, pre-empted a Global History Regents Review tutorial. She also barked at Plaintiff that she and Plaintiff would discuss it in her office at another time.

235.  The next day, Plaintiff received an emailed notice from Apostolidis that a disciplinary conference was scheduled for April 3, 2012, to discuss classroom management issues, that he should bring his union representative as further disciplinary action could ensue.

236.  Such further disciplinary action could be a counseling letter to file, a disciplinary letter to file, an official warning to put Plaintiff on notice that he is in jeopardy of getting an unsatisfactory rating for the year.

237.  At the April 3, 2012 conference, all of the feared negative actions were taken; Plaintiff was warned he could receive an unsatisfactory APPR which could lead to further disciplinary action.

238.  A disciplinary letter was placed in his file criticizing his poor "class room management."

239.  The latest assault by Apostolidis on Plaintiff has been for Apostolidis to call in one of Plaintiff's struggling students with low self-esteem, to ask him for all the criticisms he might have about Plaintiff.

240.  While Apostolidis did not explicitly promise the student any consideration for negative criticism, it may have been implied in the very nature of the transaction.

241.  It is a regular occurrence for administrators to promise that whatever is revealed could help justify his getting a passing rather than a failing grade.

242.    This is a widely used targeting technique to approach students failing the class and to elicit whatever can be elicited from them to fault the teacher especially promising to see that they received a passing grade or that they would not be held back in the grade, if they can offer some justification as to why it was the teacher's deficiencies that is causing them to be unable to pass the class in that teacher's opinion.

243.    This is a prevalent strategy in building a disciplinary case against a tenured teacher, and then to get the students to testify, even perjure themselves at the hearing on the charges against the teacher.

244.    When the student informed Plaintiff about Apostolidis conduct. Plaintiff requested that the student memorialize his meeting with Apostolidis by writing down as much as he can remember of the words spoken and answered at the meeting.

245.    A teacher who has devoted up to 20 hours a day to the school and its betterment, should not at the arrival of one person have his life set on end, should not after almost a dozen years of dedication and totally laudatory feedback for such work from everyone else, now have no recourse but to allow this person to destroy his career.

246.    All the prior mechanisms transfer, grievance, fair consideration before Community School Superintendent before any unwarranted disciplinary charges could be brought, impartial arbitrators, if charges are ever brought are gone including transfer especially for a teacher closer to the top of the payscale than its bottom .

247.    This means that Plaintiff's property interests in his very valuable tenure valued at over $8,000,000.00 for the balance of his life have been stolen from him piecemeal, bit by bit over the past decade by stealth and without due process.

248.    While rationale basis scrutiny can be defended by any rational reason, bad faith, extortion by the DOE, corruption by the UFT, conspiracy to deprive teachers of their hard earned expectation of

tenure without limitation of age, are not acceptable rational bases for denial of equal protection of the tenure laws protected in all other 57 counties of this state

249. Because Plaintiff lives in Nassau County, he specifically seeks that his claims be considered by a Nassau/Suffolk Jury and Judge beyond the reach of Michael Bloomberg's vituperation.

250. Finally, as if all this were not enough the new Chancellor Dennis Walcott, has been quoted in a video posted on YouTube, stating that there should not be hearings where "just cause" has to be demonstrated (that has not been the standard as the DOE attorneys rale for a lesser standard and have gotten it for at least six years from the arbitrator panel as it now exists), teachers should be fired when they are charged with wrongdoing (especially since Principals are unlawfully empowered to be complaint, investigator, finder of probable cause and chief witness against the targeted teacher all rolled into one.

251. Plaintiff seeks his property interests restored and protected, as they should be and would be, but for the unlawful acts of the DOE, UFT and each of the specifically named Defendants.

**AS AND FOR A FIRST CAUSE OF ACTION**

**Unconstitutionality Ed. L. 3020 as amended in 2000**

252. Plaintiff realleges and reasserts paragraphs 1 through 251 as if fully set forth herein.

253. Plaintiff alleges the 2000 amendment to Ed L. 3020 is unconstitutional as renders Ed. L. 3020-a spelling out precise due process accorded to tenured NYS teachers who are employed only by the City School District of the City of New York, inoperable, unclear, vague, was brought in bad faith specifically to do exactly what it has done, permit the wholesale termination of tenured, experienced and well educated, professional educators to be replaced by minimally educated, inexperienced, untenured teachers or not at all depriving the students of the City of New York of the teacher ratio they have benefitted from for years.

254.   Tenure is a property interest which is when unlimited by age is a very valuable asset, the most valuable asset that NYS teachers possess, that they have worked for, and that entered into their selection of a lifetime career forsaking all other possibilities.

255.   The one thing that the NYC school system has done and that can be demonstrated was already specified before the change to allow the DOE-UFT CBA to supercede Ed. L. 3020-a provisions, was to go change from the proscribed (in Ed. L. 3020-a) use of arbitrators more than four times in two years, in an effort for them to remain impartial, to a panel of permanent arbitrators already known to favor the DOE (as many had worked for the DOE in disregard of the requirements of 3020-a for more than a decade presiding over many more than the allowable number of cases).

256.   Thereafter the number of disciplinary cases increased many-fold, and the number of teacher terminations as a percent of both the number previously and a percent of the number of cases where charges were filed both increased by orders of magnitude.

257.   Though the amendment was said to be brought for efficiency though it led to inefficiency, courts have been reluctant to strike it down if it was believed it would lead to greater efficiency at the time enacted.

258.   However, we herein allege for the first time that there is evidence that it was brought in bad faith by the DOE to evade the law, co-sponsored by the UFT based on coercion and capitulation to personal extortion of the UFT President by the DOE.

259.   The statutory scheme needs to be returned to the 1999 provisions by striking down the 2000 amendments to Ed.L. 3020.

## AS AND FOR A SECOND CAUSE OF ACTION

### Deliberate and Mendacious Amendment of Ed. L. 3020 by DOE and UFT

260.   Plaintiff realleges and reasserts paragraphs 1 through 259 as if fully set forth herein.

261. Reverting to the 1999 provisions of Ed. L. 3020 would have the following lawful consequences of restoring, in part, due process and equal protection to teacher discipline and end capricious termination, defamation, and life ruining catastrophe to tens of thousands of NYC employed teachers :

a.   The "permanent panel of arbitrators" would be disbanded.

b.   All arbitrations would be conducted under the aegis of the AAA rather than the DOE.

c.   DOE and Respondent would receive the same random panel of 15 qualified labor arbitrators from the AAA.

d.   Each arbitrator should be required to submit all their decisions for the previous 10 years to a website maintained by the AAA, redacted for names of petitioners/complainants and respondents no matter who prevailed to allow informed selection.

e.   These decisions would be available to the parties who received the name of the arbitrator as a member of the panel offered to the parties by the AAA.

f.   Each party would rank and strike arbitrators on the list and return their selections to the AAA for a final choice of the arbitrator which choice would offer both parties, the arbitrator most similarly ranked by both sides.

g.   Both parties would report any problems to the AAA, rather than the DOE administering the programs.

h.   New Quarters would sought for the hearing rooms by an independent agency (the AAA premises could be used) which would invoice both DOE and UFT for rents, utilities, transcription, to that the space, etc.

i.   All requests for recusal would go to the AAA recusal committee for decision. At present all requests for recusal have been denied by the arbitrator presiding over the matter, since

arbitrators on the DOE-UFT permanent panel have cases scheduled well in advance; the arbitrator stands to loose considerable income cancelling all the days until the next case is scheduled to commence at up to $2000/day or more when travel, lodging and meal expenses are considered for arbitrators residing varying distances from the NYC venue (several arbitrators resided in Maryland and D.C.).

j.      Arbitrator rulings would have to be complied with, complaints would be resolved by the AAA including decision of appropriate sanction for non-compliance.

262.   The pre-2000 version of Ed. L. 3020 should be reverted to, and Ed. L 3020-a then rigorously enforced for the five boroughs of NYC.

## AS AND FOR A THIRD CAUSE OF ACTION

### Violations of Ed. L. 2590 j.7. by DOE; unlawful acquiescence by UFT

263.   Plaintiff realleges and reasserts paragraphs 1 through 262 as if fully set forth herein.

264.   Ed. L. 3020-a version in force when Defendant Bloomberg took office as Mayor of the City of New York requires disciplinary charges to be brought by majority vote of a deliberative body, *viz.*, the School Board typically an elected body representative of the community in which the school is located.

265.   Recently, in memorializing that the law governing the operation of the NYC Schools (Ed. L. 2590, and for this specific protection Ed. L. 2590 j. 7.) differed from Ed. L. 3020-a for 35 years, Ed. L. 3020-a was amended 2010 to begin the protections it guaranteed with the serving of the Disciplinary Charges and now is silent for the first time in more than half a century as to how probable cause to file the charges shall be determined.  The DOE

266.   Again this amendment to Ed. L. 3020-a was enacted without notice, hearings or debate allegedly solely to resolve a conflict of laws, in order quash opposition to non-compliance by NYC to the

mandates of Ed. L. 3020-a, even as superceded by Ed. L. 2590 j.7. for the five counties comprising NYC.

267.   Since the 2000 amendment to Ed. L. 3020 provides only that the CBA will supercede Ed. L. 3020-a without the individual right of election which Ed. L. 3020-a guarantees any respondent to disciplinary charges where an alternate procedure is contained in the CBA

268.   This was the case for New York City as well, as specified by Ed. L. 2590 j.7. Where the community school board was empowered to conduct the entire disciplinary process between 1969 and 1975. The community school board in the Ocean-Hill/Brownsville School District overreached and brought up white teachers without true cause (just as Bloomberg/Walcott are bringing up teachers whom the Principal does not want in the school, also sometimes because they are white, but also because they are high on the salary scale and tenured, but this time by improperly authorizing the Principal to being the charges).

269.   The solution then was to strike down the original version of Ed. L. 2590 j.7. and re-enact a version which empowered only the Community School District Superintendent to bring disciplinary charges commencing in 1975.

270.   The 1975 version of the Ed. L. 2690 j.7. is still in effect but it is not being complied with in NYC and was violated by Principals signing the disciplinary charges.

271.   At this juncture, Principals are urged to work with ATU or Teacher Performance Unit ("TPU") attorneys as soon as it is determined that the Principal wants the teacher to be removed from the school.

272.   The Principal and the attorney then prepare the documents that support the charges and then the attorney drafts the charges, and asks the Principal to sign that there is probable cause for the charges to be filed.

273.    To prevent the continued co-conspiracy between Principal and Attorney in creating the evidence that will then support the charges, and in claiming privilege over before the fact "orchestration" of wrongdoing when there is no wrong doing, several procedural changes are required to pre-empt the abrogation of due process as was embodied in Ed. L. 3020-a when the Mayor took office.

   a.    Strict enforcement of Ed. L. 2590 j. 7. with the District Superintendent carefully vetting all proposed charges and specifications prior to signing them.

   b.    Only Community School District Superintendents may sign and promulgate Ed. L. 3020-a charges in strict compliance with Ed. L. 2590 j.7.

   c.    The number of teachers for whom charges are proposed to each School District Superintendent as well as the number rejected and the number signed should be published on line, each month.

   d.    The number of teachers for whom charges are proposed to school superintendents by each Principal and the number rejected vs. signed must by published at the end of each school and significant discrepancies would be investigated between schools and districts.

   e.    Personal bonuses should not be awarded to Principals for the removal of tenured teachers from their schools.

   f.    Payroll costs should return to centralized accountability, to end the pressure to first harass and then remove teachers solely because their salary schedule advancement now places them in the upper pay grades.

   g.    For the two city-wide school districts, having School District Superintendents (but they are not Community School District Superintendents specified in Ed. L. 2590 j. 7.) also sign the charges, and only them sign the charges, is necessary to provide equal protection and due process to the teachers in those two districts as well, though it is not mandated by Ed. L.

2590 j. 7. because there were only Community School Districts when any version of Ed. L. 2590 j.7. was enacted.

h.    To prevent prosecutorial overreaching, and co-conspiratorial conduct, it is necessary that attorney-client privilege does not attach between ATU or TPU attorneys and Principals until the day the disciplinary charges are served, and that all transactions to date between the two are automatically turned over to the respondent with the service of the charges.

i.    Principals could no longer conduct themselves in such a manner as to deny teachers due process by serving as complainant, investigator, finder of probable cause, and finally star witness.

j.    Strict compliance with Ed. L. 2590 j.7. will remove Principals from the role as finder of "probable cause"; further removal from the role as investigator is also necessary to prevent bias and "orchestration of allegations"

## AS AND FOR A FOURTH CAUSE OF ACTION

**Violation of Due Process by Defendant Walcott from Urging End of "Just Cause" Requirement**

274.   Plaintiff realleges and reasserts paragraphs 1 through 273 as if fully set forth herein.

275.   Ed. L. 3020-a requires that disciplinary charges be heard by an impartial arbitrator who requires that "Just Cause" be demonstrated before any disciplinary action can be taken.

276.   Chancellor Walcott has publicly urged for the end of the "just cause" standard, stating that being brought up on charges should suffice to get the teacher fired.

277.   The video of the Chancellor urging this is to be found on YouTube using the following link **http://www.youtube.com/watch?feature=player_embedded&v=I_yOgCdh4BU**

278.   This is a total denial of due process and the Chancellor by so-stating has made tenure non-existent and unlawfully abrogated the very valuable property rights of tens of thousands of teachers

279.   Although the due process hearing has become a sham, and he is really just wanting to save the expensive fees of the hand-picked arbitrators that will say "just cause" has been found when the standards have not been met, the process must be restored to reinstitute the "just cause" standard..

## AS AND FOR A FIFTH CAUSE OF ACTION

### Violations of "Just Cause" in the conduct of the Ed. L. 3020-a Hearings by all Defendants

280.   Plaintiff realleges and reasserts paragraphs 1 through 279 as if fully set forth herein.

281.   Ed. L. 3020-a provides that the "just cause" standard be met.

282.   The DOE-UFT CBA is silent about the "just cause" standard; ergo the Ed. L. 3020-a provision is in effect and must be enforced.

283.   The NYS School Boards Association ("NYSSBA") suggests that the "just cause" standard that be adopted is that formulated in Grief Brothers Cooperage Corp. V. United Mine Workers of America, 42 LA 555 (Daugherty 1964).

284.   A seven part test is used to determine whether there is "just cause" to discipline the employee.

285.   The first prong is to establish by the preponderance of the evidence whether the respondent in the proceeding actually engaged in the conduct of which he was accused. The DOE as it conducts the hearings for the last 6-10 years insists that this is all it has to prove; despite demonstration that the NYSSBA offers as its recommended standard the full seven part test.

286.   Once having established that the conduct alleged was actual engaged in, the second and next prong of the test is did the employing Board warn the employee that the conduct could result in disciplinary action?

287. Here there are certain acts so serious that even without warning the individual must know not to engage in heinous conduct, *e.g.* felonious behavior.

288. But the vast majority of the allegations made by the NYC DOE against its teachers are often so trivial and non-consequential that the teacher was never warned nor would the teacher had ever dreamed anyone could be disciplined for said actions.

289. In one case one of the specifications of the charges was the teacher's failure to refer a seating chart as she taught the class (because the teacher had already learned all the students names) she was never warned about this nor would she have thought that learning all the students names was not superior to constantly be referring to a seating chart.

290. The third criterion of the seven part "just cause" test is whether the rule or policy is being enforced reasonably, and related to the orderly, efficient and safe operation of the school district.

291. The New York City school district has over 1600 schools; each Principal and each A.P. supervise according to their own preferences.  Therefore, the demand that the lesson plan be meticulously worked on, but then implemented without referring to the "script" in delivering the lesson is arbitrary and arbitrarily enforced; whether students may be spontaneous and cross-discuss instead of waiting to be called on and directing their remarks only to the teacher (which would make for a teacher-centered lesson which is one of the most frequent charges), what type of lesson is delivered, *inter alia* are all personal supervisor preferences, rather than necessities for the safe and efficient operation of the schools.

292. Yet failure to adhere to supervisor preferences when they have not been announced is mechanism to terminate targeted disfavored teachers, in the NYC Schools over the past decade.

293.  The fourth criterion for the seven part "just cause" test is whether the alleged misconduct was thoroughly investigated. Thus, for an experienced veteran teacher who requires only one classroom observation per school year, is this adequately investigating the allegations prior to removing a tenured teacher from the assigned class schedule.

294.  The fifth criteria for "just cause" is has the district applied its rules fairly and evenly.

295.  The answer is resoundingly, NO. Teachers are all told that they need not concern themselves with what goes on in other classrooms; it is just their conduct that is being scrutinized.

296.  But it is precisely here that the discrepancy between the favored teacher and the targeted teacher is not evident. For the favored teacher all so-called "classroom management" issues are ignored while for the targeted teacher may be terminated on these allegations alone.

297.  In the current unlawful environment of the NYC schools tenure must be enforce so that a long tenured employment does not rest on whether the lesson plan was in front of the teacher during the lesson, or whether the teacher used a seating chart, or whether enough room in the observer's opinion was provided on handouts the students where to fill in placing their answers in the spaces in the handout.

298.  To do so is to irrationally and unreasonably "set up" the teacher. The evaluation subjectivity is the problem not the teacher.

299.  The sixth criterion of the "just cause" test is whether the punishment is related to the seriousness of the offense. Discipline used to be progressive; now every teacher who does not settle with total loss of due process (summary termination without any hearing and without access to the courts after said dismissal–is always in the settlement).

300. The seventh is whether there is progressive discipline, have mitigating circumstances been considered and will the penalty deter others from similar misconduct in the future. This final prong is totally ignored; almost everyone not settling has been fired in the last four years.

301. Those who settle often are fired within the next year, or were allowed to resign within the next year as part of te settlement—but in either case, there is absolutely no access to the courts.

302. The ATU attorneys carry on that they have proven the allegations—only that should be necessary.

303. It is essential that the full seven prong "just cause" standard be re-established and enforced.

304. Comparisons to the conduct of the other teachers in the school must not be thwarted by counsel on both sides and the arbitrator as well; such comparisons should be a required part of the proceedings.

305. If demonstration that the same conduct was exhibited by every other teacher and every other class was the rule, rather than totally proscribed, more than 90% of the teachers would have successfully defended themselves and been exonerated.

306. Instead, tens of thousands of NYC tenured teachers have been arbitrarily and capriciously terminated in the last decade.

307. It has been and is nothing short of wholesale grand larceny of more than $5 million (of expected salary benefits and pension over the balance of the lifetime of each) for each teacher terminated.

## AS AND FOR A SIXTH CAUSE OF ACTION

### Arbitrary and Capricious Maintenance of Deliberately Totally Subjective Teacher Evaluations

308. Plaintiff realleges and reasserts paragraphs 1 through 307 as if fully set forth herein.

309. The only reason to maintain the narrative form of the Classroom Observation as the major means of teacher evaluation in NYC is to keep it subjective and corrupt.

310. All classroom observations should be videotaped such that the good or great aspects cannot be suppressed for a disfavored teacher, nor the moments of error or problematic student decorum suppressed for a favored teacher.

311. Extensive checklists incorporating positive criteria of teaching behavior but with room for entry of further comments must be developed and utilized during the classroom observation.

312. Observations should be witnessed by but the supervisor conducting the observation and by a teacher of the person being observed's choice.

313. Both observers would use the same checklist during the class observed.  After the class, the two observers would review the checklists, and identify all discrepancies.

314. The video tape record would be employed to assist in consensus building of what was actually heard and seen to resolve and eliminate divergent notations.

315. All defendants work together in explicit or tacit collusion to maintain the subjectivity and facilitate the targeting of unreasonably disfavored teachers and to protect unfairly favored teachers.

### AS AND FOR A SEVENTH CAUSE OF ACTION

**Deliberate, wilful, mendacious denial of equal protection under the 14th Amendment**

316. Plaintiff realleges and reasserts paragraphs 1 through 315 as if fully set forth herein.

317. While any rational reason may be put forth to justify the treatment of tenured teachers in the five counties comprising NYC as opposed to the other 57 counties of the state, plaintiff alleges that the abridgements herein alleged were not lawfully rational nor are they permissible.

318. First, when what is being denied is due process itself, as herein alleged with specificity, strict scrutiny is the appropriate standard not rational basis.

319.   Second, the "efficiency" that has been given as a pretext to hone the permanent arbitrator panel to arbitrators who are not impartial at all, it has been a pretext, as the reasons that actually led to that specific capitulation were:

     a.     Coercion by the DOE by delaying implementation of long fought for organizational grievances and class size to benefit the students of NYC, by the UFT until the 2000 amendment to Ed. L. 3020 was enacted, thereby unfairly exacting co-sponsorship of the amendment.

     b.     Extortion by the DOE of the UFT President, at the time when it was not propitious to reveal the UFT's private life in a long term relationship with a same sex partner.

320.   It was corrupt for the UFT to capitulate its members rights to protect the privacy of its then President.

321.   It was not fair representation by the UFT to allow the rights of its most vulnerable tenured members, those accused of wrong-doing, and allow rampant and wanton accusations of wrong-doing to occur to tenured teachers who had done nothing wrong, in order to promote other interests that would make the UFT appear fighting for the public interests, the students interests, and good will for the UFT leadership.

322.   It was mendacious and meretricious and well as in violation of constitutional equal protection rights for the DOE to exact co-sponsorship of the 2000 amendment to Ed. Law 3020, for the reason of undermining tenure and terminating without "just cause" whomever the DOE and the individual Principals sought to terminate.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### Deliberate, wilful, mendacious denial of due process under the 14th Amendment

323.   Plaintiff realleges and reasserts paragraphs 1 through 322 as if fully set forth herein.

324.   Plaintiff alleges that the abridgements herein of the amendment to Ed. L. 3020, the non-compliance with, and violation of, Ed. L. 2590 j. 7., the violation of the "just cause" standard required by Ed. L. 3020-a all violate Plaintiff's due process rights to maintain his tenure.

325.   These abridgements were wilful, deliberate, and knowing acts specifically to deny due process, undermine tenure rights and be able to render the tenured teacher workforce into virtually "at-will" employees.

326.   First, when what is being denied is due process itself, as herein alleged with specificity, strict scrutiny is the appropriate standard not rational basis.

327.   Second, the "efficiency" that has been given as a pretext to hone the permanent arbitrator panel to arbitrators who are not impartial at all, it has been a pretext, as the reasons that actually led to that specific capitulation were:

   a.   Coercion by the DOE by delaying implementation of long fought for organizational grievances and class size to benefit the students of NYC, by the UFT until the 2000 amendment to Ed. L. 3020 was enacted, thereby unfairly exacting co-sponsorship of the amendment.

   b.   Extortion by the DOE of the UFT President, at the time when it was not propitious to reveal the UFT's private life in a long term relationship with a same sex partner.

328.   It was corrupt for the UFT to capitulate its members rights to protect the privacy of its then President.

329.    It was not fair representation by the UFT to allow the rights of its most vulnerable tenured members, those accused of wrong-doing, and allow rampant and wanton accusations of wrong-doing to occur to tenured teachers who had done nothing wrong, in order to promote other interests that would make the UFT appear fighting for the public interests, the students interests, and good will for the UFT leadership.

330.    It was mendacious and meretricious and well as in violation of constitutional equal protection rights for the DOE to exact co-sponsorship of the 2000 amendment to Ed. Law 3020, for the reason of undermining tenure and terminating without "just cause" whomever the DOE and the individual Principals sought to terminate.

331.    When state law exceeds federal constitutional standards in the protection of individual rights the Federal Courts have always enforced the strong protection of the individuals rights.

332.    The Federal minimum standard, is just that a minimum standard; if the state has enacted a stronger protection of rights of individuals that is above the standard, the more protective standard must be applied under supplemental jurisdiction.

333.    The DOE's claim that even with the amendments, non-compliance, and violations, the minimal federal standard for constitutional requirements is being observed, should not be tolerated and the full measure of Ed. L. 3020 (pre-2000), Ed. L. 3020-a, and Ed L. 2590 j.7. must be rigorously enforced to protect the due process rights at NYS intended teachers to have them.

334.    These rights are abridged by each and every defendant in short as follows:

        a.      By the Mayor in deliberately defaming good tenured experienced veteran teachers as "bad teachers" and in implementing mechanisms to destroy tenure rights to destroy the credibility and value of the UFT, to fire 30,000 teachers who were tenured and replace them with

inexperienced less educated, untenured teachers at a savings of over three billions dollars per annum to the detriment, not betterment of the NYC students.

b.      The Chancellor by implementing the Mayor's goals and adding that anyone accused of misconduct or incompetence should not have to be heard and the DOE prove just cause for the termination or other discipline. This is especially grievous when the Principal is encourage to serve as the Complainant, Investigator, Finder of Probable Cause, and Star Witness in the Proceeding, and is rewarded both with the salary of the teacher removed as well as a personal bonus for cost savings.

c.      The Principal and Assistant Principal by orchestrating and implementing a systematic targeting of Plaintiff and by harassment, unfair observation reports, unfair and unwarranted disciplinary conference, unfair and unwarranted disciplinary letter all wilfully meant to build a case false and fabricated "case" against Plaintiff.

d.      Theresa Europe, who directs numerous attorneys and who is intimately involved herself to orchestrate said observations, letters to file, drafting of charges and hearings that deny due process and are predetermined all to terminate teachers who are merely disfavored by their Principals for personal or budgetary reasons or for personal gain.

e.      By the UFT whose consecutive leadership capitulated to all the excesses of the DOE for personal and financial (the DOE underwrites many UFT initiatives), and to gain and retain political advantage for the UFT leadership and in dereliction of fiduciary and fair representation duties of that leadership to all its member.

## AS AND FOR AN NINTH CAUSE OF ACTION

### Violation of State Laws, *viz.* Ed. L. 3020-a and Ed. L. 2590

335.   Plaintiff realleges and reasserts paragraphs 1 through 334 as if fully set forth herein.

336.   Ed. L. 3020-a specifies that "just cause" be the standard that is used before discipline can be awarded; "just cause" is not merely the demonstration that the allegations, no matter how frivolous, unfairly applied to favored and disfavored teachers, orchestrated by lawyers who have worked with that very arbitrator for six or more years on dozens of cases *ab initio* from before that teacher has been alleged to have done anything wrong, have occurred and the actor was the respondent teacher.

337.   The seven prong test authorized by the NYSSBA or an equally fair measure of "just cause" must be the standard, and surely it cannot be publically mocked by the Chancellor himself urging no hearings at all.  That would not even meet minimum federal standards much less the much more protective state standard.

338.   Ed. L. 2590 j.7. has been flagrantly violated since 2008 and has been the rule since August 16, 2008 when the then Chancellor authorized Principals to bring charges in two city wide districts.  The bringing of charges is the finding of probable cause and theat cannot be done by the same individual as the Complainant.

339.   Complainant Principals have been known to bring charges for such spurious reasons as they wanted to free the line to hire a friend or a co-congregant at their church.

340.   Ed. L. 2590 j.7. must be rigorously enforced to pre-empt the self-dealing and conflicts of interest that are the rule in NYC at this time.

341.   The DOE encourages the conflict of interest by awarding personal bonuses and discretionary use of the removed teacher's salary by the Principal.

342.  The DOE acquiesces to this flouting of the state law because of the decade long cover-ups and almost complete dismantling of tenure rights that it has allowed to accrue in the last 12 years; it alone cannot undue the wrong without a total toppling of the Unity Party leadership and lose of public prestige, acquisition of financial liability to its wronged members and loss of financial incentive to numerous DOE supported programs; thus it continues to go along in dereliction of its duty.

## AS AND FOR AN TENTH CAUSE OF ACTION

### Violation of Contractual Rights of the DOE-UFT CBA

343.  Plaintiff realleges and reasserts paragraphs 1 through 342 as if fully set forth herein.

344.  Even though the legislature was duped by the coerced cosponsorship of the amendment to Ed. L. 3020 to have the CBA supercede the due process provisions of Ed. L. 3020-a, the DOE with the consent of the UFT has not even complied with the changes incorporated into the CBA.

345.  The permanent panel was to be a rotating panel in which the arbitrators rotated which attorneys they were paired with every four cases.

346.  That was certainly no complied with at any time during the last eight years.

347.  At first, rotation occurred every fall so that the same prosecutor and defense counsel were not paired with each other or with the same arbitrator year after year.

348.  Even this was dispensed with by 2006, such that prosecutors know what is considered serious by their arbitrator and defense counsel knows what rulings are likely.

349.  Thus, working *ab initio* with a Principal, the Prosecutor knows exactly what allegations are likely to impress this arbitrator; the defense counsel does not even pursue avenues not accepted before, much less zealously advocate what is necessary to defend the respondent, even if said application

has been routinely denied in the past. Everyone goes through the motions; the only zealot is the prosecutor, who paints perfectly good and meritorious teachers as despicable criminals who must be fired.

350.     While both the UFT and the DOE are liable for non rotation, the individual who has engineered the conduct of Theresa Europe in training her staff attorneys to be increasingly vicious, intimidating to the arbitrator, non-complaint with rulings adverse to the DOE, and totally defamatory and disrespectful to the respondent teacher, is most egregious.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

### Defamation *per se* of Plaintiff

351.     Plaintiff realleges and reasserts paragraphs 1 through 350 as if fully set forth herein.

352.     Plaintiff has been teaching in the same illustrious manner as he has been for the past decade at FSSA; however he has been targeted by Apostolidis with the consent of Finn both when the former first arrived and again in the last year.

353.     Apostolidis enters his classroom more often than necessary given Plaintiff's history, and more often than warranted solely to make biased and unfair notations that she will place in Plaintiff's personnel file to build a "case" against him.

354.     Apostolidis wrote and unfair and unwarranted subjective classroom observation report and placed it in Plaintiff's personnel file.

355.     Apostolidis conducted an unwarranted disciplinary conference with Plaintiff.

356.     Apostolidis remarks at that conference with the UFT chapter present were unfairly and incorrectly derogatory, incorrect and embarrassing.

357.   Apostolidis follow-up disciplinary letter was incorrect, malicious in intent and defamatory.

358.   It was placed in Plaintiff's personnel file to build a "case" against him.

359.   The intent was malicious and therefore no qualified immunity attaches.

## AS AND FOR AN TWELFTH CAUSE OF ACTION

### Intentional Infliction of Severe Emotional Distress

360.   Plaintiff realleges and reasserts paragraphs 1 through 359 as if fully set forth herein.

361.   Apostolidis actions, conduct and harassment have been so unrelenting as to cause Plaintiff anxiety which he never suffered absent her *ultra vires* conduct in the last year.

362.   Given the aggregate allegations that are true and continuing in this complaint, Apostolidis has engendered a depressed mood of hopelessness in the most senior, most lauded, and arguably most skilled teacher in the school within recent months.

363.   This has caused agitation, stress, greater susceptibility to infection and a few lost sick days to Plaintiff who in prior years had the most exemplary attendance record, albeit even now his record is still exemplary.

364.   Given all the current conduct of Apostolidis, condonation by Finn, and at the ready to put in place all the mechanisms that the DOE and UFT have together put in place to deny any due process or equal protection under federal or state law or constitutions, Plaintiff's claims are all ripe for federal adjudication because if it continues any further Plaintiff's credibility will have been so compromised that his claims will be unfairly devalued.

365.   Plaintiff's claims are also ripe because they are recurrent and have been perpetrated against tens of thousands of tenured NYC teachers particularly during this Mayor's tenure, and are being stepped

up to reduce the ranks of NYC teachers 30,000 or more, with a net loss of greater than that many tenured, experienced, wonderful teachers while actively replacing them with untenured, inexperienced, minimally qualified new hires.

WHEREFORE, based on all the foregoing, ongoing, recurrent and actually progressing for Plaintiff, allegations Plaintiff seek the following relief.

1. Striking down and invalidating of the 2000 amendment to Ed. L. 3020 with regard to NYC and reversion to NYC's requirement to adhere to Ed. L. 3020-a as written, as was the case in 1999 and before

2. Strict enforcement of Ed. L. 3020-a and Ed. L. 2590 j.7. with school district superintendents strictly accountable for vetting proposed charges for "probable cause"

3. Striking any portion of the CBA (between UFT and DOE) non compliant.

4. Expunging all negative reports, letters, notes, in Plaintiff's Personnel file placed there in the last year to prevent further unwarranted and unfair harm progressing to violate Plaintiff's tenure rights.

5. Enjoining the NYC Schools Chancellor from urging or even suggesting the "just cause" standard short be eliminated.

6. Enforcing the "just cause" standard herein identified with departures only on approval by this Court.

7. Ordering objective means of teacher evaluation with video recording of classroom observations

8. Enjoining the direct supervision of Plaintiff by Apostolidis; Finn will have to serve as his immediate supervisor or consultants satisfactory to both the school and the Plaintiff will have to be brought in.

9, Finding all NYC Defendants have violated 42 USC 1983 by each and every one directly participating in the abrogation of due process to Plaintiff, both officially and personally.

72

10.    Finding that the UFT and its President, officially and Michael Mulgrew, individually have violated their fiduciary duty and the duty of fair representation to Plaintiff.

11.    Ordering damages be paid to the Plaintiff, in an amount to be determined by a jury but in excess of four hundred thousand dollar for each count of violation of constitutional, federal and state statutory and contract, violations

12.    Ordering damages to the Plaintiff for defamation *per se* and intentional infliction of pain and suffering from Apostolidis to be determined by a jury at trial to exceed two hundred thousand dollars for each count.

13.    Ordering reasonable attorneys fees for the prosecution of this Action.

14.    Ordering other and additional relief in favor of the Plaintiff as may be just and proper.

New York, New York
May 16, 2012                                      JOY HOCHSTADT, P.C.

                                                 Attorney for Plaintiff

                                                 300 Central Park West

                                                 New York, New York 10024

                                                  212 580 9930; 212 580 9322 (fax)

                                                 joy.hochstadt.pc@gmail.com

                                                 By: _____

                                                   Joy Hochstadt (JH 0935)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**                    **COMPLAINT**
-----------------------------------------------------------------------
**ANDREW OSTROWSKY**, PLAINTIFF

- against -                                         **DOCKET # 12-CV-**

**DEPARTMENT OF EDUCATION OF NYC UNDER THE**
**CONTROL OF MICHAEL BLOOMBERG MAYOR, IN**        **JURY TRIAL DEMANDED**
**HIS OFFICIAL AND INDIVIDUAL CAPACITY;**
**DENNIS WALCOTT, CHANCELLOR; DONNA FINN,**
**PRINCIPAL; SOFIA APOSTOLIDIS, ASSISTANT**
**PRINCIPAL; THERESA EUROPE, DEPUTY GENERAL**
**COUNSEL; ALL IN THEIR OFFICIAL AND INDIVIDUAL**
**CAPACITIES; UNITED FEDERATION OF TEACHERS;**
**MICHAEL MULGREW, PRESIDENT; IN HIS OFFICIAL**
**AND INDIVIDUAL CAPACITIES**
                        DEFENDANTS
-----------------------------------------------------------------------

## INTRODUCTION

1.   The Plaintiff makes a facial attack on the 2000 amendment to NYS Ed. L. 3020 that solely

     modifies the statute it enables, Ed. L. 3020-a, for the City School District of the City of New York

     ("DOE"), and leaves both statutes unmodified for all the School Districts in the other 57 counties

     of the State.

2.   The Ed. L. 3020 and 3020-a statutes were rendered unconstitutionally vague and subject to denial

     of the very due process they were originally enacted to protect, in violation of the United Federation

     of Teachers ("UFT") fiduciary duty and duty of fair representation to its members and cosponsored

     in bad faith, to protect the then desired privacy of the sexual orientation of the UFT President in

     2000.

3.   In order to obtain almost all later UFT concessions, the DOE extorted this and together the UFT

     and the DOE conspired to cover-up a scandal involving the currently incumbent President of the

     UFT.

10. Finding that the UFT and its President, officially and Michael Mulgrew, individually have violated their fiduciary duty and the duty of fair representation to Plaintiff.

11. Ordering damages be paid to the Plaintiff, in an amount to be determined by a jury but in excess of four hundred thousand dollar for each count of violation of constitutional, federal and state statutory and contract, violations

12. Ordering damages to the Plaintiff for defamation *per se* and intentional infliction of pain and suffering from Apostolidis to be determined by a jury at trial to exceed two hundred thousand dollars for each count.

13. Ordering reasonable attorneys fees for the prosecution of this Action.

14. Ordering other and additional relief in favor of the Plaintiff as may be just and proper.

New York, New York
May 16, 2012

JOY HOCHSTADT, P.C.
Attorney for Plaintiff
300 Central Park West
New York, New York 10024
 212 580 9930; 212 580 9322 (fax)
 joy.hochstadt.pc@gmail.com

By: _____
    Joy Hochstadt (JH 0935)