**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------

**ANDREW OSTROWSKY**, PLAINTIFF

DOCKET # 12-CV- 2439

- against -

**DEPARTMENT OF EDUCATION OF NYC UNDER THE**
**CONTROL OF MICHAEL BLOOMBERG MAYOR, IN**
**HIS OFFICIAL AND INDIVIDUAL CAPACITY;**
**DENNIS WALCOTT, CHANCELLOR; DONNA FINN,**
**PRINCIPAL; SOFIA APOSTOLIDIS, ASSISTANT**
**PRINCIPAL; THERESA EUROPE, DEPUTY GENERAL**
**COUNSEL; ALL IN THEIR OFFICIAL AND INDIVIDUAL**
**CAPACITIES; UNITED FEDERATION OF TEACHERS;**
**MICHAEL MULGREW, PRESIDENT; IN HIS OFFICIAL**
**AND INDIVIDUAL CAPACITIES**
                                    DEFENDANTS

**PLAINTIFF'S**
**DECLARATION**
 **IN OPPOSITION**
**TO DEFENSE**
 **MOTIONS AND**
 **IN SUPPORT OF**
 **ORDER TO SHOW**
**CAUSE**

--------------------------------------------------------------------

June 15, 2012

Elmont, NY

I, Andrew Ostrowsky, Plaintiff in the above action declare, verify, certify and state that the facts and statements contained herein are true and accurate to the best of my knowledge, information and belief and are based on documents, testimony, my personal experiences, and my records, under penalty of perjury pursuant to 28 U.S.C. 1746.

1) Today, Friday 6-15-12, an odd incident took place. I spent my entire day in the library carefully grading the Algebra Regents Exam with two other math teachers, Faye Ruiz and Addison Love, co-chapter leader at Frank Sinatra School of the Arts ("FSSA").

2) During the actual grading, Ms. Ruiz, acted strangely, repeatedly asked me to look over some of the questions that I graded to make sure that they were graded correctly because she did "not want [me] to get into trouble."

3) Mr. Love asked me a few times if I was feeling all right. It was very strange since I felt fine and was doing a very thorough job grading the Regents exams.

1

4) At the end of the day, as I was just about to leave the library at 3:20 p.m., Defendant Sofia Apostolidis, the A.P. of instruction at FSSA, said that she needed to speak with me and the UFT co-chapter leader/testing coordinator, Sandra Cohen about something.

5) When I asked what it was about, she said, "I will tell you when we go into the computer room at the back of the library."

6) I told her that I first needed to go downstairs for a minute and that I would be back. When I came back Ms. Cohen told me that she had no idea what Ms. Apostolidis wanted to see me about.

7) When I finally met in the computer room with Ms. Apostolidis and Cohen, Ms. Apostolidis said that it had come to her attention that I had made many mistakes in grading the questions on the Algebra Regents and that I was gazing around the room and was lethargic.

8) Ms. Cohen said that this was reported to her by my two math teacher colleagues and that she then went to Ms. Apostolidis to report this. Ms. Apostolidis, said that if you don't feel well then you should tell Ms. Cohen.

9) I stated that this was nonsense. I said that I had spent quite a bit of time carefully grading each paper and following the guidelines in the rubric and that I was feeling fine.

10) It should be pointed out that Ms. Ruiz and Mr. Love went over their own tests and found some mistakes in their own work. Why would I be singled out?

11) It is a common practice for each of the graders to review each others' work and find an occasional difference of opinion in grading.

12) In fact Mr. Love said today that after grading so many exams in one sitting he feels that he may make mistakes.

13) In 11 years of teaching I have never had any colleague or supervisor complain about my grading procedures.

14) In fact I have a letter that was placed in my file last year in which I was commended by Ms. Apostolidis for my hard work and team effort in the grading of the June 2011 Regents Exams.

15) How could all of this have suddenly changed?

16) What seemed strange also was that Sandra Cohen, UFT co-chapter leader at FSSA, whom I have known for the past eleven years, would go directly to the A.P. and not first talk to me about an issue.

17) Also before the meeting when I asked Ms. Cohen what Ms. Apostolidis wanted, Cohen claimed that she did not know. But how could she not know, if she, herself, had brought this issue directly to Ms. Apostolidis?

18) I have worked with Mr. Love and Ms. Ruiz for years grading Regents Exam papers and never have had such an odd experience.

19) I ended the meeting by saying to Ms. Apostolidis that something did not sound convincing about the story she had put forth and that something seemed very wrong.

20) I stated that I did a very thorough job grading and then said that I was leaving now to go home since I was finished with the day.

21) I followed up by sending Ms. Apostolidis and the Principal an email message explaining that once again I did a very thorough job grading the Algebra Regents exams.

22) I believe that my math teacher colleagues Addison Love, Faye Ruiz and Sandra Cohen may have been put up to staging this odd "event" by either being threatened or by being offered some sort of incentive.

23) Ms. Faye Ruiz, one of my math teacher colleagues involved in the above incident, also has acted very strangely lately about the condition of her room.

24) I share room 535 with Ms. Ruiz. I have three classes and she has five classes in the room. Lately, she has been pointing out every single mark on every desk in the room and been going directly to the dean with it. She also wrote a very exaggerated letter to the deans about the fact that my class "vandalizes" her room.

25) Recently some papers were removed from the wall and I was blamed for that too.

26) It appears very strange that she keeps picking so vigorously on the condition of the room when I never had this problem with her in the past when I shared a room with her.

27) I believe that there is a strong possibility that she was encouraged to begin to make a record, when there is no record to make; every classroom takes its toll of wear and tear from use by 250 teen age students each day. However, suddenly, it has only been my class room, that these things have been noticed and it has been only in the last few months.

28) I always check the room, when I arrive and after each of my classes, both the top surfaces of the desk-tops and their underneath surfaces, so that I can appropriately deal with any identifiable marks by cleaning it myself or by alerting the janitor.

29) In fact, what I find from other classes, I clean myself; it is those teachers responsibility to monitor and deal with the conduct of their students. I wish to ensure that my students are provided with as inviting an environment as possible that is optimally conducive for learning, that no student of mine is blamed for something s/he did not do, and where there is culpability, to take responsibility and correct the situation with the least ado so as not to interfere with the good teacher-class rapport, nor to isolate or fail to adequately support all students, even those being called to task to live up to their class-citizenship responsibilities.

30) Evermore we live in a technical quantitative world and cannot afford for even one student to become math averse, by being pejorative to any student in the presence of others. As a mathematician and a teacher, I shutter at the proportion of our society who have given up and will not do calculations, do not even try to solve quantitative everyday problems. It is

the people who can least afford it who have enriched tax preparers to complete even the simplest of returns, unnecessarily. I do not want these to be any of my students as a minimum and though FSSA is a school of the Arts, I am hopeful that many of my students found their instruction in my classes added to their interest in mastery sufficiently, that they include further mathematics study in their higher education course choices.

31) For this, suddenly I am assailed for amorphous, undocumented, nebulous and undefined deficiencies for which I was lauded for my first decade of teaching, in fact by Principal Finn.

32) This began to occur only once I became vested in my pension rights, which is now ten years; (it used to be five years previously) and once my salary rose to approximately $80,000.00, however my devotion and demands for top performance and constant growth in myself have not changed one iota.

33) If I felt unwarrantedly and unfairly beset earlier this year, it has exponentially increased in the last month to even more draconian proportions as described above and below.

34) Defendant Finn was personally served the summons and complaint in this action before the beginning of the school day on May 18, 2012 as was reported to me by the individual who served process.

35) At the same moment, the summons and complaint for Ms. Apostolidis was also left with Ms. Finn, and a second summons and complaint was mailed to Ms. Apostolidis the following day, May 19, 2012 also as reported and demonstrated to me.

36) Thursday, June 14, 2012, when I received my Annual Professional Performance Review (APPR), I was stunned to learn that the categories in which I was found "unsatisfactory" were "control of class," "maintenance of wholesome classroom atmosphere," "attention to pupil health, safety and general welfare," "care of equipment by teacher and children."

37) There were no specific instances or documentation to corroborate any of these alleged "deficiencies," whatsoever, and on this basis I was rated "U" for the year, which can lead to my being brought up on charges.

38) I was specifically found not unsatisfactory, i.e. *my performance was satisfactory* (there is no higher grade than satisfactory available see form—Exhibit 1) **in the following**

**Categories**

**Supercategory: Personal and Professional qualities**

    a. Attendance and punctuality

    b. Personal appearance

    c. Voice, speech and use of English

    d. Professional attitude and professional growth

    e. Resourcefulness and initiative

**Supercategory: Pupil Guidance and Instruction**

    f. Effect on character and personally [sic][1] growth of pupils

    g. Planning and preparation of work

    h. Skill at adapting instruction to individual needs and capacities

    i. Effective use of appropriate methods and techniques

    j. Skill in making class lessons interesting to pupils

    k. Extent of pupil participation in the class and school program

    l. Evidence of pupil growth in knowledge, skills, appreciations, and attitude

---

[1] Discovery should document the amount spent on misuse of these APPRs to bring good teachers up on charges and then fire them when the very form used for the last three years to evaluate 60,000 teachers contains an uncorrected error. We do not even know how many teachers there are and how the teacher pupil ratio has evolved during Defendant Bloomberg's control of the schools over the last nine years. We do know that he campaigned on a promise to reduce 80,000 teachers to 50,000 (but we do not know how many new hires totally were there, how many resignations were under duress, and how many teachers brought up on nonsensical charges so that no one with vested pension benefits (which usually comes later than tenure) or higher than average salaries were terminated. It is incredible that droves of inexperienced, less educated (yet to matriculate for or in the midst of the required Masters Degree and the numerous specified pedagogical courses are all superior to the veterans, many with accolade like myself.

**Supercategory: Classroom (or Shop) Management**

    m.  Attention to physical conditions

    n.  Housekeeping and appearance of room

    o.  Attention to records and reports

    p.  Attention to routine matters

**Supercategory: Participation in School and Community Activities**

    q.  Maintenance of good relations with other teachers and supervisors

    r.  Effort to establish and maintain good relationships with parents

    s.  Willingness to accept special assignments in connection with the school program

39) On all the above, I was deemed satisfactory, how can I be contradictorily unsatisfactory on "Maintenance of a wholesome classroom atmosphere" while at the same time rated satisfactory on "Professional attitude and professional growth," "Resourcefulness and initiative," "Effect on character and personally growth of pupils," "Planning and preparation of work," "Skill at adapting instruction to individual needs and capacities," "Effective use of appropriate methods and techniques," "Skill in making class lessons interesting to pupils," "Extent of pupil participation in the class and school program," "Evidence of pupil growth in knowledge, skills, appreciations, and attitude," "Attention to physical conditions," "Housekeeping and appearance of room," and "Effort to establish and maintain good relationships with parents.

40) When on all of the above, nineteen parameters, my performance was deemed satisfactory how could I be rated unsatisfactory on "Care of equipment by teacher and children" when I was rated satisfactory on "Resourcefulness and initiative," "Effect on character and personal growth of pupils," "Effective use of appropriate methods and techniques," Evidence of pupil growth in knowledge, skills, appreciations, and attitude," "Attention to physical conditions,"

"Housekeeping and appearance of room," "Attention to records and reports," and "Attention to routine matters."

41) I was rated unsatisfactory in "control of class," but if there was evidence that I possess "skill in making class lessons interesting to pupils," then there was student engagement in the lessons, which meant students were doing what they were supposed to be doing, they were working on task, if that is not appropriate "control of class," exactly what was it that is being cited as a deficiency? I would very much like the Principal to answer this in person, or if necessary on the phone but without having time to invent defenses of incidents that never happened. She already gave me the "U" in this parameter and thus, the "U" for the entire year making me vulnerable to being brought up on charges and losing my job. She ought to be able to defend, substantiate, and have supporting documentation to what she already did, without notice.

42) I was also rated unsatisfactory in "Attention to pupil health, safety and general welfare."

43) I have no recollection of any event which could measure this either satisfactory or unsatisfactory.

44) Basically, the UFT contract provides that a "U" for the APPR requires substantiation from the teacher's file, which is written on the back of the form.

45) Nothing is written on the back of the form[2] I received on June 14, 2012.

46) Further nothing may go into the teacher's file that has not been shown to the teacher and the teacher acknowledges receipt or a witness acknowledges that the teacher received it in the witness' presence but refused to acknowledge receipt. See DOE-UFT CBA Article 21A.

---

[2] Until 2009 the form required this for all teachers; the present form was changed to only require this for probationary employees. Was this in order to make it easier to fire tenured teachers by back-dating and inventing documents that did not exist but were later fabricated? When I went to the union to immediately enter my Appeal for the "U" rating (See Exhibit 2), the staff there were very surprised that my Principal would rate me "U" without any substantiating documentation cited on the back. This was on June 15, 2012. I understand that I will not get a hearing until the fall, and it I am brought up on charges I will not get an Appeal hearing at all, just the Ed. L. 3020-a proceeding.

47) There was nothing I was given on anything but class management and I totally disagree with the allegation that my non-regents tracked class was any more distractible, or had any shorter attention span, than any other class where all the students were tracked away from Regents Level mathematics (by the Principal, so that there would be higher achievement on the Regents exam for those students who were tracked for the Classes that terminated in a Regents exam) and where several students were special needs students with learning disabilities and Individual Educational Programs ("IEPs").

48) These latter IEP students had long term frustrations over their struggles, often especially with math. I pride myself in really making them more comfortable, more confident, and more willing to try to do the work and with greater success and enjoyment that they previously experienced which they reported to me.

49) Last week during period 5 the seniors at FSSA staged a prank where they ran around the building screaming with waters guns. They were running in a mob like manner and ran through the cafeteria into the court yard when they began to take off their clothes. Some of the female students were in their underwear and bathing suits. The students were spraying streams of water. The A.P. of instruction, Defendant Sofia Apostolidis, finally came out into the court yard and closed the door but did very little to stop the students from carrying on. All of this could be seen on a video that was put up on YouTube but then removed from the school's YouTube site today, Friday 6-15-12. The video ends with the students walking undressed back into the cafeteria holding cell phones and cameras which is against school rules. All throughout the video there are no security guards or supervisors monitoring or controlling the situation. I have several copies of this video on DVDs which I made before it was taken from the site and which I shall serve with the courtesy copies of this submission. I wonder what rating Defendant Apostolidis or Defendant Finn should be accorded in the categories of: "Attention to pupil health, safety and general welfare," "Maintenance of a

wholesome [school] atmosphere," "Control of [students]," and "Care of equipment[, physical plant] by teacher[s, staff] and children."

50) I believe it is essential that we learn on what parameters Principals rate A.P.'s and how Defendant Apostolidis has been rated, what are the categories in which A.P.'s are rated and are these consistent with wholesome student achievement and growth, or do they reflect goals of Defendants Bloomberg and Walcott, to merely seem to save the taxpayers money at the expense of the children of the city, while vigorously stealing the already long-vested property interests in tenure by flagrant misuse of the subjective and corrupt evaluation system and further misuse of the disciplinary based on:

   a.   An antiquated and subjectively corrupt misuse of the narrative observations in which the observers may evaluate or not evaluate whatever pleases them to note or to exaggerate or even invent and also to omit, suppress and downgrade whatever else suits them.

   b.   The loss of the ability to grieve, have expunged, removed, or corrected said observations and letters placed in the teachers file, without going to court.

   c.   Defendants who claim such necessary resort to this Court is frivolous, because most of these impending and ominous things have not yet happened to me.[3]

   d.   ATU and TPU attorneys misinform Principals that they must sign the charges, a further Attorney willful violation of Ed. L. 2590 j.7.

   e.   If confronted by private lawyers on this point, DOE attorneys display a "delegation letter," that, if lawful at all for the two city-wide school districts it is directed to, absolutely does not apply to 33 community school districts one of which I work in.

---

[3]   But they are so rapidly occurring. that I retained counsel immediately after the one and only inaccurate, unfair and incompetent unsatisfactory "Classroom Observation" in my life, because I too well know what ensues once the targeting begins.

f. Then there are the arbitrators, and we absolutely need discovery to show that over the last dozen years since the DOE went to permanent arbitrators, the pro DOE arbitrators stayed, while the fair arbitrators were let go.

g. Finally, on this tack there is another statutory provision that we wish to facially attack, as it will apply to me soon enough if this Court does not enjoin what is happening to me, and it is happening weekly to many similarly situated teachers. Every arbitration in the state of NY that is appealed under Article 75 of the CPLR, has a ninety day statute of limitations in which to petition the state court for relief. Only Ed. L. 3020-a provides that the appeal of the arbitration ruling must be filed in 10 days from receipt of the decision.

h. There are often thousands of pages of transcripts which must be read by an attorney, a petition drafted incorporating all the allegations of bias, corruption, and the special proceeding offers review on the narrowest grounds. There is often no way for the average teacher to find and retain an attorney in that time, much less have the attorney prepare and file the petition relying on the thousands of pages of testimony and other evidence admitted.

i. Most teachers utilize union-assigned attorneys for the Ed. L. 3020-a hearings because the cost of preparing a defense and representing a teacher at hearings that may last six full days or more, is prohibitive to most teachers. Thus, they must find private counsel for the first time when the decision, is issued. The union does not provide for prosecution of either Article 75, or Article 78[4], only for defense, when the City opposes the Arbitrator's decision and only if assigned counsel won the arbitration.

---

[4] It was on very rare occasions that are one every five years or fewer that the union prosecutes an article 75, when there are hundreds of teachers who have valid reason to allege that their arbitrators were biased against them.

51) By the time my attorney was able to file the Article 78 merely to object to the wrongful observation, a disciplinary conference was scheduled "re: my classroom management" (I am 36 years old; my class room management skills have not deteriorated from when I was 25, 26, . . .34, 35), in fact they have improved with experience.

52) Further, the standards of the DOE have not been raised as the defendants would like to argue, and that I no longer meet these new standards.

53) The pre-textual standards or even possibly intended standards of motivating students, cheering them on to greater achievement, and engagement in what they are doing are not being practiced nor incentivized.

54) Defendant Bloomberg and Former Chancellor Klein announced the training of "bottom line" business achievers to be Principals at a Leadership Academy, but what is alleged to be taught there is how to fire teachers.

55) With incentives (actual bonuses) for lowering total costs, or payroll costs which are the greatest component of total costs, there has been a targeting of the best veteran teachers, the best biologists, historians and mathematicians like myself, with the most comprehensive graduate education, ergo moving to the right on the salary with further graduate studies.

56) This is not a nebulous allegation; head counts have been taken again and again by teachers awaiting their fates, when the DOE did not yet see the danger of putting hundreds of teachers awaiting charges and awaiting hearings in one room. We already know that the "reassigned" teachers had higher salaries, more Ph.D's more experience than the NYC public school teacher workforce as a whole.

57) Klein's answer to that is that they were "deadwood," "set in their ways," unmalleable." But the truth of the matter is that the Ph.D.'s had fewer years of service than the non-targeted or the targeted non-Ph.D. teachers. The Ph.D.'s attained tenure in higher proportions than the total teacher workforce, yet they were also targeted at probably twice the rates of non-PhDs.

58) The inexperienced non-educator Principals are likely most threatened by this cohort not by anything they do, but what they know, their intelligence and the Principals' fear that the Principal's dearth of pedagogical skills and experience for their position will be most easily discerned by this segment of the teacher workforce.

59) Moreover they begin and end with a salary that is always $11,790 more than entry level teachers without graduate study and that will always be or $6,176 more than the Master's Degree minimum for permanent or unconditional tenure.

60) Non-Ph.D. teachers can also earn the top educational differential by completing additional coursework beyond the Master's degree to move them all the way to the right on the salary schedule and earn the $11,790, educational differential and the $6,176 increment beyond the Master's Degree required for unconditional tenure, as I have done.

61) Was anyone else targeted at FSSA? What was their performance history; what is their tenure, pension and salary history? These things need to be revealed before Your Honors can discern valid policy from unlawful agenda.

62) We need discovery to prove that the rate at which teachers with the $11, 790 differential are targeted compared to minimally educated teachers with the same experience and record.

63) Is this what Defendant Bloomberg means by "recruiting the best teachers," "the best least educated teachers to save money as Principals are given incentives to save money?

64) Is this what New Yorkers want for their children, in order to save huge sums for Defendant Bloomberg's economic peer group?

65) The disciplinary conference described in Paragraph 51 was actually held the day the Article 78 was served. The follow-up letter to my file of what the Defendant Apostolidis inaccurately stated at that meeting was memorialized in a letter to file before this instant

matter could be filed and served.[5]  By the time all Defendants could be served and a Rule 16 conference requested, Defendants had both accorded me a "U" for the year as well as simultaneously providing me with the observation attended by the Math specialist which was rated "S" (ergo the only observation I was ever rated "U" in my life was by an English teacher who omitted any reference to the content of the lesson or its delivery).

66) I can be brought up on charges and City Defendants Walcott and Bloomberg say I should be fired without due process of "just cause" being demonstrated.

67) Yet for teachers who wait until the literal army of Attorneys in the Administrative Trials Unit ("ATU") and Teacher Performance Unit ("TPU"), who have been hired solely to build cases for Principals, direct the Principals to issue disciplinary letters which the lawyers draft (my lawyer has proof from another case where Discovery was allowed), orchestrate the Principals' every move and develop a litany of carefully crafted and documented "evidence" to destroy the credibility of the teacher, has meant that to date even Article III Judges resist "taking on" these Defendants by delaying the initial phases (another case in this Courthouse an Action filed in November 2009, still is Staying Discovery).

68)  That is why it is essential, that this Court move on to Discovery of whether ATU and TPU is already involved in my case, and even if not, at what point have they gotten involved in similar cases?

69) Will they pick it up over the summer?  If they are involved, was it before or after my first and only "U" observation after 11 years in this school?

---

[5]   There was a delay in serving two defendants, because inadvertently, summons were not issued for those two defendants on May 16, then they could not be issued before the case was entered into the Long Island computers, and another delay before the matter was returned to Brooklyn despite my opposition to that occurring, and finally the lunch hour relief at the Corporation Counsel, took both summons for one defendant and returned both summons for another defendant along with the complaint for that defendant and the office assistant who served process dutifully carried back to my counsel's office what she was given, thus one defendant was still to be served.  Since that Defendant was the DOE itself, my attorney waited for that service to be effected before requesting a Rule 16 conference and possibly pre-empt entirely the several motions we now oppose.

70) Was it an ATU or TPU Attorney who had Defendant Apostolidis hold a disciplinary conference on "class management" and write the letter to file that she wrote, and that I no longer have any administrative means to protest except in a state or Federal forum?

71) Was my Principal instructed to give me a "U" on the APPR?

72) Was she instructed to "set me up" further, during Regents grading period, because the District Representative judged the lesson she observed "satisfactory," but for which she was supposed to "corroborate" the school's intent to rate me unsatisfactory?

73) Therefore, was Defendant Apostolidis told that she had to find something to do quickly to get another letter into my file, when I was rated "S" when observed by the Math Specialist for the District?

74) We need to hear from Jie Zhang, whether she was invited to corroborate the "U" rating for the year, but said she observed a "satisfactory" lesson.

75) If so, then what animus of Defendant Apostolidis, would cause me to be rated "U" anyway?

76) The teachers whom I strongly suspect complained on prearranged cue, must be called to testify immediately (preferably *in camera*, before they are threatened or bribed to make sure they perjure themselves in order not to be accorded a similar fate).

77) There should be <u>no</u> attorney-client-privilege to an effort where the attorney is the prime-mover in orchestrating the slander, libel and defamation of a teacher. This Court must not go by the precedents set against teachers who approached the Courts only when they were removed from the classrooms or already fired and there has been years to discredit them, albeit, in most cases, unfairly.

78) **There can be no worse denial of due process than prosecutors who frame the targets of the cases they are assigned.**

79) **No one knows this better than my attorney, who by some providence went through the entire process. Luckily, the UFT knew of her case, did not interfere, but sued in**

15

her behalf and she wound up with a settlement that had a total value of more than twice that which was reported by the DOE to NY1, which then broadcast it.

80) The experience not only provided her a niche practice in which she is oversubscribed but in which she has nevertheless, has had operating losses of amounting to much of the settlement trying to help teachers "buck city hall."

81) She has even been wrongfully sanctioned (a Rule 1727 assessment for an attorney's very first case brought for a client in Federal Court) but had to abandon the Appeal because she put her clients work before her own (having only 24 hours in a day).

82) The Appeal in the second must be submitted on June 25, 2012[6]. When asked why does she persist in the face of such *ad hominem* assault, she says and this week-end, smiled as she stated, "I'll find a John Sirica, albeit 40 years later."

83) She harbors no ill will to the DOE who paid her well for its treatment of her.

84) She feels great gratitude to the UFT for prosecuting an Action in her behalf, and has real feelings of sorrow that the tabloids exploited her need to include the union so that Discovery would be kept honest by comparing the production of documents, interrogatories and

---

[6] On information and belief, my attorney and her co-counsel prepared the 4th Amended Complaint in Adams et al v NYSED, at the request of Magistrate Andrew J. Peck, who said he wanted only further association of each of seven plaintiffs and nine defendants (five state Defendants affiliated with NYSED and four City Defendants) with the causes of action (i.e. who were the plaintiffs for each cause of action, who were the defendants for which cause of action and which of the ten Right to sue letters applied to each of the above associations. The penultimate draft was prepared by 11:09 PM on the day it was due. My counsel said that she approved it.. Then she was told that even an amended complaint could not be uploaded to ECF in the SDNY, thus co-counsel was taking the final version to the Courthouse at 11:35 to stamp it in before midnight which was emailed to her at 11:30. It was 116 pages, 626 paragraphs before the 10 pages of *ad addendum* clauses. My attorney had not slept the night before as she was preparing her very first Petition in the Supreme Court of the United States for a Writ of Certiorari to the Second Circuit Court of Appeals. Therefore she drafted the letter to the Adams Court explaining as requested by co-counsel that they could not upload it and therefore it was being left for the Clerk, faxed the letter to both District Judge and Magistrate and went to sleep.. My attorney never knew that at the very last 20 minutes before leaving for the Courthouse had added a paragraph making a claim for 13th Amendment relief because the draconian rubber rooms were monitored in four different modes, were infested with vermin (cited by PESH), caused respiratory diseases in almost a third of the reassignees who were blackballed from working elsewhere and thus it was akin to indentured servitude well establish as coming under 13th amendment. The Magistrate brought *sua sponte* Rule 11 sanctions because not knowing the one paragraph claim was there the suggestion that it should be removed was not comprehended by my lawyer and although she defends it it was not intentionally but because she did not know it was there that the Magistrate sanctioned her $21,000.00 reduced to $10,000.00 by Judge Marrero. At attempts to stay the payment until the Appeal was heard were denied and because co-counsel left the claim of hostile work environment which is equally appropos, but co-counsel could not raise funds for his sanction he is being held in contempt and being referred to the SDNY disciplinary committee. .

testimony in which for both sets of Defendants where both were involved. Most of all, however, how did it come to be that the acknowledged, strongest, richest, most powerful teachers' union in the nation wound up giving away all of the due process rights embodied in state law, protecting the property interests of its tenured members worth more than $3,000.000.00 per teacher (based on average age, salary and life expectancy for pension payout) and $4,000,000.00 to $5,000,000.00 (if the cohort which has been terminated or coerced to resign by false promises that they could then find employment as a public school teacher elsewhere only if they resigned and were not fired, are considered without including the entire teacher workforce).

85) Yet all the tiny unions in the small districts in the other 57 counties of the state managed to retain their rights as embodied in Ed. L 3020-a.

86) Even where Ed. L. 2590 applies to NYC, those protections have not been complied with; they have been ignored in order to wage war aimed at destroying the vested state protected property interests of already tenured teachers.

87) My attorney tells me my case is "ripe" both from the rapidity of the harm that is accruing to me, and that this is a repeating pattern that Discovery will show is occurring every day to thousands of teachers a year.

88) How many teachers have been given "U" year by year in the last two decades only one decade of which has been under the administration of Defendant Bloomberg?

89) How many teachers have been brought up on charges?

90) What were the specifications of the charges that caused these "bad" teachers to be terminated or at least to be fined an made into Absent Teacher Reserves?

91) What specifications merited termination, two decades ago, a decade ago?

92) What were the hearing officers' rates of termination? What happened to the hearing officers with a low rate of termination or with a significant rate of acquittal?

93) This Court may not be able to go backward to protect the tens of thousands of teachers whose property interests were stolen—there is no other word for it—but it must stop the continued "takings" without "due process" and continued violation of already tenured teachers property interests in the benefits of their tenure must stop before my rights are stolen more than they already have been.

94) Therefore, the defendants must all be made to answer the complaint immediately.

95) Discovery must be commenced forthwith with my Order to Show Cause this week and with a Rule 16 conference ASAP to schedule that discovery.

96) The Motion to Dismiss should not go forward, we have no interest in probing the personal lives of anyone, if the Defendants can offer credible alternatives to why NYC UFT members alone have lost all the rights they had 13 years ago, while that has not occurred elsewhere in the state.

97) The defendants will have ample opportunity to state their positions with a Summary Judgment motion.

98) We posit that the Defendants are more afraid of Discovery than they are of losing the case.

99) We further posit that if there is Discovery and the Defense actually has to produce documents, witnesses, answers and admissions under oath, and not be allowed to object to every demand as being over broad and over burdensome, then they already know that they cannot prevail.

100) To reiterate, on this week-end particularly, my attorney seeks, and prays for a John Sirica-like court in this Court to protect my rights, my career, my livelihood, to restore my spotless reputation.

101) I wish to learn why was I targeted? Why was I given three rooms to race to my next class and then set-up to hear that there was a paper left on the floor by a teacher who works only in that room and no one but the janitor follows when she leaves for the day.

102)	Why was I suddenly assigned classes with struggling, frustrated, easily distractible students, some with IEP's indicating they are classified as disabled (either emotionally or cognitively, since I observed none with physical challenges)?

103)	The Magistrate can more appropriately use Judicial resources to hear arguments on the appropriate breadth or burdensomeness of our production demands than to hear that the complaint is prolix (if it were less detailed, my lawyer says, there would be "Iqbal" and "Twombly" objections as well).  In fact, it could be more detailed but the allegation of prolixity would be even more pronounced.

104)	We suggest before a motion to dismiss is entertained that the Defendants be required to demand a more definite statement or it be demanded *sua sponte,* on any aspects of the complaint that the defense or the Court, so desires.

105)	 We have the data, the proof of how many times in the past each of the abridgements of due process has been perpetrated (that we know of) with witnesses documents, specific acts and statements.  It can be all be provided to demonstrate the pattern of illegality that has begun for me already and continues, day by day.  And that is precisely what the Defense seeks to avoid.

106)	The substantive difference between myself and the thousands of others to whom this has occurred, is that I was not in denial until it was too late to have retained sufficient credibility to show the incipient wrongs that constitute an ever repeating pattern, and that have informed me what is in store for me, and that is accruing very rapidly to inflict irreparable damage.

107)     Thus, I bring to Your Honors these wrongs as they are being perpetrated each day, and not after the fact.

/s/

_____

Andrew Ostrowsky