*Joy Hochstadt, P.C.*
*Attorneys at Law*
*300 Central Park West*
*New York, New York 10024*

June 18, 2012

The Honorable Ruth Mauskopf
United States District Judge
The Honorable James Orenstein
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 10024

                                           Ostrowsky v. Department of Education *et al*
                                           RE: Opposition to Motions for Stay of Discovery, Extension of Time to Answer

Dear Judges Mauskopf and Orenstein:

       In addition to my letter to Your Honor (the Magistrate) on June 15, 2012 making application for an extra day, due to developments that were occurring as I was writing my response, and in which, I began my response (that request was never denied and a substantive ruling was made while that application was still *sub judice;* that is not fair, today is not over and it is the first day that the Court is in session–I respectfully request until the end of the day). I offer this letter of rebuttal and opposition to the letters of opposing counsel, along with the Declaration of Plaintiff filed earlier today (with two exhibits therein affixed), the Motion brought by Order to Show Cause for the "U" annual rating of Plaintiff which necessitates immediate testimony of Defendant Apostolidis and Defendant Finn to defend said rating before the DOE attorneys can "develop evidence" and coach these witnesses and the Application for a Rule 16 conference in lieu of a Motion to Dismiss comprising my opposition to all stays in Discovery and stay in pleading an Answer. The latter two applications to the Court shall be made later today or during the overnight.

       I am at 12:46 PM submitting what is complete at this time within minutes of reading the ruling to which I have the strongest objections, and will continue to work and ask further reconsideration with a full document later. It is totally unfair that a sole practitioner is not given a a single day of extension, was not denied that day, and while that application was *sub judice,* a ruling is made when my opponents each are employed by firms of 1000 attorneys and about 50 in each of their employment departments alone.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,**    **Telephone 212 580 9930**    **Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court**    **e-mail joy.hochstadt.pc@gmail.com**

While Law Department Asst. Corporation Counsel can be fierce and unrelenting adversaries, I have never found them to suborn perjury, draft "evidence" that is back-dated and alleged to have been part of the record, or entrap plaintiffs in clearly staged incidents (as occurred to Plaintiff on Friday). Unfortunately, I cannot say the same about DOE attorneys, particularly Attorneys in the Administrative Trials Unit ("ATU") and Teacher Performance Unit ("TPU"), which is the reason why these two Defendants must be called immediately to defend the "U" rating that Plaintiff was accorded.

I also wish to reassert the reasons why all the claims against both the City and UFT defendants are both timely, ripe and that plaintiff has standing to bring these claims, thus avoiding a long and unnecessary motion briefing process which taxes both the Court and the Parties.

Moreover, after having re-described to the Court the present status of the unconstitutional demise of teacher tenure to NYC teachers alone, who have long-vested property interests in their tenure, a demise that has been both by *de facto* and *de jure* mechanisms, both we assert has been in bad faith, (and we shall show numerous instances where the private sector has acted more responsibly than these defendants under color of state law), I respectfully request that the Court instead, convene both a Rule 16 Conference to go forward with the matter at hand and a plenary hearing for the Order to Show Cause we are also submitting to justify the "U" rating that Plaintiff has been rated for the entire year, that we allege is without basis, yet leaves him subject to being brought up on disciplinary charges and fired.

As to the points made by the letters on behalf of the City Defendants and UFT Defendants, I shall address them each in order.

First, the City Defendants inference that because the 2000 amendment to Ed. L. 3020 was enacted before Plaintiff was employed by the DOE, ergo he has no standing to protest its Constitutionality because he began his employment after its enactment. Either the abridgement of due process by a vague substitute (as long as both sets of Defendants agree, anything goes)[1] for an exquisitely specific state law protecting the due process rights of tenured teachers, either it is too vague to substitute for the due process that the State intended to accord its tenured certified teachers or it is not. If City defendant's reasoning was valid, no constitutional challenge could ever be made after the time a law was enacted by a claimant to whom it did not apply at the time of its enactment and many challenges to abridgement of our fundamental rights would have been dismissed for lack of standing (*cf.* Lawrence v. Texas, 539 U.S. 558 (2003); Loving v Virginia, 388 U.S. 1 (1967), *inter alia ad infinitum.*

---

[1] Further, provisions agreed upon by memorandum between the ratification of the typically 3-5 year contracts are incorporated into the contractual terms without ever being subject to ratification of the membership.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,    Telephone  212 580 9930    Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2ⁿᵈ Circuit & U.S. Supreme Court        e-mail  joy.hochstadt.pc@gmail.com**

There is a difference between invoking the equal protection clause, when the issue may be the right to paint your house pink in the five boroughs of New York, when it is allowed in the other 57 counties of the state, and the sudden voiding of the procedural due process access to a plethora of fair and objective safeguards from the initiating of the complaint to, finding of probable cause, to selection of a fair and impartial hearing officer/trial, and the right to a full *de novo* appeal after being given adequate time to prepare.

The equal protection to the same procedural due process rights that were available in NYC before 2000 and are still available to the rest of the state to maintain and not suffer total loss of the greatest asset that any tenured teacher must be accorded strict scrutiny and not the rational basis of (anything goes if its in the CBA) that may be appropriate for allowing or forbidding pink houses, but cannot be allowed in deciding whether the same person is allowed to be complainant, investigator, finder of probable cause, and star witness, before a hearing officer who has been screamed at *ex parte* by a Supervising DOE Attorney (Dennis Costa) "You'll do what we want you to do or you will be very sorry" to which a former UFT staff member shall appear and testify.

Thus, what has occurred, is that the rest of the state has a deliberative body rule after majority vote on whether to bring each charge. NYC is supposed to have at least a Community School District Superintendent to find probable cause, but unlawfully and in violation of Ed. L. 2590 j.7. Principals who receive personal money incentives for removing teachers from their school and bringing them up on charges are the one complaining (and being rewarded for doing so). ATU and TPU lawyers guide the Principal to investigate (which means to orchestrate documents to satisfy the lawyer's standard of sufficiency), then are urged to find probable cause by the same Attorneys whose sole role is to prosecute teachers that they can get Principals to bring up on charges; and finally the Principal is the star witness at the hearing where on cross-examination the Principal testifies that the derogatory letters were drafted by the prosecuting attorney and I have the transcripts to prove that is the case.

The 2000 amendment allowed the conversion of a process where the American Arbitration Association ("AAA") provided a panel of 15 qualified labor arbitrators and the DOE and the Teacher each ranked and struck to show their preferences and returned the "cards" to the AAA which then selected a hearing officer who was as best as could be determined by a computer algorithm, currently, a hearing officer which opposing parties liked or disliked equally (see Ed. L. 3020-a 3.b.(i),(iii)) to the DOE's "policy" of a permanent hearing panel which was the reason that the 2000 amendment to Ed. L. 3020 was made. See Exhibit 1 Dkt #14. It is clear that the legislature is being kept from knowing the true purposes of the amendment. This is my reasoning. 1) In the 12.5 years since the amendment the change Article 21G as seen in Dkt #14 Exhibit 1 has been the only change in the CBA that has ever been made; 2) Both sets of Defendants knew in advance what they planned to change, as evidenced in Dkt # 14 Exh.1 before they went to the legislature; 3) Therefore why did not they just put Article 21 G before the legislature if that is what they planned. I posit that is would not have been enacted. Thus, either or, both parties wanted it; or the UFT was coerced as in the two

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,    Telephone  212 580 9930    Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court        e-mail  joy.hochstadt.pc@gmail.com**

penultimate paragraphs as explained in Docket #14, Exh 2. But then one wonders why would they announce such a coercion and *quid pro quo* in a document to be widely distributed? Unless the public announcement of some coercion was orchestrated to cover-up and protect a more serious coercion. This means that both UFT, and DOE were willing to co-operate with relying on the then current arbitrator panel which had been well-honed over more than a decade, and included at least one former Principal who went to law school while he worked for the DOE and then either immediately or sooner after joined the panel and is still there (*i.e.* Arthur Riegel), on information and belief a member of the Mayor's office (or on a major Mayor's advisory panel) was another arbitrator. Eleanor I. Glanstein is an arbitrator who always decides the way the DOE wants her to decide, irrespective of the evidence put before her. Because of this the UFT wanted to fire her, not too long after the 2000 amendment to Ed. L. 3020 was enacted. The UFT wanted her off the panel. The DOE offered an extra seat on the Collective Bargaining Committee (CBC) for a long as Glanstein continues to preside over Ed. L. 3020-a cases and Arbitrator Glanstein is still busy doing the DOE's bidding almost a decade later.

I'm sorry, but that is an illegal contract for the DOE acting under color of law to offer something "presumably" of value in exchange for retaining someone known to both sides as *NOT impartial*. Now, the bargain is not only an unlawful deliberate attempt to abridge the due process rights of NYC tenured teachers under color of state law by Municipal Official, untrusted with enforcing constitutional rights for NYC residents, but it is a wan bargain and has little value. Glanstein used to be able to fire or get to resign at least a dozen people a year.[2] Now with longer hours, 20 extra days, and more abbreviated trials, she can get rid of twice to thrice that number).

The Ed. L. 3020-a also provides that no single hearing officer is allowed to preside over more than four cases in two years for a single school district in two years. This is turned on its head when the DOE and UFT hire permanent arbitrators who become more and more economically dependant on continuing with the DOE. The hearing officers seem to be getting older, not only as they age with long tenure as hearing officers into their 70's and 80's but the new hires as old. Does the DOE seek hearing officers who will prefer or need the easy work, ability to work two days a week, and yet earn

---

[2] Eleanor Glanstein finally exonerated a special ed teacher who restrained a child having a violent tantrum. The child had a history a of such violent outbursts. The teacher, Gail Friedman, held the child bent over a table to immobilize him and prevent him from injuring himself and others. Even in this position he was kicking wildly. Thus, Ms. Friedman, removed the child's shoes so that it was less likely that his kicks could cause serious harm. This is an example of the viciousness of the prosecutors under Defendant Europe's direction. Nancy Ryan the ATU Attorney who has been assigned to Arbitrator Glanstein for approximately nine years (the CBA Article 21G calls for rotation every four cases; there has no rotation for six years). Ms. Ryan's mantra about the shoes went something like this. You are guilty of corporal punishment. You touched the student; that is corporal punishment, you must be terminated, You took off the student's shoes, that is corporal punishment; you touched the student's feet; that is corporal punishment, you must be terminated; removing a students shoes is assault; you must be terminated and criminally prosecuted. Ms. Ryan also adopts the meanest of accusatory tones.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,**     **Telephone 212 580 9930**     **Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court**     **e-mail joy.hochstadt.pc@gmail.com**

up to $2000/day or more including expenses, and thus really covet the job[3]. It is If you receive compensation from NYIT in whatever form from this point on, by either remaining in place or executing a termination agreement or settlement that exceeds $20,000 (the amount they have offered you to date exclusive of the EEOC claim), I shall be paid 1/3 of the amount which exceeds the $20,000 or a minimum of $3,000.00 whichever is greater, to be paid either at the time you resign or, at the rate of $1,000 per month for the months you continue to work in each of February 2012, March 2012, and April 2012, and $2,333.00 per month for each month beyond May 2012 that you remain employed by NYIT. If you receive compensation from NYIT in whatever form from this point on, by either remaining in place or executing a termination agreement or settlement that exceeds $20,000 (the amount they have offered you to date exclusive of the EEOC claim), I shall be paid 1/3 of the amount which exceeds the $20,000 or a minimum of $3,000.00 whichever is greater, to be paid either at the time you resign or, at the rate of $1,000 per month for the months you continue to work in each of February 2012, March 2012, and April 2012, and $2,333.00 per month for each month beyond May 2012 that you remain employed by NYIT. .

Another first and foremost is, let us dispense with the notion that <u>Cleveland Board of Education vs Loudermill,</u> 470 U.S. 532 (1985) is controlling in this case. That decision sets a minimum in states where the State itself has not enacted stronger individual due process protections, while this state has stronger statutory protections in place, *viz.* in Ed. L. 3020, 3020-a.

Further, neither the legislature, nor the UFT could not have understood the bad faith intended ends motivating the DOE, when the vague 2000 amendment to Ed. L. 3020 [allowing the UFT-DOE collective bargaining agreement ("CBA") to replace any and all provisions of Ed. L. 3020-a without an individual right of election provided by Ed. L. 3020-a utilized by all other NYS counties] was enacted without debate or hearings, simply because of co-sponsorship by UFT. UFT co-sponsorship was only after documented coercion (see penultimate paragraph, Exhibit 1). I further learned in the last 10 weeks, that alleged extortion by DOE (concerning the private life of then President Randi Weingarten) was either in addition to the coercion identified in Exhibit 1, or Exhibit 1 represents pretextual coercion to cover-up the more serious extortion.

We know that the legislature neither knew nor would have approved of the intended unlawful misuse use of the disciplinary process to "purge" tenured but disfavored teachers by a progressive "packing" of the permanent arbitrator panel to which the amended Ed. L. 3020 because NYC has

---

[3] On April 1st 2012 NYSED informed all arbitrators, that henceforth the fee will be $1400.00 /day and there will be no arrears paid (or at least this is what I was told be someone who works at the hearings full time). One longtime arbitrator Martin Scheinman is enraged saying he was owed over $600,000.00. Ten arbitrators resigned and are or have filed an Action. I just wonder if this is not a non-confrontational way of "retiring" long term, non-rotating arbitrators who have gotten too financial dependant on the the DOE. Another problem with lopsided relation between arbitrators and senior legal staff at DOE. The hearings are held in DOE premises Executive Counsel from UFT rarely even visit. The arbitrators socialize with the DOE most senior staff on a daily basis. Defendant Europe charms them daily. This arrangement is just one of many factors in eroding any vestige of impartiality for NYC Ed L. 3020-a proceedings

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,   Telephone  212 580 9930   Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court      e-mail  joy.hochstadt.pc@gmail.com**

approached the legislature virtually every year in the last seven or more years after the DOE created the category of tenured teachers called "ATRs" or Absent Teacher Reserves (tenured teachers displaced by Principals from their assigned classes, and teachers having survived disciplinary process but not 100% exonerated, both are given day-to-day assignments to cover the classes of absent regular classroom teachers). Each year NYC has claimed it would have to "lay off"[4] between 2000 and 8000 teachers, and asked permission to allow the Principals to decide who would be "laid off" rather than by reverse seniority and tenure. Each year the legislature has denied the request, each year. No teacher has been laid off in decades, because NYC desires to not have to pay tens of thousands of experienced tenured teachers while hiring new replacements who are inexperienced, untenured and earn entry level salaries. Thus, unilaterally, the DOE has been able to substantially turn-over much of the tenured teacher pool by displacement, concomitant to school closings (which reopen with everything identical except the tenured teachers are for the most part all gone, made into ATRs, and replaced by new hires) and by misuse and overuse of the disciplinary system which it has been able to weaken in several ways beyond the change to permanent arbitrators that is the one change that has been put into the CBA as a sequella of the Ed. L.3020 2000 amendment. All others changes concerning the disciplinary process have been unilateral, *ultra vires,* in violation of other rules and laws, and largely unforeseen by the UFT but it has not litigated against the DOE to comply with the law and protect its members. Why?

With the pressure on arbitrators who preside over disciplinary hearings pursuant to Ed. L. 3020-a, to find for the DOE or be let go, ten arbitrators recently quit. The DOE is currently lobbying for removing the "just cause" requirement from Ed. L. 3020-a, apparently the UFT will not agree to introduce that change into the CBA (as the 2000 amendment to Ed. L. 3020 would allow it to do). What is tenure, if "just cause" is not necessary to fire a tenured teacher, so that arbitrators would not be needed to then there is no tenure and the millions of dollars each tenured teacher possessed in tenure property interests have simply vanished, evaporated.

Repeated Motions to Dismiss have been the standard practice of these Defendants with all litigation by teachers. Perhaps, they will "get lucky" and terminate the matter due to Plaintiff's counsel being, outmatched and out maneuvered, or at least they narrow the issues with which they shall have to deal, considering their monumental exposure and liability. However, most of all they seek to delay *ad infinitum* until all the tenured teachers have been fired or coerced to resign, each losing millions of dollars in tenure rights, that are rightfully theirs, and they have been "gotten rid of" by false accusation, unfair trials, and coerced resignations..

I therefore, wish to respectfully inform both the Court and opposing counsel of the orders and holdings in the cases that they cite, and show how very different they are.

---

[4] Quotations are used because the term is a euphemism. These teachers will never be recalled, as thousands of newly hired teachers are constantly being appointed to replace the teachers displaced because they are disfavored by their Principals.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,**   **Telephone  212 580 9930    Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court     e-mail  joy.hochstadt.pc@gmail.com**

The Defendants state that the present complaint is a repetition of claims brought in:

1) <u>Thomas et al v. Dept. of Ed.</u> 09 cv 5167 (SLT)(RLM) an ongoing action brought under FRCP 23 in which that Court sought to focus on (in a 1st amended complaint): first amendment retaliation, constructive termination by teachers reassigned to a rubber room, and greater detail of these allegations of the named Plaintiffs alleging said claims, rather than, at this point in the action, addressing the common allegations of the class which was defined ***as teachers reassigned to TRC's.[5]*** We will wake up this sleepy case imminently with an Order to Show Cause why the Rubber Rooms are reopening after a much heralded DOE-UFT agreement to close them two years ago. To date there have been no TRC's or rubber rooms in the present Ostrowsky case.

2) <u>Adams et al v. NYSED et al</u> (in which the DOE ***intervened*** and then sought sanctions against ***pro se plaintiffs***[6] for having to relitigate issues that the ***pro se plaintiffs voluntarily dismissed in a predecessor case Teachers4Action et al v Bloomberg et al only because they were advised to dismiss and open a new case by Magistrate Judge Peck. Judge Peck denied their motion to sever when the 61 plaintiffs regrouped into two major factions, one seeking the disqualification of the original Attorney, and the other very loyal to him.*** The "loyalists" were also more moderate in their not wanting to complicate the litigation by disruptive "Job Actions" sought by the other faction. This was a case primarily about the conditions in the rubber rooms, the predominance of older, protected class, and whistle blowers being sent to the rubber rooms, and that preadjudication detention for years under such sordid and dastardly conditions was punishment itself and therefore was a denial of both substantive and procedural due process. The Appeal the Penkovsky clients filed was denied by Summary Order. There are none of those element in the Ostrowsky case. If one peruses the docket sheet in T4A, and Adams *et al,* the following is very notable.

> A. At the outset, the Plaintiffs were <u>Teachers4Action</u> and <u>Florian Lowenstein</u>, one among them who was willing to be named. The other Plaintiffs were afraid of retaliation, the T4A Court demanded their names and it was reported to me that the Court said "we'll take care of any retaliation if it occurs." Yet all 61 plaintiffs lost their appointed NYSUT (state union) counsel and at least 10 were fired having their assigned counsel withdraw mid-trial pursuant to Ed. L 3020-a. Their due process

---

[5] TRC stands for Teacher Reassignment Center then Temporary Reassignment Center (as the number of Assistant Principals and Principals with tenure reassigned grew) aka "Rubber Rooms" burgeoned. Principals appointed to their positions prior to 1997 could retain tenure, while those appointed later voted to waive tenure in return for substantially higher pay and complete autonomy over their building including that only the Principal determined who would be appointed to their school and the Principal could have any teacher removed from their school whom s/he did not want to teach in "their building," tenure of the teacher or AP, notwithstanding.

[6] All of the Plaintiffs in <u>Adams et al v NYSED et al</u> 08-cv-5996 (VM)(AJP)(SDNY) and its predecessor <u>Teachers4Action v Bloomberg et al</u> 08-0548 (VM)(AJP) were *pro se* between January 2009 and October 2009 because the Attorney who

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,    Telephone  212 580 9930     Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court      e-mail  joy.hochstadt.pc@gmail.com**

rights were denied when their assigned Counsel abruptly withdraw when the UFT not NYSUT counsel withdraw. It is unprecedented for counsel to be allowed to withdraw mid-trial and only 3% could afford to hired private counsel.

B. Nine plaintiffs filed <u>Adams et al.</u> and dwindled in number when assessed over $11,000.00 to a final group of seven who claimed race, age and disability discrimination, first amendment retaliation, hostile work environment at the TRCs. The hostile work environment claims were said to be viable by the Magistrate. See Exhibit 2. But then Sanctions were imposed on Mr. Penkovsky for including Hostile Work Environment in the next version of the complaint with respect to his clients. No amount of reasoning, showing the Magistrate his own Report and Recommendations, could convince him that he had invited Hostile Work Environment claims. Throughout, the transcripts, of numerous in-court conferences, there is a constant thread of the Magistrate threatening Rule 11 sanctions with no basis or sending us to "Brooklyn," i.e. the Magistrate's referral to his desire for the Teachers to bring their actions in this Court, or threatening contempt without basis. When Mr. Penkovsky, in the middle of a divorce, barely maintaining two households, requested leave of the Court to submit his Appeal to the Second Circuit in 38 days rather than 30 (because his wife and daughter received a notice of eviction he had to deal with) and a Stay of the Sanction pending Appeal both were denied; the Magistrate could not understand the Penkovsky simply did not have the funds and recommended the most Draconian of punishments (a demeaning excoriating Order he was to give all clients and all potential clients and attach to all papers submitted to any Court. Exhibit 3)[7] My clients did not ask me to file an Appeal to the Second

---

[7] I paid the sanction and shall seek refund in my Appeal and was only able to do so because of an error of possible providence again, of putting the wrong check in the envelope for the co-op maintenance in May, mailing it, and leaving co-op check, for ten times what I owed the dogdaytrips.com proprietor for taking my huskys on all day hikes each MWF in Harriman State Park, for him. Now I owe my co-op more than the egregious sanction and that was ordered (in fact, more than twice the ordered amount was originally recommended *sua sponte* by the Magistrate because at the literally last minute, unbeknownst to me, Mr. Penkovsky put a one paragraph claim invoking the 13th Amendment as applied to the rubber rooms in the 116 page ~626 paragraph complaint (if being on an ineligible/inquiry list so that no work as a public school teacher could be obtained, camera and guard surveillance at all times, no desks or internet access, merely chairs to hold reading material on lap, prohibition on all electronic devices, no access to any office supplies including phone, no windows, walled up fire exit and door hung to open in to egress to alternate fire stairs guaranteeing stampede at the wrongly hung door in a true emergency, overcrowding and inadequate air supply causing bronchitis, COPD, in 25% of the teachers crowded into the "room," and two uneducated aides who interpreted their jobs as obligatory nastiness and harassment of the "reassigned teachers" while the Deputy Human Resources Director who delegated her oversight role to them telecommuted for her other personnel duties, for seven hours each day, is not indentured servitude, (well established as a 13th Amendment claim). Thus, when asked (without a 45 day safe-haven but merely a 19 hour window, I was not aware it was there, nor that the Magistrate was asking that it be removed, and thus, a $21,000 sanction was recommended by Magistrate Peck, in my second federal case ever, for a complaint submitted when it was less than two years since I left the full-time employ of the DOE and went into full-time practice, and my first case in which I worked collaboratively with co-counsel, each of us representing a separate group of plaintiffs in an multiplaintiff case.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,    Telephone  212 580 9930    Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court        e-mail  joy.hochstadt.pc@gmail.com**

Circuit. One elected to Appeal *pro se,* and the other who had not been fired; she had been merely fined and made into an ATR (when she did absolutely nothing to deserve it, but as a Master Teacher with many honors offered the new Principal constructive criticism) did not believe it worth her while.

It is the DOE's wrongheaded policies to have unprepared Principals that are given to much power, that removed this latter outstanding African-American female science teacher-role model for attracting more minority and minority women into science from a regular classroom and foisted her into temporary stints. It is the children, who are set back the most from these ill-thought out policies of Principals bringing every teacher they do not favor up on charges. It is not "bad teachers" that are being removed–it is the teachers disliked by their Principals. The "bad" but submissive and supplicant teachers, who have no special expertise and no Principals' certification, and thus not deemed a threat to the new and ill-prepared Principal who are rated "S" and not brought up on charges.

3) <u>Pakter v. DOE et al,</u> This was the first federal case I brought for a client. I was terminated on July 25, 2008 and Pakter called and sought me out after researching the peer group for recommendations, and had chosen me; we first met on or about August 11, 2008 as that is when the retainer is dated. Pakter's case was not one in which the court did not credit that he had very real and viable claims. The court realized that there were viable 42 USC 1983 claims against high level DOE officials. Where the court sidestepped getting involved was that the Pakter court ruled that each of the 50+ specific wrongs perpetrated against Pakter were individual events, which those serious enough to be actionable on their own occurred more than three years before the Action was filed. That, is not true, and we argued that he was set-up for a second time and removed for fabricated pretexts that even the Special Commissioner for Investigation ('SCI') DOE found to be false, and that second round of removal, rubber room and ridiculous charges (the charge they wanted to make was that a student had been shown a photo of Pakter nude and in an aroused state; when SCI investigated the student who was alleged to have made the accusation to the Principal, said she saw in on another student's cell phone; when the second student and her parent were interviewed it turned out that the second student's cell phone had no camera and she never had a cell phone with a camera, nor did anyone in the family. Since the removal of "miscreant" teachers is incentivized by DOE, too often students are asked by authority figures to make accusations that the Principal alleges to the student is true and that the student must help to provide needed evidence; therefore the charge that was made was that Pakter bought a plant to school without prior authorization. Pakter had been in the Rubber Room for almost four years when he retained me, we claimed the entire 50+ acts were a single continuing tort to get Pakter fired. The Law Department argued they were separate acts; that all the acts against Pakter were individual. The court went along with that. The Appeal was filed but the DOE had so tortured Pakter to get him to resign that they did not pay him for nine months, and threatened to bring him up on 25 additional specifications when the Arbitrator dismissed all the charges that he had reached after Pakter could no longer exist without income. When Parker resigned

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,   Telephone  212 580 9930   Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court     e-mail  joy.hochstadt.pc@gmail.com**

he retired on a pension that was larger than his highest salary by about $4,000.00. i.e $104,000 per annum. He abandoned the Appeal needing to "get on" with his life as an artist. Pakter was undoubtedly the finest artist and greatest art teacher the DOE has ever had and was celebrated as "teacher of the year" by Mayor Giuliani at City Hall in 1997. His student, the first African American to receive a Ph.D. in Art History from Yale, came to testify at his Ed. L. 3020-a hearings (he had a great arbitrator Douglas J. Bantle, whom the DOE made Pakter his fourth and last case and insisted he the arbitrator be let go; he had a great NYSUT attorney Christopher Callagy, who got the charges dismissed as the DOE brought silly charge after sillier charge against Pakter. the new charges alleged he tried to bribe a DOE central payroll staff to give him copies of record as to the disposition of the payroll checks that being cut but not forwarded to Pakter *inter alia*). As to my Rule 1727 sanction in the case, I consulted with colleagues as to how to gain a handle on the overzealous advocacy of the ACC who referred to himself as voted the "Rookie of the Year," and simply was making motions to dismiss. I was advised to be pro-active, to move for relief for the non-payment of wages due, for the new charges that were threatened *inter alia.* We needed discovery in the Pakter case not to demand production, but to produce the tapes of every conversation where the DOE testified oppositely at the Ed. L. 3020-a as opposed to what actually occurred and was taped to compare with the Ed. L. 3020-a transcripts. The Ed. L. 3020-a hearing began only when the second amended complaint was being attacked for dismissal. What did Pakter really do to be visited upon by the worst treatment to the best teacher; he began whistle blowing and his Principal was forced to resign, but first she tortured him and sent him to the Rubber room as her final act the day before she resigned. Thus, Ostrowsky whom Pakter referral to me, is not going to wait until they have destroyed him all together and then be told it is too late, Defendants Finn and Apostolidis are targeting already. What is the matter with the courts, not me, that this theft of career, income, quality of life, and extremely valuable long-vested tenure and pension rights yes, to life long-career-work and then to life long tenure benefits as protected by state law is being denied and stolen by the DOE from tens of thousands of teachers.

No, the bad faith purposes of the change in Ed. L. 3020 (see Exhibit 4 for the full Ed. L. 3020-a packet as the state sees that it is administered everywhere else) should not be able to be countered with DOE and UFT testifying it was for efficiency, and that is enough for "rational basis" standard because NYC is different. The abridgement of state protected due process rights to any group must be viewed by "strict scrutiny" as due process is a fundamental right.

Having arbitrators work for the DOE for two decades earning over $100,000.00 a year for one day a week for very easy work and only retaining the ones that find for the DOE, is a corruption of a state maintained tribunal process, that is occurring in NYC not in Alabama or Texas but in one of the reputedly strongest civil rights states of the 50, and not in the rest of the state which still does it as exemplified in Exhibit 4.

Overzealous prosecutors that, at least Chancellor Klein, announced he wanted Principals to begin working with the moment that they decided that they wished to remove a particular pedagogue,

are not acting as attorneys they are co-conspirators in a system-wide agenda to find anything, or allege anything against tenured pension-vested pedagogues before their retirement benefits escalate by 2% of current salary per year for a payout after resignation and reaching retirement age for life. Get them out before they have 20 years in the system when the annual increment of the fixed-benefit pension payout goes from 1.66% x # of years of service x highest salaries or salary to 2% and is paid for life. This is prosecutorial misconduct on a grand scale as they draft the derogatory letters, advise the Principal to violate Ed.L. 2590 j.7. and sign the charges that the prosecutors have been orchestrating all along.

The announcement of the effort to get rid of the "just cause" is a travesty. The "just cause" standard required by Ed. L. 3020-a requires that there be equal treatment for equal infractions, but no one is allowed a defense that includes that what they are accused of occurs in every classroom in their school. "We are only here do find out what you did, we are not interested in anyone else" has been the mantra of the prosecutors (and the "seasoned" DOE arbitrators) it must have been a new arbitrator who knew better what just cause means, that Dennis Costa (Supervisor of TPU) was screaming at, "you'll do what we want you to do, or you will be very sorry."

A ten-day statute of limitations and the narrowest of reviews of the decisions of this process is as much as denial of due process and the process as practiced in NYC in NYC.

I implore you not to allow this total corruption of due process not to see the light of day by STAYing Discovery, and allowing thousands of more teachers lose everything they have worked for, for no good reason during this stay. I implore you to order the Defendants to Answer. They do not want to answer because they will either have to admit to all these allegations which are scandalous, or perjure themselves and we might just get far enough to substantiate the perjury–so they do not want to take that risk.

What I agree to do is to not ask and personal questions, until the transactional truth is discovered and then the Court itself wants to know how the strongest, more powerful . . . .teacher's union attained it all, but then gave it all away in the last thirteen years.

There is more to come but I must file this now [my rapidly failing eyesight from macular degeneration of age (presently at age 73), does slow me down more than I ever estimate}, but in closing this chapter I must add, that Ostrowsky has been harmed the "U" makes him on the path to being brought up on formal charges which will result in the consequences described above. They are so foreseeable and they happen in every case (statistics that must by obtained in discovery), the irreparable harm is already occurring.

The cases that Defense cites are either where due process is alive and well or narrower than are being implied by the defense. <u>Adams</u> only holds that reassignment to the rubber rooms at full pay is not an abrogation of due process, not that there is due process in the system. That was solely a

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,    Telephone  212 580 9930    Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court      e-mail  joy.hochstadt.pc@gmail.com**

"rubber room" case, and this is totally not a rubber room case. The Defense should have advise Defendant Finn not to rate Plaintiff "U."

      The major distinction between the cases being cited is the bad faith agenda that must be accorded Discovery and due process to show that they simply apply where the expectation is that if you are innocent you will be exonerated that is not the case here. Transcripts must be reviewed, *de novo,* Article 75 is not doing that, there is not time to even cite the transcript cogently with a 10 day statute of limitations.

                              Respectfully submitted,

                                /s/
                          _____
                            Joy Hochstadt

P.S. Exhibits will be put up on ECF after this is uploaded and filed for exigency of time I was supposed to be at least eight hours ahead of myself, and I apologize.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,**    **Telephone 212 580 9930**    **Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court**    **e-mail joy.hochstadt.pc@gmail.com**