

**Joy Hochstadt, P.C.**
**Attorneys at Law**
**300 Central Park West**
**New York, New York 10024**

October 26, 2012

The Honorable James Orenstein
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

<u>Ostrowsky v. Department of Education</u> *et al*
RE: Opposition to Renewed Motions to Dismiss and for Stay of Discovery; Plaintiff Respectfully Requests Defense be compelled to file a Pleading in 20 days.

Dear Judge Orenstein:

     I am responding to the Court's Order by asserting that Defense Motion to Dismiss, is no longer an effective expenditure of legal and judicial resources, that the Defense should be Ordered to enter an answer in 20 days and that Discovery should commence forthwith. In fact, it would squander the Court's, the City's and my efforts for the Motion to Dismiss to be renewed. Further, delay is justice "denied" as the adage says, to the Plaintiff. I give the compelling reasons for these assertions as follows.

     The Motion to Dismiss is obviated by an Amended Complaint that focuses narrowly on the harm that has already been perpetrated against the Plaintiff. The twelve original causes of action are reduced to four (actually only three causes of action, however, specific harms to Plaintiff comprise one tripartita claim under 42 USC 1983, and a structural harm to plaintiff as well as to all teachers comprises a second claim under 42 USC 1983). Additionally, Defendants who "had to be" complicit for these events to ever have occurred, but whose conduct could not be directly alleged to a specific act or person, at a time definite or specified place prior to comprehensive Discovery, were dropped. A DOE Defendant, who may or may not have already been involved in the wrongdoing, but who soon definitely would be involved, if the insidious wrongful targeting of Plaintiff continued, was dropped as well. These changes, as well as amplification of the specific mechanisms of harm more tightly and irrefutably demonstrate compliance with the meeting the standards of <u>Twombly</u> and <u>Iqbal</u>.

     The City's assertion that only termination of salaried employment entirely, or malicious prosecution that has already led to the filing of formal disciplinary charges[1], comprise harm to the Plaintiff is not one with which Plaintiff, the Court, nor a jury need agree, despite it being offered as if it were black letter law, by the Defense.

     I have litigated too many of these matters, in which the teacher allows unlawful conduct to go on until there are sufficient nonsensical, erroneous and falsified additions to the file, none of which can any longer be grieved, that once formal charges have been filed, there is such a mountain of "evidence" that no Court, no jury, (and no hearing officer) believes that at least some of it is not true. This loss of credibility is heightened by a recurrent public campaign by Defendants that new teachers (proxy for low salaried, no tenure and no pension vesting) are "energetic," "vigorous," and have "fresh ideas," while senior teachers [Defendant Bloomberg's appellation for them *cf.* ¶ 74 1st Amended Complaint ("FAC") is a proxy for high salaried, tenured and pension-vested] and are "tired," "deadwood," "clinging to old inapplicable methodology," and "unmalleable." Neither of which is true.

     The Plaintiff has been specifically, definitively and seriously harmed by all of the following: 1. Falsified and defamatory official records have been placed in my client's personnel file and remain there. 2. Plaintiff has been unreasonably forced out of his job, which was a constructive termination by the City's own admission that rescinding the outrageous contradictory "U" for the year (*cf.* ¶¶ 284-293 FAC) was a *quid quo pro* for his resignation from FSSA. 3. He was forced to spend a considerable sum in obtaining another position and in preparing for

---

[1] Which the Department via Corporation Counsel's Office inevitably then argues for abstention by the Federal Courts until the process "in progress" comes to a conclusion, and then asserts that the sole remedy specified in the State Law under which the proceedings were held limits review to the state courts under CPLR 7511(b) which allows error in application of the law, wrongdoing, and malfeasance, as long as there was no provable corruption in the conduct of the arbitrator.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,**    **Telephone 212 580 9930**    **Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court**    **e-mail joy.hochstadt.pc@gmail.com**

contingencies. In addition to out-of-pocket costs, Plaintiff should be reimbursed for the time (at the usual BOE "per session" or incidental hourly rate[2]), that these needless efforts, but for the Defendants' wrongs, entailed ($35,000.00). The new position is inferior to the prior position in all ways except for the unlawful and unwarranted harassment by Defendant Apostolidis, *i.e.* the pecuniary ways the new position damages Plaintiff is that it requires an additional LIRR fare and then an MTA fare to commute to the new position at a cost of ~$11.00/day x 182 days = $2,000 p.a), it requires 90 minutes per workday of additional travel time to commute to the new position, and 90 minutes extra preparation time to research and develop activities/metaphors and materials to compensate for the new students' proclivities; they are more difficult to truly engage, "render rapt" so that they may achieve at the same rate as the FSSA students = $126.00/day at the per session rate for 182 days = another $23,000.00 for the three additional hours per day, plus an undetermined amount that is many times the "teachers choice" $250.00 disbursed to each teacher to purchase additional classroom materials to motivate students. This $60,000.00 represents merely the pecuniary damages and does not even include his legal costs. The defamation *per se* for the promulgation of falsified documents (if they were not to be promulgated why is the crux of the entire dispute over removing/destroying two documents) and the damages for the intentional infliction of emotional distress (as conduct by a public official intentionally falsifying the permanent personnel records of a subordinate public official, in furtherance of a bonus to the falsifier, certainly shocks the public conscience) are amounts that can best be determined by a jury depending upon how outraged they are by these occurrences.

       The City again complains of the "prolixity" of the Complaint. As cited in ¶¶ 345-351 FAC, if the Complaint merely alleged that Defendant Bloomberg was well on his way to achieving his announced goal[3] that he would replace half the teachers; that he had replaced 30,000 already; that Plaintiff, because of his outstanding performance was in the final 10,000[4], that the goal was to surreptitiously eliminate tenure, pension vesting, and high salaries, the pleading would not have survived.

       It was necessary to allege that we had evidence, and we do have such evidence, that the top decision makers, incentivize Principals to reduce the average teacher salary in each school by $10,000.00, despite each incumbent teacher averaging a $20,000.00 (about 35% for most teachers) increment pursuant to a series of automatic longevity/steps and CBA across-the-board increments between 2007-2008[5] [but the average overall salary of the workforce was increased only $5,000 (about 8-9%) rather than $20,000.00 and the workforce was reduced by another 6-7% further reducing total teacher salary expenditures to what they before the raises and before the concessions in the CBA]. (*cf.* ¶¶ 43, 44 FAC). This could only be accomplished by a systematic reduction in highly paid incumbents, while replacing them with entry level teachers. However, all teachers earning above the mean by the very nature of the salary schedule must be tenured, and no teacher with an entry level salary can have the three years of in-state public school teaching experience (for which they are given salary credit) can have attained tenure. Therefore, by the directive to reduce mean teacher salary in each school, the Principals are being directed to rid said school of tenured teachers and replace them with entry level teachers[6]. The only way Principals can accomplish

---

[2] The "per session" or incidental rate for work beyond normal "teacher time" of six hours forty minutes/day is paid at entry level rate to all teachers engaged in before or after school, summer. or extra coverage activities, therefore reimbursement is being claimed at only 57% of Plaintiff's actual hourly rate for his regular school day.

[3] In his campaign for enabling legislation that gave rise to Mayoral Control of the Schools.

[4] Before the end of his final term in office.

[5] Which again were in return for not opposing the continuation of Mayoral Control which otherwise would have expired in 2008, and in not opposing end of grieving documents placed in teacher's files [and also not opposing escalating numbers of "U" ratings and disciplinary charges brought and continuing not to monitor hearing room activities), *i.e.* there is irrefutable proof of the conduct; there is no current proof in hand of advance agreement to the conduct as a *quid quo pro* for $1,670,000,000 (one and two thirds billion dollars per annum in teacher raises–because the plan was to arrange not to have to pay it) which has been accomplished but the concessions remain in place].

[6] It is possible that the only factor in Plaintiff's targeting was when the student teacher in Math was at FSSA long enough to impress the Administration that she could replace the highest paid Math teacher, was when Defendant Apostolidis decided she would "observe" Plaintiff's class, without any witnesses with whom she previously arrived, and "develop" an observation which served her purpose and could not be grieved, and then get a "two-fer" by following it up with a "disciplinary meeting" to place a redundant letter covering the same ground in the files.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,   Telephone 212 580 9930   Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court   e-mail joy.hochstadt.pc@gmail.com**

this directive therefore, is to harass high salaried teachers to leave, and failing that, to use the harassing false observations and disciplinary letters to file, against the teachers who would not leave in a perjured disciplinary proceeding. That this policy and directive are knowingly, wilful and intentional conduct in furtherance of a "taking" of an average of $6,000,000.00 per teacher, including from Plaintiff, is supported by the leaving in place of Principal Iris Blige, whose A.P.'s "blew the whistle" on her demands they target good teachers, write negative observations in advance, etc. Even though Blige was fined $7,500.00, the incident was settled before any charges were brought against her; the Special Commissioner for Investigation ("SCI") demurred by sending the matter back to the DOE for internal handling ("SCI does potentially criminal investigations" he stated to the media[7]). If such targeting was not condoned (and encouraged) why was Principal Blige, left in place to continue her course of conduct (which she is still pursuing vigorously) with other A.P.'s who wish to keep their positions. Yet the DOE has done nothing to remedy the harm to the many teachers whom Principal Blige brought up on charges based on the false observations[8]. School reorganization is a major cause of displaced tenured teachers with high salaries which Defendant Bloomberg wants to lay-off (*cf.* ¶ 74 FAC) (never to be recalled since entry level teachers now fill their posts), though the reorganized classes meet in the same building, with the same students, same curriculum, same Principal often, only the tenured Senior teachers are gone–replaced with "newbies" (*Cf.* ¶ 74 FAC) is further evidence of his intentions.

However, directing Principals (including both incentives and pressures) to lower mean salaries, and there is no other way to do it, except to remove tenured Senior teachers, by whatever means necessary, is a "taking." This entails false observations, false allegations, false letters to file, perjured testimony, backdated documents prepared for the hearings with the assistance of the DOE attorneys who are hired to prosecute the "bad" teachers *inter alia.*

The City Attorneys are familiar with <u>Loudermill</u>, they cite it all the time, to assert that the State due process requirements (if they were not corrupted in NYC) are far stronger than constitutional *minima*. But if the entire "due process" is an orchestrated "taking," because Defendant Bloomberg has arrogated to himself, that middle-class teachers each having a $6,000,000.00 property interest in their tenured continued employment and continued accrual of pensionable service, is absurd; only he and his coterie should have such rights to acquire wealth undiminished by more than nominal taxation, and surely not be required to fund through taxes the teachers' property interest accrual, then Defendant Bloomberg has to date perpetrated a multibillion dollar taking from teachers, mostly with neither due process nor for just cause[9]. He should be responsible for the remedy personally.

What is needed in this case, is not more time for the City to delay, to avoid adverse revelations, but the fresh air of the truth being revealed, through the pleading of an Answer and the rigors of the Discovery process.

As to Defense assertion that I consented to a briefing schedule. It is true and is an example of my learning from DOE tactics it uses with UFT. First I enlisted their consent to the briefing schedule that I would need *were* the motion to go forward. And then having settled that issue, I then broach the entirely separate issue that it would be improper to have said motion at all, herein.

Respectfully submitted,<br>
/s/<br>
Joy Hochstadt

---

[7] The NYS Penal Code cites the falsification of official public records and even private business records, as crimes, and they are felonies when committed in furtherance of other unlawful conduct. Therefore, Commissioner Condon's excuse to the press which they quoted, does not pass muster with present counsel.

[8] We infer many Principals are doing likewise, however Blige is the most widely disseminated example where the evidence has been bought into the public domain.

[9] Luckily because the closest to retirement were targeted first, the number of years salary toward the desired retirement for most were few, and the already locked-in accrual of pensionable service high, the dollar amount of the actual taking is much less than $6,000,000,000.00 per teacher for the teachers who were terminated, actually or constructively, and Defendant Bloomberg would be able to "cover" the actual damages personally; it was and still is the non-pecuniary damages after a lifetime of dedication to their profession that affected the most senior teachers devastatingly.

**Principal: Joy Hochstadt, PhD., JD, Dipl. Amer. Bd. Clin. Chem.,     Telephone 212 580 9930     Facsimile: 212 580 9322**
**Admitted: Federal & State Bars of NJ & NY, 2nd Circuit & U.S. Supreme Court     e-mail  joy.hochstadt.pc@gmail.com**