UNITED STATES DISTRICT COURT                              SECOND
EASTERN DISTRICT OF NEW YORK                      AMENDED COMPLAINT
--------------------------------------------------------------------

**ANDREW OSTROWSKY**, PLAINTIFF

against                                                            **12-CV-
                                                                   2439(LDW)(GRB)**


**DEPARTMENT OF EDUCATION OF NYC UNDER THE
CONTROL OF MICHAEL BLOOMBERG MAYOR, IN        JURY TRIAL DEMANDED
HIS OFFICIAL AND INDIVIDUAL CAPACITY;
DENNIS WALCOTT, CHANCELLOR; DONNA FINN,
PRINCIPAL; SOFIA APOSTOLIDIS, ASSISTANT PRINCIPAL;
IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES**
                            DEFENDANTS
--------------------------------------------------------------------


## NATURE OF THE CASE

1.    Plaintiff, a highly commended math teacher in his eleventh year of satisfactory service to the

      DOE, is the most senior teacher in the school, teaching there since the inception of Frank

      Sinatra School of the Arts ("FSSA"), though he has not yet reached his 36th birthday, has

      been harassed, criticized, warned, and ridiculed since his base salary rose to almost

      $80,000.00 *per annum.*

2.    He makes claims under 42 USC 1983, for the bad faith fallacious targeting of him, by

      Defendant Apostolidis, acting under the supervision of, and with the consent of Defendant

      Finn in violation of his statutory, and constitutional rights, all under color of law, and

      directed by Defendant Walcott and Defendant Bloomberg to reduce the average teacher's

      salaries, and to reduce overall school budgets while spending more of the school budget to

      raise overall school grades such as to restore FSSA grade of "A" recently lowered to "B," for

      which the FSSA administration is being held accountable, and will receive bonuses when

      restored.

3.    These policies promulgated as following the "business model" in the private sector, are

      considered reasonable measures, however when applied by government officials, and in bad

faith, to exaggerate, fabricate, slant, and apply different subjective evaluations based on the above directed objectives, against tenured teachers vested in their future salary and pension rights, comprise elements not only in furtherance of "taking" of Plaintiff's property interests in future salary and pension and in furtherance of "taking" the liberty interest of all future ability to practice Plaintiff's profession because it was in furtherance of terminating his NYC teaching license had he not taken the very costly and painful practical and litigative actions to deal with the constructive eviction from his teaching position at FSSA.

4.     They also indicate falsification of business records and in this case, falsification of official government records which Defendant Apostolidis created, and Defendant Finn adopted and relied upon in rating Plaintiff Unsatisfactory ("U") on his Annual Professional Performance Review ("APPR").

5.     While Defendant Finn did withdraw the unjustified APPR, and substituted one rated Satisfactory ("S"), she refuses to remove the actual falsified records upon which she relied upon, which Plaintiff, cannot grieve (only since October 13, 2007), and which are what is used as evidence to support prosecution for termination of his tenured position.

6.     Defendant Finn reported that she was advised not to remove this "evidence."

7.     The relatively recent loss of the right to grieve unfair letters, and classroom observations, (compared to the 47 prior years that they could be grieved) to prevent these subjective, often orchestrated and false instruments from becoming part of his permanent personnel file, allow these additions to file to be later used as if they were truth, if relief is not sought and granted from the courts.

8.     Thus, for the past year, DOE Officials wrote Plaintiff up negatively, when they used to write him up only for accolades for doing exactly what he did in 2011-2012, rated him unsatisfactory at the end of the year, which has never happened before, and were ready to

charge him with incompetence or misconduct or both, and have a permanent hearing officer receiving $1,400.00 *per diem* (guaranteed for 74 hearing days per year), who does not want to lose this job, preside over the hearing and fire him for nothing that he did wrong.

9.    Plaintiff alleges that actions were in progress only because FSSA administrators were directed to fulfill salary reduction goals, that the DOE top management will defend as good fiscal policy but which were in furtherance of abrogation of Plaintiff's property and liberty interests for future salary and license and property interests in future pension, under color of law.

10.    This is not what tenure meant when Plaintiff accepted employment with the DOE; this is not what he understood tenure to be when he was granted tenure years ago; this is not what the NYS legislature meant when it enacted the tenure laws decades ago. Instead this is the falsification of deliberately subjective evaluations to pejoratively rate teachers whose tenure, salary level and pension vesting impose future obligation on the city in which Defendant Bloomberg is the single most vulnerable (i.e. wealthiest) taxpayer who is self-dealing to reduce his own future tax obligations (as well as those of his confreres whose admiration he seeks to strengthen).

11.    Plaintiff also makes supplemental state claims for defamation by Apostolidis and intentional infliction of emotional distress because it shocks the public conscience when government officials so openly falsify records (and later perjure themselves at termination hearings) and that the Mayor of the greatest city in the world (and by the way the 10th richest American, 90% of his wealth accrued while he held his present office) sets policies that he openly admits are to take senior tenured teachers jobs and give them to new entry level untenured hires (see ¶ 74) that forces Principals to do exactly that (falsify records), in order to retain their own positions, and maintain their compensation levels with the bonuses they receive

for meeting the goals of $10,000.00 reduction of mean teacher salary, *inter alia*.

12.    Therefore, though Defendants Walcott and Bloomberg were not directly involved in the defamation, the intentional infliction of emotional distress due to the necessarily false reports and letters (40% of the teacher workforce are not incompetent or guilty of misconduct–in fact the Mayor and the prior Chancellor publicly announced they wanted to replace 50% of the teacher workforce and they essentially have done that by unlawful "takings").

## JURISDICTION AND VENUE

13.    Plaintiff asserts claims of violation of his U.S. Constitutional due process and equal protection (differences in due process accorded different groups are to be accorded strict scrutiny because due process is a fundamental right) under the 14th Amendment and with the individual right of action conferred by 42 USC 1943, is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4) and to set aside all inaccurate, prejudicial, false and wilfully knowing they were untrue and thus, made in bad faith, and by the falsification of business and government records) letter and observation placed in Plaintiffs file, by municipal officials acting under state law.

14.    Plaintiff's claim for declaratory relief is authorized by 28 U.S.C. §§2201 and 2202.

15.    The Court's supplemental jurisdiction is invoked under 28 U.S.C. §1367(a) for defamation and (b) intentional infliction of emotional distress claims herein, and to set aside all inaccurate, prejudicial and made in bad faith letters and observations placed in his file, as especially when public officials issue intentionally deceptive, false, and wrong government records, whether for personal gain in a compensation system that incentivizes the arbitrary reduction of teacher's salaries (which has to focus the preferential targeting of the higher paid teachers on a fixed salary matrix who are all tenured and thus have vested property interests in their positions), or merely to keep the Administrators' own untenured jobs, it certainly not

4

only shocks the public conscience, it is corruption directed from the top, ***and it undermines the instruction of the students!***

16.    Plaintiff filed the instant complaint within three years since the harassment was begun by Defendant Apostolidis and within one year of it being stepped up to orchestrate the bad faith actions, inaccurate reports, and biased classroom observation now placed in his file in an attempt to defame him and intentionally inflict emotional distress to coerce him into "self-eviction," *i.e.* constructive termination from his position at FSSA in order to make Ostrowsky one of the tens of thousands of tenured, pension-vested, salary above the mean teachers that Defendants Bloomberg and Walcott have fired or plan to fire to fulfill budgetary reform goals (not reform of the instruction) but reform of the demographics of the pedagogical workforce mostly by unlawful means by misuse and corruption of the already completely subjective evaluation (now without grievance opportunity) and disciplinary systems (without internal grievance possibility under Defendant Bloomberg's control), and with only very limited review in the courts once formal disciplinary charges have been brought.   Plaintiff filed a notice of claim within 90 days of receipt of the false written observation report to enable his state claims.

17.    The principal place of business for pedagogical management of the Department of Education, is 65 Court Street, Brooklyn, New York 11201; the acts complained of took place in Queens County, State of New York,.  Therefore, venue properly lies in the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. §1391.

## PLAINTIFF

18.    Plaintiff, Andrew Ostrowsky, is a citizen of the United States and a resident of Nassau County, New York.  Plaintiff was first employed by the DOE as a teacher of mathematics,

in 2001 at the opening of FSSA and taught there ever since, remorsefully transferring to High School for Global Citizenship ("HSGC") in Crown Heights Brooklyn in August 2012.

19.     HSGC is a "C" rated school not an "A"-"B" rated school.  Therefore, students are much more of a challenge to effectively teach, requiring significant additional preparation to find engaging materials and to create metaphors they can relate to that will motivate them and get them to develop some sense of a drive toward mastery which these students have not already developed from their prior experiences.

20.     The FSSA students on the other hand have a fully developed drive for mastery in the discipline in which their achievement allowed them to successfully compete in the audition portion of the admissions process for a  place at FSSA.  This drive in the performing and visual arts to mastery is much easier to transfer to academic subjects than not having a model for serious mastery to achieve to real-world standards, and much easier for a teacher to tap.

21.     FSSA in Jackson Heights, Queens was a shorter, easier as to changes, less time consuming and less expensive commute, by far, from Plaintiff's home in Nassau County than H.S.G.C. in Crown Heights, Brooklyn.

22.     On literally every parameter of working conditions and potential job satisfaction (*i.e.* prior to the time during the 2011-2012 school year, almost immediately after FSSA was down-rated from an "A" school to a "B" school, that Defendant Apostolidis began to target Plaintiff for the first time in since just after she arrived over four years ago), did Plaintiff, through no change in conduct, performance, or loyalty, did Apostolidis unreasonably constructively exile him to a significant inferior job, and for this he is damaged, in out of pocket expenses (including increased commuting costs), effort and expense involved to achieve optimal results with more difficult to teach students, as well as general ambience and physical atmosphere of HSGC, one of six schools in the old Prospect Heights H.S. building.

23. Finally, Plaintiff claims anguish and suffering for the needless and inappropriate targeting, harassment, anxiety, fear for his future, sense of loss, loss of feeling of comfort and security when a home for eleven years, suddenly becomes a hostile evicting environment.

24. This was accompanied by anxiety, depressed mood, joylessness, digestive disturbances, insomnia, whenever the thoughts of loss of job, increasing hostility of the environment and especially the ever present ever-demeaning Apostolidis arose who at all times acted under color of law, and made false accusations, demeaning comments over the same conduct that was commended for 11 years.

## **DEFENDANTS**

25. The Department of Education is empowered to be the governing body of the City School District of the City of New York ("District") and existing under the laws of the State of New York, and the United States Constitution and to submit, and with a duty to lobby for and seek enactment of NYS laws that are consistent with the U.S. Constitutional requirements for due process and equal protection, and are not intentionally vague and in bad faith to defeat those requirements.

26. Defendant Michael Bloomberg, was inaugurated to the office of Mayor of the City of New York in 2002 and began to lobby for legal authority to control the public schools of NYC, disband its Board of Education, and implement reform he envisioned and campaigned for without offering specifics other than he planned to improve schools with 30,000 fewer teachers than he found upon taking office. The methods that he used have not improved the schools but have destroyed the lives and careers of the majority of the most talented, best educated and highly experienced tenured teachers, in an effort to abrogate their the property interests in the continued employment of tenured teachers who rightly expect future salary until retirement, and retirement benefits which accrue based on their total length of service

until retirement and final salary, unless they are found guilty of serious offenses or dire dereliction of duty. State law, separately provides disability retirement with modified pension for teachers disabled either physically, emotionally or cognitively, prior to retirement age.

27. Defendant Dennis Walcott has been the Chancellor of the District for the most immediate relevant period, when the unlawful conduct against Plaintiff has been stepped up and, as such, is responsible for the operation of the City School District of NYC and is its Chief Executive Officer. Any specific policy signed by him, promulgated or implemented so as to accrue to Plaintiff's claims are alleged as "Monell" claims against the Chancellor, officially and personally, since at all times he carried out his lawful duties under color of state law; promulgating policies that encourage Principals to undermine tenured teachers property and liberty interests in their future employment and pension is a violation of 14th Amendment, and thus cannot be part of the Chancellor's lawful duties, for which he at all times acts under color of law. If directed by his superior, Defendant Bloomberg, then Defendant Bloomberg shares responsibility, in fact Defendant Bloomberg has publicly announced all the aspects of his "business model" as directing this mass "taking," and should pay personally for the harm inflicted wrongly on thousands of teachers, to do so would not harm him personally (except to move from 10th on the Forbes list of 392 richest Americans, a few places) one iota.

28. Defendant, Donna Finn was at all times relevant hereto, employed by the Department of Education as Principal of FSSA and its CEO responsible for implementing the general and specific policies of the Chancellor at her FSSA building at which she is autonomous in controlling the pedagogical personnel therein appointed and retained; she further promulgated and implemented additional policies of her own, and omissions and supervises

Defendant Apostolidis, and therefore implicitly or explicitly approves of whatever Defendant Apostolidis does.

29. Defendant Sofia Apostolidis is the Assistant Principal (Instruction) at FSSA, who arrived over four years ago and harassed Plaintiff almost immediately, questioning his affect and appropriateness of his conduct, and sending him for psychological evaluation.

30. It appears that strategy soundly backfired, as not only was Plaintiff evaluated as totally fit for duty, but Defendant Apostolidis did nothing to criticize or harass Plaintiff again for several years, until the downgrading of FSSA from overall grade of "A," which it had always held until last year, to "B" occurred, and he again became her scapegoat.

31. Though Principal Donna Finn and the Plaintiff worked well together before Apostolidis arrival, Finn has delegated the treatment of Plaintiff to Apostolidis, and was acquiescent to the unfair, and undeserved treatment plaintiff received from Apostolidis.

32. The exception appears to be that Finn unilaterally agreed to change the "U" rating that had been accorded to Plaintiff, to "S," some eight weeks after it was presented to him and only after the goal of constructively driving Plaintiff from the school he loved and always worked at for his entire employment with the DOE, had been achieved.

**BACKGROUND FACTS**

33. When Mayor Bloomberg ran for his present position he stated he would apply a "bottom-line" "business model" paradigm to reforming the public schools of NYC and he also publicly announced NYC schools did not need 80,000 teachers, 50,000 would be the goal.

34. The universal[1] way that a government agency achieves a reduction in force ("RIF") is to freeze hiring, not replace those lost by attrition, and release probationary employees (which

---

[1] The reason that it is the "universal" way, is that all permanent government employees from janitor up, have a been adjudged to have a 5th Amendment (federal employees) and 14th Amendment (state and municipal employees) property interest in their future employment and must be given pre-deprivation due process. *See,* Bd. Educ. v. Loudermill, 470 U.S. 532 (1985).

for teachers is a minimum of three years full-time service and now quite often four years or five years) which would account the 30,000 the Mayor proposed to reduce since the employment half-life of teachers in the NYC school system has been repeatedly reported as five years.

35.     If this universal method of RIF in public employment was followed, class size would increase drastically, and that would not be acceptable to the parents of the of the 1,100,000 students who attend NYC public schools, nor to the teacher's union, the United Federation of Teachers ("UFT"), both for the same altruistic reason of student instructional time and quality (as well as the inordinate extra burden of workload on its members) and because the UFT would lose almost 40% of its union dues income from teachers (assessed *per capita*).

36.     If the universal method of RIF in public employment was followed, the ratio of tenured teachers would increase to almost 100%, which is not what the Mayor nor current thought on school reform favored.

37.     If this universal method of RIF in public employment was followed, the average teacher's salary would be increased substantially, also contrary to the Mayor's fiscal planning.

38.     However, the goal announced, at least internally, each year has been to lower the mean teacher's salary by $10,000.00 from the then prevailing mean salary.

39.     Thus, in 2007, when the average NYC teacher's salary was reported as $70,000.00, the goal was to reduce it to $60,000.00.

40.     In 2012, when the average teacher's salary is $75,000.00 the goal is $65.000.00.

41.     These goals are promulgated in workshops for administrators where the agenda of the workshop is written and includes means of achieving the goal which are taught as encouraging retirement, encouraging unpaid leaves, and bringing disciplinary proceedings.

42.     In fact, since across the board raises between 2007 and 2009 (there has been no new contract since October 31, 2009; the teachers work under a continuing clause of the last contract), amount to about a 35% increment in most teacher's pay between their salary in 2007 before any of the raises and the same teacher's salary at the end of the contract in 2009 (including any longevity increments at the beginning of the 2007-2008, 2008-2009, and 2009-2010 school years as per the publicly accessible teacher salary schedules, if the reduction from 80,000 teachers (when the Mayor was campaigning to first assume his present Office in 2001) to the May 11, 2011 testimony, of Chancellor Walcott before the NYS legislature of where he testified there were 75,000 teachers (currently found at YouTube using the link **http://www.youtube.com/watch?feature=player_embedded&v=l_yOgCdh4BU**) had all been only the highest paid teachers (in violation of the universal RIF lawful requirements) and replaced by the lowest paid teachers, the average salary would be about $95,000.00 and an increment of $25,000 per teacher, not an increment of merely $5000.00 per teacher on the average would have resulted.

43.     What this indicates ***unequivocally and irrefutably*** is that the Mayor's goal of thirty thousand teachers at or near the top of the payscale have been replaced by twenty-five thousand teachers that are at or close to entry level[2].  The publicly available pay schedule increment[3], the announced facts of the average teacher's salary and the public information of how many teachers were on the payroll in 2011 and were on the payroll in 2007, gives all the data necessary, to calculate exactly which teachers at what portion of the payroll ***had to***

---

[2] Actually the turn over had to be greater than 30,000 because not all the replaced teachers were at the very top of the payscale, and all the replacements were not at the very bottom, some did have some graduate education and some experience, but were all in the bottom quartile of the payscale.

[3] See teachers "salary schedule" at the UFT website as well as DOE website.

***be removed and replaced with entry level salaried teachers*** in order to arrive at the announced mean salary and teacher workforce in 2011 per the Walcott testimony.

44. Teachers who have worked for the NYC school system for any length of time all know throngs of tenured teachers, who have been excessed to Absent Teacher Reserve ("ATR") status (that of a substitute but at their current pay which is three to four times the maximum (and with full benefits) that a *per diem* substitute can earn (without any benefits at all)[4].

45. Further, non-tenured teachers merely work on a one-year renewable at-will contract until tenured or discontinued prior to tenure, teaching fellows who were not fully credentialed when hired can be discontinued at any time (usually at the end of a term), until they have completed the program and are fully credentialed, "Teach for America" appointments are for two years and then they must leave, H-1 visa status teachers may stay for a maximum 5 years and they must then leave and cannot be offered tenure unless sponsored for nationalization). Thus, this built-in turn over at the bottom means that the pressured turn-over at the top is even greater than what is clearly the calculatable from the available data.

46. On September 24, 2012 Michael Mulgrew issued a press release stating the following. "Despite the DOE's mismanagement of the hiring process and the political needs of the mayor, we will continue to fight for the children in our schools, and the rights of the teachers in the ATR pool who are working hard in schools every day."[5]

---

[4] The excessing of teachers occurs two ways; either fewer teachers in that license area are needed in a particular school because of demographic or programmatic changes in that school; or the school itself is closed and reorganized pursuant to the agreement with the UFT that 50% of the incumbents must be retained–however the union agreed when payroll was still centralized and presumed the best teachers would be retained. Immediately after agreeing, payroll became part of each school's budget with incentives to the Principal to lower payroll costs and rather than the best teachers being retained, the teachers with the least salary were retained.

[5] The UFT had its own needs as well. If 30,000 teachers were lost, the income of the United Federation of Teachers ("UFT") would be reduced by $33,000,000.00/*per annum* and the UFT would have gone public decrying that the almost doubling of class size was not only severely detrimental to students' education, it was extremely dangerous to their safety in an emergency to have a single teacher responsible for guiding that many students to safety. We never know how or why the deals are made we only know the outcome. The outcome was that only 5,000 teachers net, were lost, thus, $5,500,000.00 of union dues that would have been lost were made up with a 6% increase in per capita union dues. The

47.	To further harass the ATR's they were moved to different schools every week during the 2011-2012 school year, while they were assigned to a single school for all or most of a school year prior to June 2011.

48.	In addition to thousands of ATRs displaced from their classrooms, thousands of other teachers have been brought up on disciplinary charges which are heard by arbitrators who earn $1,400.00 a day for hearing sessions (seven days/month) and *pro rata* hourly rates for off-site case review, research, and opinion drafting.

49.	Most teachers brought up on charges are coerced to resign and waive all access to the courts prior to or during the arbitration proceedings, on the false premise that they will not lose their teaching license if they do so–they all lose their NYC teaching license and the DOE will reveal to other school districts that they are on the Ineligible/Inquiry ("I/I") list, if called for reference of even verification of employment.

50.	Most teachers do not know that what is meant is the State Teaching Certification; all teachers coerced to resign under those conditions do lose their City teaching license.

51.	No teacher except those convicted of a felony, lose their state certification without an additional hearing in Albany, although all those who resigned with pending charges involving allegations of inappropriate conduct toward students with any sexual overtone whatsoever are asked to voluntarily surrender their license to the state and then they claim they were lied to and betrayed by the DOE to coerce them to resign.

52.	Plaintiff can produce dozens of teachers in all these categories. Most are unemployed or enduring the agony of serving as ATRs, since if the way students treat substitutes who will

---

increase in the average teacher's salary increased only $5000.00 despite an across the board salary increment of about $20,000.00 for a mid-level veteran teacher such as Plaintiff over the same period. Union dues are the same for all teachers irrespective of salary which sets up an inherent conflict of interest when the DOE seeks to target the highest paid tenured teachers–in order for teachers to reach the mean salary they must be tenured as all salaries for rungs above the mean require sufficient experience that the teacher would have to have been granted tenure or be out before that salary level was reached.

not grade them, are not in contact with their parents, was not onerous enough, the ATRs are arbitrarily made to play "musical schools" with short stints at each school and then on to another.

53.     Even teachers who settle with the DOE for less than resignation all become ATR's and lose all access to the courts as part of the "settlement." Only teachers who are completely exonerated do not become ATR's. Most often they are sent back to the same school, where they encounter the same demeaning treatment they received before they were brought up on charges.

54.     That is why, when Plaintiff had been an exemplary teacher during every single one of eleven school years with only commendations in his robust personnel file, did Plaintiff Ostrowsky become so distraught when he began to be targeted by Defendant Apostolidis without cause..

55.     After eleven years a professional can judge his own worth, a jurist by decisions being upheld on appeal, attorneys by the clients who seek them out on prior client referral, as well as the cases on which they prevail, teachers by how their students score on Regents and Advanced Placement exams as well as how well-prepared for competitive colleges they return to report that to the teacher who prepared them, as well as how cogently the students can explain and apply what they learned, to more complex applications.

56.     Teachers, also have observed, conferred with and seen the progress on standardized exams *inter alia* of their colleagues' students and they are very aware when a teacher they know has given excellent instruction for one or more decades is targeted for misconduct that never happened or for incompetence as a pretext for high salary and being vested in a pension plan that was typical of the pension plans offered to teachers entering service in any but the last four to five years.

57. No wonder Plaintiff was terrorized ever since Defendant Apostolidis called Plaintiff in for a post-observation conference on December 12, 2011, for a lesson to which she was not even paying attention, stated it was unsatisfactory and recited to him incidents and events that simply did not occur.

58. We allege that interaction of two factors, neither of which had anything to do with Ostrowsky's work performance caused him to be targeted.

59. Frank Sinatra School of the Arts had been rated "A," the highest and most coveted grade a school can get, until the past year when its rating dropped to "B."

60. The algorithm by which grades are attained by schools, likely include rate of graduation on time, subsequent attendance at a four year college, Regents Diplomas awarded *per capita,* Regents Exams passed/grade average for each subject on the Regents exams, overall attendance rate, student suspensions, incident reports (injuries, thefts etc), ranking by students applying as their first or second choice, number of applicants per number of openings, number of Advanced Placement and specialty classes offered, students enrolled in, and grades achieved, on the AP exams *inter alia*.

61. Early after the commencement of the Mayoral control of NYC schools most incumbent Principals, even those already tenured before Mayoral control and all those not yet tenured, opted for a contract which would trade tenure for complete autonomy over their building (including all hiring and firing) and opportunities for incentive pay for a plethora of parameters which could raise their compensation significantly (*i.e.* the estimate was > 60%).

62. Thereafter, each Principal was essentially an independent entrepreneur, to be richly rewarded if s/he met or exceeded goals, or be removed from the post if s/he underperformed.

63.    As soon as most Principals were where the Mayor's "business model" wanted them, the previously centralized pedagogical payroll, where schools were allotted teacher lines by license area, but were not accountable for individual salaries, ended.

64.    In all fairness to the U.F.T., this was an DOE internal accounting matter for which the U.F.T. was never consulted and only afterwards realized how their most senior members would be negatively affected in the recent open market teacher transfer system (replacing seniority transfers) that it had agreed to before salaries were decentralized.

65.    Until that time schools and Community School Districts ("CSD"s) (*e.g.* CSD 25 and 26) prided themselves that they attracted and retained the best educated, lowest turnover, best paid, most experienced teachers and had the most stable faculties, ergo the best performing students.

66.    The school budget, including the pedagogical payroll became the responsibility of the Principal to allocate.

67.    Since grade for the school as a whole was influenced by student grades, special courses/programs, and other resources, decisions had to be made as to expenditures for tutors, investment in special programs, *e.g.* musical instruments for FSSA, versus, always the largest item in the budget, pedagogical salaries.

68.    Thus, when FSSA went from "A" to "B," the Administration's own jobs were on the line unless they could compensate with other parameters, or with expenditures likely to restore the "A" but the only way to achieve savings to invest in other resources, was to reduce the payroll.

69.    Thus, as the longest tenured, likely highest paid teacher in the school, getting rid of Ostrowsky, was the greatest savings that could be achieved by altering one position.

70.     With the exit of Ostrowsky, and the hiring of an entry level untenured teacher[6] who would not be vested in pension rights for a decade, if ever, several Chancellor sought parameters would be improved.

71.     The mean teacher's salary would be reduced; the overall budget would be reduced by tens of thousands of dollars; the ratio of tenured teachers in the school would be reduced; the number of pension-vested teachers in the school would be reduced. These are acknowledged parameters for which incentive bonuses are awarded.

72.     On information and belief the following additional parameters have pre-set goals as well–the number of teachers receiving "U" ratings for the year (for which on information and belief each Principal has a quota to meet), the number of teachers bought up on disciplinary charges (which is acknowledged to remove the teacher immediately from the school budget and shifts the teacher to a central budget).

73.     On information and belief, the Principal is also awarded a personal bonus as an individual of ~$3,000.00 for each teacher brought up on disciplinary charges.

74.     The above is not speculation. Quoting from press releases from both Defendant Bloomberg and Mr. Mulgrew the following was published on January 19, 2011

> Mayor Michael Bloomberg blasted public employee pensions, current layoff rules and educators serving in the Absent Teacher Reserve in a State of the City address on Jan. 19 in which he said he would shrink the cost of government by going after public employee benefits rather than raise taxes to meet this year's budget challenges.
>
> UFT President Michael Mulgrew described the speech as "another Bloomberg snow job."
>
> In response to the mayor's criticism of the cost of pensions to the city this year, Mulgrew said that the cost of pensions was spiking because of the Wall Street meltdown.
>
> "His friends on Wall Street created this problem, but the mayor won't join us in changing the law to let us sue the people who lost the money," Mulgrew said.

---

[6] Indeed an entry level teacher with no experience has replaced Ostrowsky at FSSA, she student-taught at FSSA 2011-2012, and thus, has just finished her degree. It was during her successful stint as student-teacher that the pejorative treatment of Ostrowsky began, as she could be hired for less than 58% of Ostrowsky's salary.

The mayor also took aim at seniority provisions that govern public-sector layoffs, saying that current rules should be changed in part because laying off senior teachers saves more money than laying off a similar number of junior teachers.

Mulgrew responded: "I was disgusted. I have never heard a mayor say that people should be laid off on the basis of salary. He is saying people should lose their jobs for dedicating their lives to the children of New York City."

ATRs were also in the mayor's cross-hairs in his speech. He asked Albany to help him deal with the ATR issue, which he called a "wasted" $100 million expense. He called for a limit to the amount of time a teacher can spend in the pool.

The ATRs — many of whom are veteran teachers who spent their careers in schools that the Bloomberg administration decided to close — were created by the Department of Education in the 2005 contract as a byproduct of former Chancellor Joel Klein's insistence that principals should have complete discretion in hiring for their schools.

"I don't know why the mayor has to go to Albany to get a change in a contract provision that he insisted on," Mulgrew said. "The ATRs are in school, they're working, and the school system has the power to do right now the strategy we've recommended — to put them in schools to lower class size."

The mayor vowed to gain concessions and give-backs in upcoming contract negotiations with unions representing city workers to address the budget shortfall. "I will not sign a contract with salary increases unless they are accompanied by reforms in benefit packages that produce the savings we need," the mayor vowed.

Speaking before 800 officials and residents at the newly refurbished St. George Theatre in Staten Island, the mayor said pension reform would be his "number one priority in Albany" in the coming weeks. Bloomberg said that he would seek to increase the retirement age for new non-uniformed employees — which would include teachers — to 65[7].

In the only bright news for city schools, the mayor said he plans to double the number of attendance mentors to address chronic school absences, and he will seek private funds to boost the summer youth employment program.

75.    Defendant Bloomberg's proposal to "lay-off" (*i.e.* never to be recalled) tenured ATRs (all

ATR's are tenured, untenured teachers not-selected for the school reorganization, are let go

at the end of the year and do not return to the reorganized school, nor do ATRs they are

---

[7] Increasing the full retirement age from 62 to 65 is a pretext because the longer the teachers work the longer their service and the more across the board increments will have been negotiated during their service, ergo, the greater their pension according to the algorithm of years of service x final pay. The subtext, Defendant Bloomberg leaves unspoken is that he is seeking to end all teachers service early, locking in their final salary and years of service, whereby they will not be able to accrue further credits, and most incumbents now will either have to take discounted pensions (if over 55 but not yet 62) or wait to get any pension until age 62, while those under 55 will not have the possibility of any pension for years. An incumbent who began teaching at 22 can reach top pay at age 45, which was the mean teacher age five years ago. We need discovery to learn what it is today unless the UFT will reveal it. The vesting was changed from 5 years to 10 years about a decade ago–this means that fewer teachers will get any pension if separated before vesting, but moreover vested teachers, even if their pension is small and they waited years after separation to get it,, are entitled to major medical and hospital insurance for life and to reimbursement of part B medicare costs for life once they are covered by medicare.

rotated from school to school to act as substitutes, rather than given regular assignments (as Mr. Mulgrew suggested would serve to lower class size and improve instruction).[8]

76. In fact, we allege that though "A" and even "B" schools are not reorganized, most schools are "C" or worse and the very purpose of the reorganization, is to be able to "excess" 50% of the teachers who served in the pre-reorganized school. (Ergo, the option of total control over hiring is not absolute–Principals simply take the lowest paid 50%, who are usually untenured–so that the meet their salary reduction goals, and free the money for other initiatives, all to increase their own remuneration).

77. Given that the contract allowing the ATR pool to develop pre-dated the change to decentralized payroll, and Principal accountability for the entire school budget and performance, the UFT, was not forewarned that the 50% retained, for the same building, the same students, the same Principal in most cases, the same curriculum would be the cheapest teachers, the untenured teachers, the non-vested in pension rights teachers, rather than the most effective teachers.

78. Defendant Bloomberg boldly admits this in his presentation at the above cited meeting.

79. Thus, "bad" schools can pick off their costly teachers all at once, lower the budget, attain savings, lower the mean teacher salary for the school, in a single reorganization, while excellent performing schools, to accomplish the same are required to "salary-target" and must pick off the teachers earning above the mean city-wide, one at a time [or in the case of Principal Resnick, nine at a time (*see* ¶ 124 and *fn* 12)] in order for the school administrators to protect their own jobs or receive accolades and money bonuses for their leadership.

---

[8] Bloomberg has become more vocal because it appears that Walcott is less so than Klein was. Klein as a lawyer was also a bit more circumspect about lobbying for overt "takings." Instead, he repeatedly announced and urged that the DOE would replace "old deadwood" with "new young vigor" (which was replaced with "young ideas" when he was accused of age discrimination").

80. This appears to have worked, extremely well for Defendant Bloomberg in the "Private Sector." However, it is alleged that he does know that this is an unlawful and unconstitutional "taking" when applied to tenured teachers who have demonstrated neither incompetence nor misconduct in the performance of their jobs, and he does not care –as long as he keeps NYC's progressive or proportional taxes low for himself and his confreres, and he could increase regressive sales taxes, which he did for everyone else.

81. False accusation, wholesale relegation to ATR status, and then appeal to the legislature to allow the lay-off of the ATRs is an abrogation of due process by a government official acting under color of law pursuant to the 14th Amendment and state tenure laws requiring "just cause" to discipline a tenured teacher (or otherwise remove that teacher from service).

82. Due process is a fundamental right and deserves the strictest of scrutiny.

83. With knowledge of all of this background, an overwrought, severely stressed Plaintiff, based on familiarity of what had already happened to droves of teachers before him, Plaintiff was forced out[9] of the school he loved and at which he had taught since its inception.

84. Ostrowsky spent a depressed and most miserable symptom-ridden, fearful, anxiety-prone eight months until he obtained another job, and even that has residual pain and suffering because the commute is longer and more costly, the students are more difficult to teach, the physical plant much less attractive, the ambience where admissions are highly competitive, is lost, *inter alia*.

---

[9] Math and Science teachers are deemed to be in scarcity subject areas and cannot be excessed out of their schools as there are always new openings annually for math and science teachers which go unfilled in many high schools. To deal with the scarcity NYC has requested ICE to issue a number of H-1 visas to foreign teachers (usually from the Philippines) to cover the shortfall. However, before a Community School District can hire an alien they must certify that no licensed teacher in good standing who is an American Citizen is available for the position. Few, if any, DOE District Administrators will perjure themselves. that is why the teachers brought up on disciplinary charges are disproportionately in all the "shortage" areas, and why since August 16, 2008, the Chancellors have had Principals rather than Superintendents sign disciplinary charges in violation of Ed. L. 2590 j. 7. b. At FSSA the sudden incentive was undoubtedly the availability of the student-teacher who could replace Plaintiff a barely more than one-half his salary.

85. This has been due to no reason related to his own performance, but due to the "business model" budgetary and performance objectives of the school administration as directed by the Chancellor and the mayor, Plaintiff was mercilessly, wilfully and deliberately, mistreated, mis-evaluated[10], harassed, deliberately made ill to either coerce him to leave the school, or failing that to bring him up on charges that would also take him off the school payroll.

86. In the private sector, this may be an acceptable practice, and according to some, even a commendable practice to benefit the shareholders, whatever the cost on the staff–after all it is being touted as the way "Bain Capital" made money for its investors.

87. However, even in the private sector, practices should improve the product or service, taking the best most experienced teachers from the students has deteriorated the instruction to them, and may have even been aimed at promoting Charter Schools which will ultimately go to a voucher system that will remain constant while operating costs will inevitably rise, and in time, not cover all the costs, but limit what is paid by tax revenues. Defendant Bloomberg's announced objective.

88. In the short run, of any single union leadership, of a decade or so, the trade off of maintaining a teacher workforce of 75,000 out of 80,000 (rather than the Mayor's campaign proposal of 50,000), and raising the flat per capita union dues by merely 6% (which did occur), income to the UFT remained the same.

89. However, this "business model" was applied not to the private sector, but by government officials, acting under color of law, with regard to pension-vested, tenured teachers who have

---

[10] Only by Apostolidis, however as is the practice before a "U" for the year is awarded a District Representative, an expert in the discipline being evaluated makes an independent class observation. Jie Zhang was sent to corroborate Apostolidis assessment. Ms Zhang disagreed, she commended Ostrowsky on his lesson, skills, and background and instructed Apostolidis and Finn to award the lesson a satisfactory rating. Despite the satisfactory rating by the expert, only one unsatisfactory observation by the English teacher, Apostolidis, which did not conform to the standard by describing the content of the lesson, but only commented on what she believed she observed as to "classroom management," Ostrowsky was nevertheless rated "U" for the year, subjecting him to be brought up on disciplinary charges as soon as September 2012 selections for "PIP" were made (see *fn* 11).

a property interest in their future salary and accruing pension benefits, and a liberty interest in being able to continue to practice their profession as public school teachers.

90. What is at stake here is that not only is it in the public interest to stop the widespread targeting of tens of thousands of outstanding teachers because their future salaries and pension accruals are more than the Mayor wishes to allocate, it is further a "taking" without adequate due process of both property interests (~$6,000,000.00 in future salary and pension for a tenured teacher of Ostrowsky's age and salary) and liberty interests (placement on the I/I list and loss of NYC teaching license is essentially a bar to all public school pedagogical positions in the U.S. thereafter, barring all future employment in one's chosen profession as well as defamation) for all those not wary enough to take as early and aggressive action in the face of an all too familiar assault on an innocent and especially effective teacher's work such as Mr. Ostrowsky.

91. If Mr. Ostrowsky does not have standing to bring his claims of fraudulent evaluation, harassment, defamation, and intentional infliction of emotional distress, all in furtherance of an unconstitutional "taking," at this time, then tenure is not only a myth, teachers would be better off without out tenure, they would not have to be defamed, barred from their profession, harassed, framed, and psychologically tortured with fear of never being able to teach again, to displace them and hire a teacher without experience, without tenure, and without pension vesting, and with entry salary–it could be accomplished without the defamation, and as much wilful and deliberate pain and suffering to coerce "voluntary" asportation ("self-deportation"?) from the school and removal to another position.

92. It is not in the public interest to give students minimally qualified teachers, when they need seasoned, efficient, effective, instruction, which they were getting from veteran master teachers such as Plaintiff.

93. If teachers have no standing to make claims when they are so mistreated under color of law in furtherance of "taking" their tenure rights, at this point, before formal disciplinary charges are brought then they never have any opportunity for relief, and due process is completely denied because once the disciplinary charges are brought they shall never teach in public schools again.

94. Once formal charges are brought both state and federal courts abstain until the administrative arbitration process is completed.[11]

95. Once the arbitration decision is made then the federal courts abstain and the state courts have extremely limited review based on fraud, corruption, bias which they are want to find. They are limited by Ed. L. 3020-a to review pursuant to CPLR 7511(b) only.

96. Thereafter, the federal courts abstain calling the very limited review of the state courts *res judicata* and issue preclusion from further claims.

97. Thus, if the City had its way there would be no review and no opportunity seek review of what is a $6,000,000.00 "taking" to a teacher at Ostrowsky's age, tenure, vesting, and salary.

98. Removing the last vestige of pre-defamation due process from the Collective Bargaining Agreement ("CBA") in 2007, the ability to grieve what is placed in the file, made the only place that false allegations placed in the files could be reviewed, was in a court of law.

99. The discriminatory fabrication of false reports to a personnel file, and the deliberate establishment of a hostile work environment, is actionable when committed by public official acting under color of state law. It is a civil rights violation in furtherance of a "taking" of Plaintiff's property rights both to meet unlawful goals dictated "from the top" and in

---

[11] Chancellor Walcott publicly announced that the "Just Cause" standard required by state law to be met by the arbitrators should be eliminated, the allegations of the Principal should be enough (the arbitrators cost too much money and there are disparities in results between arbitrators (hear his testimony at the website cited in ¶¶ 42, 329. The video of said proclamation was on You Tube when the original complaint was filed but it has since been replaced by audio of day long hearings on the escalating cost of administering the disciplinary process. No wonder the Chancellor balk's at the cost, when the number of charges filed have so drastically increased in the last decade.

furtherance of their own pecuniary gains by Defendants Finn and Apostolidis and that is not only falsification of government records it is also corruption.

100. There is no other conclusion to reach but that Defendants Bloomberg and Walcott are operating a corrupt enterprise in the way the DOE is being run. Thousands of teachers and have been harmed by the insistence to Principals to reduce the pedagogical payroll by reducing the mean teacher salary by $10,000.00 insisting that Principals may hire whomever they wish as well as to fulfill this goal (among others such as vesting and tenure, but there is absolute direct evidence of the orders to reduce the mean teacher's salary). This can only occur if they "purge" the higher paid tenured teachers, either to excess them as ATRs, to coerce them to retire by harassment (taking the future salary and pension increment that would accrue to them for life) or bringing them up on charges with the same "taking" of future salary and pension increments.

101. Further, malice must be demonstrated to invalidate the qualified privilege of administrators doing the job the administrator believes is the correct conduct or the only possible conduct necessary to fulfill the objectives that are the goals sought by senior management?

102. Malice must attach when a public official such as a Principal knowingly files a false document, intended to harm the career of a subordinate, and to promote her own.

103. Plaintiff alleges that, that is the reason Principal Finn agreed to rescind the "U" rating for the year, which she signed, but accepted the advice of DOE counsel to refuse to remove those items placed in Ostrowsky's file because, she did not sign them.

104. Therefore, she can no longer be accused of relying on the false documents signed by Apostolidis, since as of today she did not rely on them.

105. That does not negate the pain and suffering she caused and perpetrated for the two months that Plaintiff was terrorized by what awaited him when either he returned to the same

(already a disciplinary meeting was planned for the opening days of school in September 2012, by Apostolidis) or when he received disciplinary charges.

106. Knowing untruthfulness and wilful misstatement in official government records in order to fulfill other goals unrelated to an accurate evaluation are malicious and abrogate qualified privilege of a supervisor.

107. Surely, doubly so. when promulgated by government officials acting under color of law.

108. We allege that the only way that school administrators could fulfill the mandates of lowering teacher salaries by $10,000, using the methods suggested at workshops ("encouraging unpaid leaves," "encouraging resignations/retirements," "and bringing teachers up on disciplinary charges" is to target higher paid teachers (and all teachers earning above the mean are tenured), with harassment, false allegations, and intentional infliction of emotional distress to get them to leave and barring that to bring them up on false charges.

109. We further allege that the inability to grieve the very additions to the file that are necessary to lead to a "U" rating for the year [which did occur and made Plaintiff eligible to be brought up on charges as soon as the selections for Peer Intervention Programs ("PIP") were over, if he was not selected[12]], had he not requested its reversal and had that request not been

_____

[12] PIP is a confidential program in which a teacher whose salary is paid equally by UFT and DOE works with the teacher in the classroom for a year – no observations are conducted for several months. The intervener may not report to the school administration nor testify in any proceedings; it has not grown in size despite and increase in the number of teachers receiving "U"s. During the year's program the teacher will not be brought up on disciplinary charges for in competence. PIP+ can accept those not selected for PIP if they wish to join PIP+. In PIP+ the interveners are retired Principals. It is not a confidential program. In practice, the Intervener has testified for the DOE in every case that the teacher was brought up on charges. Though it also delays the bringing of charges for a year, the DOE demanded in return for the new program that the Intervener could testify. Thus, the DOE traded more places in a program that delayed charges being brought for a year, for strengthening the case with a witness not related to the school administration, who has extensively worked with the teacher–but who also has the conflict of wanting to continue in the lucrative position to supplement pension benefits doing the work supervisory work they did before, without having to go out of state to do so (the DOE hires former administrators as consultants through a private agency, to finesse the laws on "double dipping.")

acceded to (after he announced he was reluctantly leaving the school), would have precluded his coming to this Court for relief.[13]

110. The removal from the CBA of the ability to grieve materials placed in the "file" also created "open season" without recourse, for placement of items in the teacher's file that are erroneous, arbitrary and capricious, as well as deliberately false and wilfully fabricated.

111. The failure to remove them (purportedly being one false observation that does not even comply with the standard format for even subjective observations, and one follow-up disciplinary letter which reiterates and repeats the same so-called "deficiencies" in class management that Defendant Apostolidis alleged she observed in the one classroom observation for which she already had faulted plaintiff, and was thus not only untrue, but redundant) despite Plaintiff's earnest request, is indicative that these items are intended to serve several aims.

   a. To use later against Ostrowsky and argue to the arbitrator that they must be accepted as uncontested, since relief was not sought in a timely manner from either the courts or the Public Employees Relations Board ("PERB").

   b. To fulfill aims and goals set out for the Principal to meet, in terms of payroll reduction, and other personnel status goals.

---

[13] In 2006, 13 teachers from Graphic Communications Art H.S. commenced an action for age discrimination against the DOE, the Principal Jerod Resnick and an A.P. Judith Silverman 06 Civ. 1836 (JSR) (SDNY); two teachers cases were not even sent to the jury because the Law Department convinced Judge Rakoff, that they had lost their disciplinary hearings and therefore deserved adverse employment actions. However, the sidebar in which the Law Department reported this to the Court and convinced the Court not to send the two teacher's cases to the jury (on the record) occurred two months before one of the teacher's arbitrators issued her decision, and three months before the arbitrator for the other teacher issued his decision and the two Plaintiffs were not privy to the sidebar until after the trial when they prepared motion for post-trial relief [Friedline v NYC Dept of Educ., 2009 WL 37828 (S.D.N.Y.)] and read the transcript of the sidebar. In the latter opinion Judge Rakoff misstates that the jury found no liability, which clearly contradicts the trial transcript, he never sent it to the jury after the sidebar. It is no wonder that many teachers believe that their due process rights are ignored by the mayor, the Chancellor, the Courts, and on some enactments the Legislature as well (e.g. in violation of the "Taylor" law that changes in the law were made without being personally notified that their due process rights were being narrowed, before the 140 page CBA was presented for their ratification, and that such enactments were made at all to abrogate the due process in taking their constitutionally protected property rights in their tenure (See, Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985).

c. To shore up the "stats" of School Administrators, whose "stats" have gone down and who are being scrutinized as to their own performance by diverting Plaintiff's salary to other uses to enhance other school performance parameters.

112. It is further alleged that, if the DOE was serious about true teacher performance, it would insist on the development of standardized check lists and non-subjective means of teacher evaluation. But The DOE insists on subjective "Principal evaluations."

113. From Defendant Bloomberg's own statements he is not so inclined; instead he admits wanting to go after the "senior teachers" and keeping the inexperienced ones because they cost half as much (as well as can be more easily disposed of later because they do not have tenure, and are not yet vested in the pension system) *See* ¶ 74.

114. The evaluative instruments could combine a high weight on improvement *e.g.* on attendance and completion of assignments and a low weight for absolute value of test parameters for students whose record was poor in the prior two years in academic parameters, while phasing in the opposite weighting for students whose performance has been impeccable for their entire schooling to equitably reward both improvement where there is much to improve as well absolute achievement where there is little room for improvement because achievement is already excellent..

115. There is no problem writing the paradigm or programming the algorithm, making it user friendly such that the data already available could be input and the effectiveness of teachers could be measured.

116. Though the DOE has argued for state-wide standardized scores as a parameter in teacher evaluation, it knows that this is a ruse. If the students are only tested in the fourth and eighth grade and have had four or more teachers as a minimum in each interval, who is responsible; where is the measure of highly weighting what the student starts out knowing from his home

environment (and this is likely to continue to be an increasing factor in higher performing students compared to their less advantaged cohorts)[14]?

117.    The City and apparently UFT want to end the instant matter[15], before it begins, by preventing discovery to prove these allegations,[16] and by threatening sanctions.

118.    The City and the UFT wish to be as heavy handed to dissuade any teacher from bringing 42 USC 1983 claims for the above willful and deliberate conduct to expose the unlawful taking of tenure rights from its most vested and experienced teachers.

119.    In fact, on information and belief, it has been widely alleged that the entire effort is aimed at privatizing public education through Charter Schools, which would lead to the further disparity between rich and poor and the further demise of the middle class–which was the

---

[14] Home or outside instruction is likely to be the most important factor in student achievement as the student is in school 8% of the waking hours of the year.  That is why "Head Start" students resemble middle class students at kindergarten but the divergence increases until any increment that the "Head Start" students demonstrated is completely dissipated by eighth grade.  Thus, the effectiveness of education for all students from all homes, must be supplemented by enriching after-school and summer programs for all students who progress demonstrates that they lack this needed supplementation no matter what their other demographics are.

[15] The UFT has been removed from this Action not because they are not culpable of facilitating almost all of the wrongs being perpetrated by the DOE, but they do not act under color of law in the "takings" actionable under 42 UFT 1983, and they can only be dealt with for failing to comply and enforce compliance by the DOE with the "Taylor" law through appeal to PERB, which is being pursued by Plaintiff and by appeal to the legislature which is also being pursued. The lack of standing of UFT members to enforce their contractual rights, other than by UFT suing for breach of contract, and the only relief that UFT members are allowed is to go to PERB, which enforces the Taylor law and admits it has little power, is the major reason that the unlawful excesses described herein have been allowed to occur.

[16] They have singled out  present counsel out for targeting because the opposing attorneys are not accustomed to dealing with counsel who is an accomplished educator and a fairly recent retiree (effective July 26, 2008) of the DOE, who also had two years of paid DOE employment to do nothing besides investigate in depth the cases of hundreds of DOE tenured teachers brought up on charges between 2005-2008, and thereafter established a practice to assist dozens more teachers each year, since then.  Thus, contrary to a vendetta, the DOE provided present counsel with a work-free fully paid two year opportunity and material to prepare to establish a niche practice; the UFT sued the DOE for bringing disciplinary charges in said case; and the DOE settled with a huge cash settlement and at least as much more in tax preference, withdrawal of opposition to unemployment benefits, *inter alia,* as a retirement sendoff.  No, the DOE treated present counsel magnificently; there was no  ego involvement in being sent to a TRC, only freedom from a vindictive Principal who was fired (when she would have succeeded had she taken the personally offered advice). Had she not reassigned present counsel, retirement likely would have come two years earlier since there was no discipline in the school. The "rubber room," was a welcomed change from disrespectful students in a chaotic school.  Present counsel was accompanied each day by her beloved service dog (who just died on September 1, 2012 or the Court would have met him on September 19, 2012) for the two years, and he brightened everyone's life there. The facts of the cases of over 125 reassignees were learned and rest of  the time was spent putting to good use a Westlaw subscription.  For present counsel the experience could not have been better.  I am indeed grateful to both the UFT and the DOE.

basis of U.S. economic and intellectual strength and prowess in the last 65 years, based on the rapid rise of education level in the U.S. due to the post-WWII veteran's benefits, which led to an order of magnitude increase in the number of males in higher education and completing degrees in higher education (and have long since dissipated) brought the U.S. which was first in educational attainment fifty years ago to a very mediocre position among not only developed countries but several developing ones as well.[17]

120.    The taking of the best teachers from their students and their vested rights from the tenured teachers–has harmed the students of the city more than the teachers, but Mr. Ostrowsky has suffered considerable harm, too, from which he seeks relief.

121.    Ostrowsky has suffered, constructive eviction from the school he loved and worked at for longer than either Defendant Finn or Defendant Apostolidis.

122.    Ostrowsky would have been brought up on charges, had he not been constructively evicted from the school he loved and thrived in, only as much as his students thrived from his instruction, now lost to them.

123.    Ostrowsky was pained to spend his summer exhausting himself mentally and physically applying to literally hundreds (over 200) of NYC's public schools (out of a total of 1700 total schools in the NYC school system and over 100 in Nassau and Suffolk Counties at considerable mental and physical effort, exhaustion and expense, for supplies, copying and postage.

124.    The balance of his energies were spent taking courses and test preparation for the CPA exam so that in the worst case, he could at least support himself; as so many excellent but targeted teachers have become homeless, destitute, long-term unemployed after being targeted,

_____

[17] Both before WWII and with the aging out of the numbers of veterans receiving educational benefits including living expenses, females receiving degrees again exceed male higher education degree earners.

victims of ruined lives not because they were poor teachers, but because their Principal had some secondary gain in mind, *e.g.* Principal Jerard Resnick of Graphic Communications Arts H.S., who gave the most "U's" and brought nine teachers up on charges in a single year was named "Principal of the Year" by Chancellor Klein five months later; he was also Defendant in Federal Claims by at least 14 different teachers in 2007-2008 in Actions in SDNY and EDNY with varying results.

125. Finally, in 2011 the DOE spent a fortune, in public advertizing, to press the idea that Principals could identify "great teachers" and that the "keepgreatteachers.com" initiative would incite pressure on the legislature to finally agree to said lay-offs that were so very necessary in such hard economic times for the city. The legislature was not duped, if lay-offs had to occur they would be last in, first-out. No lay offs ever occurred despite the City going to the legislature for at least three consecutive years with the same urgent need and the same proposal. [*cf.* ¶ 74].

## SPECIFIC FACTUAL ALLEGATIONS OF OSTROWSKY'S MISTREATMENT

126. Until the December 2011 observation by A.P. Apostolidis, Plaintiff consistently and without exception was rated "Satisfactory" on each observation she conducted, which comprised a handful of the approximately 40 classroom observations all rated satisfactory which Plaintiff received during his DOE career to date. (Apostolidis arrived at FSSA seven years after Plaintiff).

127. This was after Apostolidis' fiasco in sending Ostrowsky to the medical bureau for "psychological evaluation" immediately after Defendant Apostolidis arrived four years earlier. After appearing at the Medical Bureau, Plaintiff was left alone and treated well by Apostolidis for the next three years.

128. However, the one negative observation report for a lesson held on December 7, 2011 and the shocking verbal report she delivered to him on December 12, 2011 was followed with the observation report dated January 27, 2012, which was so false and distorted, that either she was seeing and hearing things that were simply not observed or heard or she was deliberately creating a false instrument.

129. It also coincided with the downgrading of FSSA from "A" which for a decade had placed FSSA in a rarified category of truly outstanding schools and was considered much more than a single rung higher than "B" schools which panicked the entire school as to whether the students who sought entry would be as competitive in the future, and it particularly panicked the FSSA administration which would be called to task to account for the down-rating.

130. Before the "post observation conference," the protocol at FSSA is that the teacher is to make a self-analysis or "reflection" of the lesson as the teacher perceives it.

131. The reflection was written by Ostrowsky immediately after the lesson and brought with him and discussed at the post-observation conference held on December 12, 2012.

132. It is always is the teacher's interest to be critical and extremely accurate in the reflection, because techniques that were well-intended do not always work out that way; the teacher who recognizes that a segment of the lesson was confusing, and who reports how it was "tweaked" for the next class and how the results differed, may be complimented for insight, perception, attunement to students needs and responses, while a teacher oblivious to a metaphor that went awry is likely to be faulted.

133. Plaintiff was shocked to have his recollections of a perfectly satisfactory lesson much like the over 10,000 lessons he had delivered before it, in his teaching career, so distorted by misapprehensions, misunderstandings and outright misstatements that Apostolidis reported. She stated that she was going to rate the lesson "unsatisfactory."

134. It was to be the first unsatisfactory observation rating ever in Plaintiff's career.

135. Plaintiff knew he was being targeted for a second time by the same one individual who had targeted him, briefly four years earlier, until it totally backfired.

136. Finally, after almost two months had elapsed after the December 7, 2011 observation, Apostolidis' written observation report was completed and transmitted to him.

137. Plaintiff, drafted an eight page rebuttal refuting virtually every one of its comments, and submitted it for inclusion in his file.

138. Plaintiff alleges that Apostolidis falsified that students called out without being first recognized throughout the lesson. Plaintiff asserts that this is not true.

139. Plaintiff insists that his students must raise their hands and wait to be called on, and this is what they did during the observed lesson.

140. In the rare instance that some one did not wait to be recognized, they were reminded to do so and their comment or solution for that question was not accepted.

141. Plaintiff alleges that Apostolidis negatively remarked that one student got up to throw a paper in the trash, another asked to go to the lavatory, and a third removed a sheet of paper from his looseleaf.

142. Students are encouraged to keep the room clean, one female student out of over twenty asking to use the lavatory in about a 50 minute period is quite unremarkable especially since it was after she had turned in her assigned classwork, and making it sound as if a student ripped a page out of a textbook without plaintiff commenting, when the student removed the paper from his binder to do calculations, at an angle that was more comfortable than in the zip-around binder, were deliberately written to appear as if students were doing something they should not have been, and Plaintiff was ignoring unacceptable student conduct.

143. Plaintiff asserts that denying permission to a student to use the lavatory, is cruel and unlawful, while querying them for details is embarrassing and humiliating.

144. Apostolidis criticized Plaintiff at the post-observation conference because it took five minutes for the student to return.

145. Apostolidis falsely accused Plaintiff of answering his own question as soon as the handouts were distributed and the class began to work on the problems. This most assuredly did not occur. A student was called on, the student answered, and then several other students volunteered and were called on to discuss as a class how to approach the problem.

146. Apostolidis alleged that a student asked, "How do we plug it in"? And Plaintiff allegedly answered, "We'll get to that." No such interchange ever occurred.

147. There was evidence of total comprehension by the students and the entire class was actively participating and engaged but this went unmentioned.

148. There was no recitation by Apostolidis of the actual questions asked by Plaintiff nor the comprehending way the students were able to field those questions.

149. Apostolidis' only comment about students solving problems at the board was that she felt too many students were working at the board rather than commending how many students were eager to be involved and participate at the board and then present how they arrived at their solution to the entire class. Their presentations were clear, concise, and correct.

150. Apostolidis falsely included in her report that Plaintiff erased a student's work, and replaced it with the correct solution without explanation. This is categorically false.

151. Asking students to explain incorrect solutions is as important, if not more so, than correct ones. It allows the class to see pitfalls and to learn how to avoid them in the future.

152. Apostolidis faulted Plaintiff for informing a student that a problem she was asking about had already been explained by another student. As soon as the student asked, the board panel

with the correct solution was pointed out to her, and she said that was what she was looking for or words to that effect, and that she did not need more.

153. Plaintiff then elicited the steps to Bernoulli's formula that he had introduced two days earlier and wrote them as the students provided each step. Apostolidis falsely wrote in her observation report that Plaintiff wrote them all himself without any student participation. This is a boldface deliberate misstatement and contrary to what occurred.

154. Plaintiff also reminded students key words need for the probability operations, and elicited the definition of each key word.

155. This was omitted from Apostolidis report.

156. Also omitted was all the praise and positive reinforcement students received when they worked efficiently and effectively, and comported themselves by the class and school rules, insisted on from day one of each term in Plaintiff's classes.

157. Finally the excellent summary given at the end of the lesson to integrate all the concepts and reinforce them for the students was ignored as well.

158. When she was called on these errors, by Plaintiff, Apostolidis could not defend any of them she just went mute.

159. Plaintiff concluded his rebuttal by stating the "observation report written by Sofia Apostolidis is completely unjust, inaccurate, incomplete, incoherent, contradictory, and a gross distortion of the events that actually took place in that classroom."

160. Because FSSA is a small high school, and there is no A.P., for each academic discipline as there are in larger High Schools, where the supervising A.P. in each Department is licensed both as a teacher holding the subject matter teaching license of the department and an administrator, holding NYS School or District Administrative Licensure.

161. Therefore, it is routine practice, in similar small High Schools that a "content" specialist

assigned to that School District and the A.P. and or Principal, jointly perform the teacher evaluation observations.

162.   In fact, the consultant-specialist for Math. at FSSA, is a retired 40-year veteran A.P. Mathematics who served at Franklin K. Lane H.S., one of the city's largest High Schools.

163.   At the December 7, 2011 formal observation, only Ms. Apostolidis, entered Plaintiff's classroom to conduct the observation.

164.   At the pre-observation, it was clear that Apostolidis did not understand the lesson she would be observing,[18] nor did she appear receptive to being taught the operations and concepts which she would require in order to follow what the lesson's objectives and activities were.

165.   Only then could the delivery of the expectations and directions of the teacher be fairly evaluated and so too, only then could the execution of expectations of the educational supervisor, be fairly assessed.

166.   At the pre-observation conference, Apostolidis did not understand why Plaintiff was introducing Bernoulli's formula two days before the day she would observe it being used. Plaintiff, explained that the understanding and applications to probabilities would take three days to fully assimilate and use, especially with the group of students in the class she chose to observe[19].

167.   In fact, both Apostolidis and Finn sat-in on the entire class where Bernoulli's Formula was introduced. Thus, Apostolidis should have been able to comprehend and assimilate the unit

---

[18]  A meeting required by the collective bargaining agreement ("CBA"), at which the observer and the teacher plan the lesson together, setting the standards, that will be looked for, and the outcomes expected, much like a film director and an actor may plan the execution of a scene from the script together.

[19] The students selected for the course called "Statistics" at FSSA were students that the school Administration steered away from Math B, a course terminating in a Regent's Exam based on their performance on the Math A Regent's (Elementary Algebra) exam, based on their less than expected scores.  By offering them only non-Regents math courses after Math A, FSSA could improve the pass rate on and grade average of all students actually taking Math B (Geometry and Trigonometry)..

since she did sit in on the lesson (two days before the one formally observed where the basic concepts were initially taught).

168.    Surely a Professional Educator, with experience attending and evaluating instruction, Certified to serve as an Administrator in schools and school districts, who had attained at least an earned Master's degree should have been able to follow and comment on the lesson as well as the average high school student who had been selected for the class based on lack of proficiency in Math, if not much better than such students.

169.    The students worked effectively in pairs helping each other, grasping the concepts and operations assisted by a classmate-partner; Plaintiff walked among the students to ensure that they were doing the work correctly and assisted them.

170.    When Apostolidis finally wrote up her recollections of the observation some eight weeks later, there was no description or comment on the substance of the lesson (which A.P. Apostolidis, as an English Teacher, did not, in any event, deem herself competent to rate)[20], instead she elected to focus either on trivial and irrelevant matters (one student required a trip to the lavatory, another got up to deposit a paper in the waster basket) which she negatively criticized, or in the case of some of her comments, just did not happen and on which no other teacher would be rated or upon which comments would even be noted, and upon which Ostrowsky had never been faulted before.

---

[20] Although true of Apostolidis, this is not universally true.   There are numerous examples of Formal Observation Reports pursuant to observations by High School Principals (*e.g.* one who was formerly a French Teacher) who observed a science class, took notes which she incorporated into her observation report.  If all permanently tenured teachers and all administrators have at least a Master's degree, required for their licensure to work at their positions, they certainly should be able attend a high school class lesson, take notes, follow the activities, and be able to state what they learned, whether the material was clearly presented, whether any portion was confusing, did students appear to be comprehending the material from the beginning of the period to its end.  There is really no excuse for Apostolidis not doing likewise for the observations report of the December 7, 2011 observation.

171.　Any constructive criticism that a supervisor noted where greater instructional efficiency was thought to be able to be achieved, were made as recommendations, and never led to a rating of unsatisfactory.

172.　Always, there is the precís of the lesson, the analysis of technique, the commendations, and the recommendations for improvement. Finally there is the grade of either satisfactory or unsatisfactory for the lesson.

173.　Likely not understanding the applications of Bernoulli's formula (the application of which was the topic of the day), nor the derivation thereof (despite her attendance at the lesson two days earlier where it was introduced), Apostolidis was undoubtedly "at sea" observing the third lesson in this aspect of probability theory.

174.　Thus, since she observed a lesson devoted to the expansion of applications of the formula in order to reinforce and cement mastery as well as to perform slightly more complex operations in probability measurements than in the two immediately preceding class periods, (though she attended the first lesson in the unit), she was either behaving as a distracted student not attending to what was being taught, as Ostrowsky was teaching her as he taught the students, or she was deliberately just looking for student comportment indicia to negatively criticize, and did not plan to pay any attention to what was being taught.

175.　Apostolidis was there only to find whatever she could to exaggerate what she could make out of students being students or to invent items that did not occur on that day.[21]

---

[21] Incidently during the lesson that the "French Teacher" Principal loved because she loved science, she got up told two boys to change their seats to separate them and told them to put away a magazine.  Since she was not "out to get" the teacher, did not feel that the conduct detracted from the class, and could assist instruction for even those three students without the lesson thread being broken for the rest of the class, she never deigned to even mention such trivia in her formal write up.  But of course, that was in 1997, before the current "business model" was instituted, and by the end of the year she was forced out after 34 years of service, so that the new Superintendent could make room for his boyhood chum and longtime friend to become Principal.  The new Principal was in "over his head," and he too was replaced in a year by an excellent man who also stayed only for a year, preferring to return to his prior position as A.P. Organization of a Large High School in Staten Island.  The school was eventually closed after a graduate of Klein's "Leadership Academy" became Principal and became notorious for some of her practices and comments.  One that comes to mind is that when a student complained about something, she told the student, "you can't expect those things in a public

176. Had Apostolidis come in good faith, she would not likely have come without the Math specialist (who happens to be a now retired, long established Mathematics A.P.), but had she found herself there alone and not really understanding the content, she could have asked one or more of the students to allow her to see their notebooks, and she could have reviewed the lessons preceding the one she was observing, in order to do several things.

    a. She would have been exposed to the instruction that came before on the subject to better understand the content and objectives of the lesson.

    b. She would have ascertained whether there was on-going progressive instruction, where one lesson builds on the one before and lays the groundwork for the one to follow–one of the most important measures of good instruction.

    c. She would have been able to assess, by looking at the notebooks of the students how many were actually mastering the material and which students were just going through the motions but not preparing notes and notation that were sufficiently complete and intelligible to allow the student to learn and use the notes to assist in being able to do the class work or the homework or go back and prepare for an exam, usually after other topics had intervened in the class.

    d. However, Apostolidis did none of these things.

177. Looking at student notes and notebooks is one of the best ways assess the work students actually accomplish in that class.

178. Instead, rather than commending that not one student was late to the class, a definite measure of adherence to class routines, the desire to be on time, and respect for the expectations of the teacher, she faulted that four students had not yet unpacked and had their notebooks at the ready when the bell rang.

---

school; this is not a private school costing tens of thousands of dollars; you get what you pay for."

179. The fact that the last students to arrive were already all in their seats when the bell rang, when students are given only three to four minutes to get from one class to another including packing up all of their belongings from the last class, and getting to the next class, getting to their seat and unpacking their books, reading the instructions on the board for them and all but the four who were just finishing reading the instructions as to what the first task required, in order to begin to work, was already evidence, of their industriousness and seriousness.

180. It was further disingenuous for Apostolidis to say that students were speaking among themselves. She was given a lesson plan. She commented favorably on the lesson plan (the plan would have been there to refute her comments had she derided it). The lesson plan clearly called for students to work in pairs. The students were instructed by Plaintiff to work in pairs. Of course they would talk to one another as they worked together.

181. Apostolidis, did not read the lesson plan but commented favorably, making her entire comments arbitrary and capricious. Thus, whether favorable or unfavorable, neither had any basis, in fact or knowledge that she acquired from the lesson.

182. Therefore, she had no basis to evaluate whether the metaphors and examples used, related to the students lives and frame of reference, or engaged them by naming their favorite celebrities, pastimes and notable events for them in constructing the metaphors and examples they related to, identified with, and thus would be easily remembered.

183. She acquired no information as to whether the concept and derivation was adequately presented, sufficiently piecemeal and explained until there was feedback that everyone was understanding how to proceed with the operations involved. In fact, she misstated that the Plaintiff had written all the steps in Bernoulli's, when he clearly elicited each step from the students.

184. Apostolidis was not even attending to the lesson, she made it all up before or after the lesson.

185. To a seasoned mathematics educator, as would be the supervisor in a larger school (likely with at least a Master's Degree in the subject), they could come in anywhere because of familiarity with the material, and even infer any pitfalls that had been missed in the earlier lessons by observing the types of difficulties that students where having and the errors they were making, if any.

186. While the problem with all classroom observations are that they are totally subjective and entirely in the eye of the beholder, this one was particularly arbitrary and capricious, malevolently critical, in that present counsel who has analyzed dozens of classroom observations, has never seen one in which the final rating appeared anywhere but the end. In this observation it appears three times.

187. That is akin to a judicial decision where the ruling is announced near the beginning in the middle and then at the end, when only the final ruling at the end of the decision could be based on the entire facts and analysis.

188. This entire evaluation was based on subjective, exaggerated, incorrect statements about student comportment parameters and, contrary-to-fact comments concerning engagement in the lesson.[22]

189. Apostolidis acted in bad faith in making sure that there was no other witness to her mendacious observation report, while at all other times she was accompanied by the Principal or Math Consultant and at all other times, including at the observation that

---

[22] The observation reports are so subjective that at one deposition of an A.P. supervision, present counsel read half a dozen "recommendations for improvement" sections of observation reports to a supervisor which he had written himself and asked him which he had graded satisfactory and which he rated unsatisfactory. He was sure he could tell from the needs improvement section which he had rated S and which he had rated U. He got each and every one wrong.

followed she was accompanied and at that next observation the lesson was, of course, not only deemed satisfactory, it was lavished with praise by a new "expert" (who three months later was installed as the present Principal of Stuyvesant High School)..

190.    Apostolidis sole focus was not central to the core instruction that students and teachers engage in together, to assure comprehension, mastery, permanent assimilation of the lesson objectives *inter alia*.

191.    Further, one of the announced objectives in establishing smaller schools, is that staff would know all the students by name, and become familiar with their progress, so as to more effectively interact with each student.

192.    However, this knowledge was totally ignored during the observation.  While Apostolidis knew the name of each student, she did not refer to who supposedly did what, as she alleged that students were "calling out," talking, and other untrue allegations she made in her report to cast aspersions on Plaintiff's ability to maintain a cohesive learning environment.

193.    Finally, she took no measure of the nature of the class that she was observing.  This was an "inclusion class" which meant that special education student(s) were included in the class who were given additional services outside the class to support their functioning in a general education class.

194.    At least one of the students in the class has been officially diagnosed with Attention Deficit Hyperactivity Disorder for which he is being treated; another has been more informally acknowledged to have the same affliction and spectrum of symptoms and also receives the same test accommodations.

195.    In fact, all the students in this particular class, were placed in the class because their progress in Mathematics had shown them to be struggling, in fact, previously drowning, in the Regents Sequence of Mathematics courses and in the Regents exams that many students had

failed to pass or barely passed with a grade of 65.

196. FSSA is an arts-oriented high school, in which students compete for entry with performance auditions, arts portfolios, videos they have produced, and the like.

197. Thus, while there are many students who are capable in all their cognitive functions and excel in the Regents Mathematics Sequence, there are also many students for whom Mathematics is not their forte and the Principal has elected to remove them from the full Regents sequence to non-Regents Math courses to keep the cohort which does take the Math B Regents Exams passing them with both high grades and a very high percentage of those who attempt the Regents, passing the exams.

198. Such outcomes of percent passing the Math Regents, improves the overall ranking of the school, and attracts more competitive students to rank the school high on their computerized "matching" entry applications.

199. Thus, the class that Apostolidis chose to observe was not a typical class, but a class in which some of the students are repeaters in the course, oppositional about Math, in general from long term negative reinforcement as something in which they exhibited long-term deficiencies.

200. It is no accident, that Apostolidis elected to make her formal annual observation in a non-Regents, inclusion class, where students' ability to be organized in their Mathematical thought and performance differs from the Math B Regents classes. There might be more comportment issues to negatively criticize than if a Regents or Honors or other high functioning Math class was selected.

201. The mechanisms that are used to make targeted teachers vulnerable, are to observe them in their lowest performing class, where comportment and engagement are more prone to be less than optimal, to assign teachers outside their license areas and then observe them and fault

them, to assign teachers who previously taught Advanced Placement, to self-contained Special Ed classes (non-compliant with NYSED regulations if there is no Special Ed license but it is nevertheless done to target the disfavored teacher) and then fault the teacher for syntax and vocabulary that are allegedly "over the heads" of the students assigned to the class, to assign the classes of targeted teachers to unconventional spaces for their class, e.g. a portion of the library where in the open space used by others, there are distractions, etc.

202. When targeting a teacher, the object is to always observe only the class least likely to mandate that the subjective observation, be rated satisfactory, and then to distort, exaggerate, and outright misstate what was observed holding all classes to the same standards, whether the class includes disabled students, students chronically failing and at-risk of dropping out, or the best students all headed for prestigious colleges.

203. While high expectations are universally the goal, and Plaintiff does have the highest expectations for all of his students, to be effective, a teacher will also be faulted if there is no differentiation of instruction to meet the needs of diverse students in the class.

204. Not only was the observation report in disregard of the nature of the class that was being observed, but it was a malevolent, insidious display of disregard for sound educational principles simply to discredit Ostrowsky whose teaching has been above reproach for over a decade, and still is above reproach, despite this one unfair and unreasonable assault.

205. In this case it was even worse, there are misstatements in the observation report that simply did not happen the way Apostolidis portrayed them, or did not happen at all.

206. The FSSA Administration then used the one erroneous observation made in bad faith, as the point of departure to several other pejorative actions against Plaintiff.

207. Once an unsatisfactory observation is on record, an entire galaxy of "remedial" measures can be aimed at the targeted teacher.

208.  These are done both to harass and to build the case that the Administration was supportive and attempted to resurrect the teacher in order to sustain disciplinary charges to terminate the tenured Teacher's employment.

209.  Thus, Ostrowsky has been subject after the one unsatisfactory rated observation, to numerous mini-observations in which it is clear that the object was to criticize solely what is hard to refute and which is called "classroom management." Classroom management is the ability to keep all students totally on-task, never distracted or gazing around, never calling out or speaking to another student (except when directed to interact in pursuit of completion of a specified task and then to have only "accountable talk" that is for the purpose of accomplishing the assigned task), all students able to complete all assigned work in the time allotted (without finishing faster than allotted so as to be ever off-task), always having completed and submitted homework when due, never nibbling any food, never doodling or reading other than the assigned passage, never passing any item to another student, no wisecracks to take advantage of situations that present themselves for a moment of humor, no getting out of one's seat without permission, *inter alia*.

210.  Thus, once a veteran teacher has receives a single "unsatisfactory" observation, whether deserved or undeserved, an Administrator can justify entering that teacher's room at any and all times to observe and record whatever they wish to record, whether true, hyperbole or a lie.

211.  Even under the most stringent and competitive circumstances (*e.g.* at the U.S. Naval Academy), comportment being 100% complied with by 100% of the students for 100% of a six hour and forty minute day (or longer for many students who have other unique program schedules) for 180 days during each school year is just not going to occur. In every class there is going to be some deviation, at some time and the Administrator prays to be there at that moment when a teacher is targeted.

212. The total subjectiveness of the means of teacher evaluation, by a narrative classroom observation report which can include or exclude anything the observer elects to report, means that any and all inevitable departures from the ideal classroom – which indeed is an ideal that is never 100% attainable 100% of the time, with 100% of the students, in 100% of the classes, can show up as the only comment that the observer who stops by for a minute or two records and then makes a composite of several such intrusions to write a "mini-observation.".

213. For the totality of the 21st century, the subjective classroom observation has been increasingly used in NYC to target higher paid, more competent tenured teachers who are less totally submissive to less knowledgeable, more threatened younger administrators (as the appointed favorites of former Chancellor Klein and the present Chancellor Walcott).

214. When a teacher has been tenured for eight years and has been appointed in the school for 11 years as Plaintiff in this case has, the contract between the DOE and the UFT mandates only a single formal observation per year.

215. Thus, on the basis of this single, erroneous report, Plaintiff now tenured for eight years, could and did receive an unsatisfactory rating for the year, using the false observation as the basis for the rating and still being awarded an unsatisfactory rating after being observed by a highly esteemed Math specialist (Jie Zhang, who was appointed as the incoming Principal of the Premier NYC High School, Stuyvesant H.S. within weeks after Plaintiff received the observation report) for which she verbally reported to Plaintiff that he had delivered an excellent lesson and that with his skills and experience he should be teaching at a school like Stuyvesant.

216. The School Personnel File of Plaintiff which until the December Observation Report had absolutely nothing unsatisfactory about his classroom teaching, was then compounded by the scheduling of a disciplinary conference on "classroom management" which was held on

Tuesday April 3, 2012. To further build "a case" where there is in reality no case to build.

217. One of the issues that Apostolidis began to harass Plaintiff on March 29, 2012 about, concerned a student whom Plaintiff had allowed to go to the cafeteria to get lunch from period 6 Statistics class.

218. The school rule is that a student who has no scheduled lunch period, may during one of the periods that other students are scheduled for lunch (typically from about 10:45AM to 2:20 PM), go with permission, to obtain lunch and bring it back to the class.

219. Therefore, knowing this rule, it was Plaintiff [observing that the student looked pale and was behaving in a listless manner (this student has issues that likely stem from his home and personal life which may involve lack of adequate parenting)], who allowed him to go to the cafeteria and bring a meal back to the classroom, in hopes that some food would enable him to better focus on the lesson, than Plaintiff could get him to do before the suggestion.

220. The student met Apostolidis as he was returning to Ostrowsky's class and she excoriated him for having gone to the lunchroom from Plaintiff's class. The student was then told by Apostolidis, that he was allowed to go during only one specific class period of the four or five allowed to other students similarly without a designated lunch period..

221. The student had taken longer than it should have taken to quickly obtain food and bring it back to the room, in Apostolidis opinion, as there was an unexpected queue at the cafeteria line, but he should have been back sooner, Apostolidis derided Plaintiff that the student took so long.

222. Apostolidis caught the student as he was returning to Plaintiff's class and spoke to the student in the hall. Plaintiff was planning on addressing the issue of the length of time it took the student to return, and that he must return with the food more quickly and consume it in the classroom in the future by speaking with the student after the class was over.

223. Apostolidis returned with the student and told Plaintiff, that this particular student may only go to the lunchroom during the 7th period while Plaintiff's class was during 6th period. The 7th period, the student was scheduled for a Regents Review tutorial for students who had failed an important Regents exam and were preparing to retake the exam.

224. Apparently Apostolidis felt, that even a non-Regents math class, pre-empted a non-credit Global History Regents Review tutorial. She also barked at Ostrowsky that she and Ostrowsky would discuss it in her office at another time.

225. The next day, Plaintiff received an emailed notice from Apostolidis that a disciplinary conference was scheduled for April 3, 2012, to discuss classroom management issues, that he should bring his union representative as further disciplinary action could ensue.

226. Such further disciplinary action could have been be a counseling letter to file, a disciplinary letter to file, an official warning to put Plaintiff on notice that he is in jeopardy of getting an unsatisfactory rating for the year.

227. Apostolidis turned this never before addressed, further limitation on the choice of lunch period for the student with a fuller than normal schedule, into a warning of jeopardy of a U rating for the year for Plaintiff – and Ostrowsky was awarded a U rating for the year, on June 14, 2012.

228. This was totally uncalled for; there had been no prior instruction. It was a totally arbitrary and capricious instance of discipline, which had no other purpose but to harass, embarrass, humiliate, demean, and demoralize Plaintiff and the student was an innocent pawn "collateral damage," of Apostolidis' "setting up of Plaintiff."

229. Principals are routinely solicited to bring tenured teachers whom they do not want in their school up on charges, by allowing the attorneys of the Administrative Trials Unit ("ATU") or the Teacher Performance Unit ("TPU") to assist the Principal in developing the case against

the teacher, i.e. to "set up" the teacher by unwarranted letters to file, inaccurate classroom observations that specifically only mention items that can be cast in a negative light, and then to report them with hyperbole. Often the Attorney drafts the pejorative letters or report.

230. The Attorneys then send the Principal or A.P. into the classrooms, tell them how to create incidents where there are none, assist them in framing the tenured teacher in order to steal that teacher's property interests in tenure. That theft is a violation of the 14th Amendment.

231. It is also Defendant Bloomberg's and Walcott's way of finessing purging the "senior teachers" which they announce they wish to do, but that "business model" is an unconstitutional taking without due process for tenured teachers. Framing a teacher for incompetence or misconduct, is the abrogation of due process and a "taking." Especially when they perjure themselves at the disciplinary hearings, the hearing officer accepts the "evidence" and fires the teacher and the Administrator receives a bonus for purging a "bad" teacher, and another for lowering the average teacher's salary in their school.

232. When Iris Blige (Principal of Fordham H.S. for the Arts) was caught irrefutably telling her A.P.'s which teachers to target, going into observe classes with pre-written "U" rated observation reports and getting several teachers fired, through she was fined an amount equal to one of the bonuses she had earned that year for removing teachers, lowering the payroll and other parameters –it was for show–she was never brought up on disciplinary charges, nor removed from her post but left there to continue her unlawful practices unfettered.

233. Principal Blige openly states that she plans to get rid of all the senior teachers and only to hire "Teach for America" candidates, who do a two year stint and leave as part of the program and are all typically 21-22 years old.

234. Too often present counsel is retained to get involved in the case when there is a litany of false and fabricated "evidence" in the file collected over years and the Court is reluctant to believe

48

that none of it is true, but the teacher does not seek counsel until brought up on charges because until they perceive their job is imminently threatened they sheepishly accept a false case being built angainst them, until the material is a fortress that is difficult to totally deconstruct 100%.

235.   In this case, there is nothing in the file at this time that could be used against Plaintiff but the one observation and one disciplinary letter.  There was supposed to be a second disciplinary letter about a totally false allegation of error-prone Regents grading, because he held the students to an appropriate rubric, while the administration wishes the students to be "over-graded" by an overly lenient standard.

236.   Plaintiff also wrote a rebuttal to this accusation, but was too ill and distraught to attend the disciplinary meeting which was to be held the last day in June prior to the Summer break. Plaintiff was sufficiently ill that he went to see his physician instead.

237.   Plaintiff immediately received an e-mail that the disciplinary meeting would be held immediately after the summer break ended and school reconvened. At this point, Plaintiff has done nothing that is less than the high standard that he has always adhered to.

238.   Plaintiff avers that there is manifest necessity at this time to, as a minimum have discovery as to the date of commencement of FSSA Administrator contact with DOE attorneys, which have advised Defendant Finn not to remove this material from the file, date of assignment of a case number, if any, and log of all contacts and the nature and means of the contact between FSSA and Legal Services of the DOE regarding Plaintiff, if any. *i.e.* a privilege log.

239.   This will determine whether there was a case already being built against Plaintiff that was interrupted when Plaintiff left the school, but that the investment in the wrongful and malicious prosecution, which the Mayor and the Chancellor have incentivized in School Administrators and DOE Lawyers as well, and which Plaintiff alleges is all in furtherance of

intentional, deliberate taking of his property and liberty interests in his teaching position and teaching license.

240. Plaintiff further avers that such contact at this point, with units of the DOE whose sole function is to build cases against teachers to ensure getting them fired and to then prosecute the Ed. L. 3020-a charges against them, is evidence of collusion before the fact to target Plaintiff for firing absent any conduct on his part which would merit taking away his tenure rights worth millions of dollars in salary, benefits, and pensions for life.

241. Any teacher who has received a "U" or unsatisfactory for the year, can be brought up on charges for incompetence and fired, tenured status not withstanding.

242. These were not the conditions under which Plaintiff elected to accept employment as a teacher 12 years ago, and became tenured after a three year probationary period nine years ago.

243. Plaintiff as a well-trained mathematician and with experience in statistics had many choices at the time he accepted employment with the DOE.

244. But teaching is a calling and there is great satisfaction that comes with guiding young minds to gain comprehension, particularly in Math.

245. When the Plaintiff was first hired by the DOE, there were about 1 per thousand of teachers throughout the City facing disciplinary charges.

246. A total of 60 teachers out of 80,000 had charges pending at any given time. Typically, this was against males, typically the males were in Plaintiff's age range, but the charges were not the nonsense that is found in the December 7, 2011 observation, i.e. a student got up to throw a paper in the basket, another asked to use the hall pass to go to the bathroom, only 80% of the class had already begun to work on the assignment when the bell to begin class rang, another 20% were still getting ready to work, an enthusiastic student allegedly tried to answer before being acknowledged (but was reminded he needed to raise his hand to get called on).

The charges against those teachers were serious–usually an inappropriate relationship, touching or speech directed toward a student.

247. The final step in the devolution to the *de facto* devaluation of the property interest in tenure, has been the loss of the contractual right to even grieve unfair observation reports and other letters-to-file to build a case against a teacher and then bring charges against that teacher.

248. Before October 2007, teachers often grieved observation reports, to get erroneous material removed and inaccurate comments modified.

249. It was usual that some statement or sentence or more in the observation report was modified, if the report was grieved.

250. There usually were some compromises both ways, the observer would agree to remove certain statements and modify others, but not entirely accede to all the demands of the teacher and the teacher would agree to the compromise and accept not going further to the next level with the grievance.

251. It has been nothing less than a purposeful dismantling of the tenure of NYC teachers who are already tenured and as such is a "taking" without due process, when totally subjective observation reports, in this case written eight weeks after the actual observation[23].

252. Plaintiff was well aware this was occurring to numerous teachers and saw how their lives had disintegrated.

253. It was suddenly experiencing the same injustice and selectively unfair treatment himself, that literally terrorized him as to his future opportunity to teach or to even make a living and that brought on all the dread and suffering and all the physical and emotional pain.

---

[23] Often to be "tweaked" or worse drafted by a DOE prosecutor in the Administrative Trial Unit ("ATU") who did not observe the class, who is not an educator at all. A great deal of material was produced for discovery in one case from the ATU, because it eventually was given to the teacher–but drafts as well showing it was the lawyer drafting all the letters to file etc., or perhaps because there was a change in DOE counsel (all the material produced was drafted by the first attorney who began working with the Principal before any of the alleged "misconduct" took place while nothing was produced that bore the name of the attorney who replaced her).

254. On, Friday 6-15-2012, an odd incident took place. Plaintiff spent his entire day in the library carefully grading the Algebra Regents Exam with two other math teachers, Faye Ruiz and Addison Love, U.F.T. co-chapter leader for FSSA.

255. During the actual grading, Ms. Ruiz, acted strangely, repeatedly asked Plaintiff to look over some of the questions that he graded to make sure that they were graded correctly because she did "not want [him] to get into trouble."

256. Mr. Love asked Plaintiff a few times if he was feeling all right. It was very strange since Plaintiff felt fine and was doing a very thorough job grading the Regents exams.

257. At the end of the day, as Ostrowsky was just about to leave the library at 3:20 p.m., Defendant Apostolidis, appeared and said that she needed to speak with Plaintiff and the UFT co-chapter leader/testing coordinator, Sandra Cohen about something.

258. When Plaintiff asked what it was about, she said, "I will tell you when we go into the computer room at the back of the library."

259. Ostrowsky told her that he first needed to go downstairs for a minute and that he would be right back. When he returned, Ms. Cohen told Plaintiff that she had no idea what Ms. Apostolidis wanted to see him about.

260. When Plaintiff soon met in the computer room with Apostolidis and Cohen, Apostolidis said that it had come to her attention that Plaintiff had made many mistakes in grading the questions on the Algebra Regents and that he was gazing around the room and was lethargic.

261. Ms. Cohen said that this was reported to her by his two math teacher colleagues and that she then went to Apostolidis to report this. Apostolidis, said that if Plaintiff did not feel well then he should have told Ms. Cohen.

262. Plaintiff stated that this was nonsense. He said that he had spent quite a bit of time carefully grading each paper and following the guidelines in the rubric and that he was feeling fine.

263. Ms. Ruiz and Mr. Love went over their own tests and found some mistakes in their own work. Why would he be singled out?

264. It is a common practice for each of the graders to review each others' work and find an occasional difference of opinion in grading and reconcile it so all papers are graded to the same standard.

265. Mr. Love said that day after grading so many exams in one sitting he feels that he may make mistakes.

266. In 11 years of teaching, Plaintiff has never had any colleague or supervisor complain about his grading procedures.  In fact, a letter was placed in his file last year in which he was commended by Apostolidis for his hard work and team effort in the grading of the June 2011 Regents Exams.

267. How could all of this have suddenly changed?  The entire ordeal since December was Kafkesque, most disturbing, and had engendered numerous adverse physical symptoms which were painful, debilitating, and frankly depressing.

268. What seemed strange also was that Sandra Cohen, UFT co-chapter leader, whom Plaintiff has known for the past eleven years, would go directly to the A.P. and not first talk to him about an issue.  The UFT Chapter leaders are elected to be the teacher's advocates not to conspire with Administration against the UFT members they represent.

269. Also before the meeting when Plaintiff asked Ms. Cohen what Ms. Apostolidis wanted, Cohen claimed that she did not know. But how could she not know, if she, herself, had brought this issue directly to Ms. Apostolidis?

270. Plaintiff has worked with Mr. Love and Ms. Ruiz for years grading Regents Exam papers and never had such a disconcerting experience, which Apostolidis wanted to make into a disciplinary issue alleging Plaintiff's inability to perform the core functions of his job.

271. Plaintiff ended the meeting by saying to Ms. Apostolidis that something did not sound convincing about the story she had put forth and that something seemed very wrong.

272. Plaintiff stated that he did a very thorough job grading and then said that he was leaving now to go home since he was finished for the day and had accomplished a great deal of work grading hundreds of Regents Exams.

273. Plaintiff followed up by sending Ms. Apostolidis and the Principal an email message explaining that once again he did a very thorough job grading the Algebra Regents exams.

274. Plaintiff believes that his math teacher colleagues Addison Love, Faye Ruiz and Sandra Cohen may have been "put up" to staging this odd "event" by either being threatened or by being offered some sort of incentive.

275. Ms. Faye Ruiz, one of Plaintiff's math teacher colleagues involved in the above incident, also has acted very strangely lately about the condition of the classroom that Plaintiff and she shared for different periods during the day.

276. The two each hold classes in room 535. Plaintiff has three classes and Ms. Ruiz has five classes in the room. Lately, she has been pointing out every single mark on every desk in the room and been going directly to the dean with it. She also wrote a very exaggerated letter to the deans about the fact that Plaintiffs class "vandalizes" "her room."

277. Recently some papers were removed from the wall and Ostrowsky was blamed for that, too.

278. It appears very strange that she keeps carping so vigorously on the condition of the room when Plaintiff never had this problem with her in the past, though they shared a classroom before. All the carping began in mid-May 2012.

279. Plaintiff believes that there is a strong possibility that she was encouraged to begin to make a record, when there is no record to make; every classroom takes its toll of wear and tear from use by 270 teen age students each day. However, suddenly, it has only been Plaintiff's classes

for which these things have been noticed and it has been not only after the school was down graded to a grade of "B," but mostly after Ms. Zhang complimented rather than negatively criticized the lesson Zhang observed which Plaintiff taught.

280. Plaintiff always checks the room, when he arrives and after each of his classes, both the top surfaces of the desks and their underneath surfaces, so that he can appropriately deal with any identifiable marks by cleaning them himself or by alerting the janitor, more so than any other teacher, and so that his students are never falsely accused, and that he can immediately hold the student accountable, if there is something at the end of the period which was not there when the class began.

281. For this, suddenly Plaintiff is assailed for amorphous, undocumented, nebulous and undefined deficiencies for which he was lauded for his first decade of teaching, in fact, often by Principal Finn, personally.

282. This began to occur only once he became vested in pension rights, which is now ten years; (it used to be five years previously) and once his salary rose to approximately $80,000.00, and once the school lost its "A" rating and received a "B" rating, and escalated in the last seven weeks of Spring term 2012 (after Ms. Zhang was called in to observe his teaching). However Plaintiff's devotion to, and demands for, top performance and constant growth in his teaching did not change one iota.

283. Plaintiff felt unwarrantedly and unfairly beset beginning in December 2011, and it has exponentially increased by June to even more draconian proportions as described above and below.

284. On Thursday, June 14, 2012, when Plaintiff received his Annual Professional Performance Review ("APPR"), he was stunned to learn that the categories in which he was found "unsatisfactory" were "control of class," "maintenance of wholesome classroom atmosphere,"

"attention to pupil health, safety and general welfare," "care of equipment by teacher and children."

285.    There were no specific instances or documentation to corroborate any of these alleged "deficiencies," whatsoever, yet on this basis Plaintiff was rated "U" for the year, which leads to being brought up on charges unless the teacher is accepted for enrollment in the PIP program, and then it only forestalls the charges being brought for one year if it is a "set-up."

286.    Plaintiff specially was found not unsatisfactory, ***i.e. his performance was satisfactory*** (there is no higher grade than satisfactory available)  in the following categories.

### **Categories Where Plaintiff's Performance was Rated Satisfactory**

a.    Supercategory: **Personal and Professional qualities**

    i.      Attendance and punctuality
    ii.     Personal appearance
    iii.    Voice, speech and use of English
    iv.     Professional attitude and professional growth
    v.      Resourcefulness and initiative

b.    Supercategory: **Pupil Guidance and Instruction**

    vi.     Effect on character and personally [sic][24] growth of pupils
    vii.    Planning and preparation of work
    viii.   Skill at adapting instruction to individual needs and capacities
    ix.     Effective use of appropriate methods and techniques
    x.      Skill in making class lessons interesting to pupils
    xi.     Extent of pupil participation in the class and school program

---

[24] Discovery should document the amount spent on misuse of these APPRs to bring good teachers up on charges and then fire them when the very form used for the last three years to evaluate 75,000 teachers contains an uncorrected error. We do not even know how teacher pupil ratio has evolved during Defendant Bloomberg's control of the schools over the last nine years.  We do know that he campaigned on a promise to reduce 80,000 teachers to 50,000 (and we do know that at least 25,000 new hires replaced 30,000 senior teacher from salary data alone although it can have been much more if the senior teachers were not all at the very top of the pay scale–which we know is correct and that the entry level teachers were not all at the very bottom of the payscale (see calculations in  ¶¶ 42, 43) How many resignations were under duress, and how many tenured teachers were brought up on nonsensical charges so that ones with vested pension benefits (which usually comes later than tenure) or higher than average salaries were terminated.  It is incredible that droves of inexperienced, less educated (yet to matriculate for, or in the midst of, the required Masters Degree and the numerous specified pedagogical courses) are all superior to the veterans, many with accolades such as Plaintiff, and yet have not taken or passed the Statewide Standardized Comprehensive Content Test in the discipline they teach which must be passed before the professional or permanent license is issued and thus before unconditional tenure can be given. Plaintiff was replaced by a first year teacher, who student-taught at the school last year (Mentored by Sandra Cohen) It is entirely likely that the campaign against Plaintiff began as soon as Ms. Cohen suggested that her trainee should be hired for the 2012-2013 school year..

xii.    Evidence of pupil growth in knowledge, skills, appreciations, and attitude

**c.    Supercategory: <u>Classroom (or Shop) Management</u>**

xiii.   Attention to physical conditions
xiv.    Housekeeping and appearance of room
xv.     Attention to records and reports
xvi.    Attention to routine matters

**d.    Supercategory: Participation in School and Community Activities**

xvii.   Maintenance of good relations with other teachers and supervisors
xviii.  Effort to establish and maintain good relationships with parents
xix.    Willingness to accept special assignments in connection with the school program

287.    On all the above, Plaintiff was deemed satisfactory, how can he be contradictorily unsatisfactory on "Maintenance of a wholesome classroom atmosphere" while at the same time rated satisfactory on "Professional attitude and professional growth," "Resourcefulness and initiative," "Effect on character and personally growth of pupils," "Planning and preparation of work," "Skill at adapting instruction to individual needs and capacities," "Effective use of appropriate methods and techniques," "Skill in making class lessons interesting to pupils," "Extent of pupil participation in the class and school program," "Evidence of pupil growth in knowledge, skills, appreciations, and attitude," "Attention to physical conditions," "Housekeeping and appearance of room," and "Effort to establish and maintain good relationships with parents.

288.    When on all of the above, nineteen parameters, Plaintiff's performance was deemed satisfactory how could he be rated unsatisfactory on "Care of equipment by teacher and children" when he was rated satisfactory on "Resourcefulness and initiative," "Effect on character and personal growth of pupils," "Effective use of appropriate methods and techniques," "Evidence of pupil growth in knowledge, skills, appreciations, and attitude,"

"Attention to physical conditions," "Housekeeping and appearance of room," "Attention to records and reports," and "Attention to routine matters."

289. Plaintiff was rated unsatisfactory in "control of class," but if there was evidence that he possesses "skill in making class lessons interesting to pupils," then there was student engagement in the lessons, which meant students were doing what they were supposed to be doing, they were working on-task, if those parameters do not comprise "control of class," then exactly what was it that is being cited as a deficiency?

290. Plaintiff was also rated unsatisfactory in "Attention to pupil health, safety and general welfare."

291. Plaintiff has no recollection of any event which could measure this either satisfactory or unsatisfactory.

292. Basically, the UFT contract provides that a "U" for the APPR requires substantiation from the teacher's file, which is written on the back of the form.

293. Nothing was written on the back of the form[25] Plaintiff received on June 14, 2012.

294. Further, nothing may go into the teacher's file that has not been shown to the teacher and the teacher acknowledges receipt or a witness acknowledges that the teacher received it in the witness' presence but refused to acknowledge receipt. See DOE-UFT CBA Article 21A. (Available online at UFT.org)

295. There was nothing Plaintiff was given on anything but class management and he totally disagreed with the allegation that his non-Regents tracked class was any less engaged, eager

---

[25] Until 2009 the form required this for all teachers; the present form was changed to only require this for probationary employees. Was this in order to make it easier to fire tenured teachers by back-dating and inventing documents that did not exist but were later fabricated? When Plaintiff went to the union to immediately enter his Appeal for the "U" rating the staff there were very surprised that Principal Finn would issue a "U" rating for the APPR without any substantiating documentation cited on the back. This was on June 15, 2012. Plaintiff understood that he will not get a hearing until the Fall, and if he were to be brought up on charges he will not get an Appeal hearing at all, just the Ed. L. 3020-a proceeding. However no one has overturned a "U" rating in the last decade through than 8000 teachers have been rated "U" over that period.

to participate, *inter alia*, than any other class where all the students were tracked away from Regents Level mathematics (by the Principal, so that there would be higher achievement on the Regents Math B exam for those students who were tracked for the Classes that culminated in a Regents exam) and where several students were special needs students with learning disabilities and Individual Educational Programs ("IEPs").

296. In fact, Plaintiff is so organized, so methodical, and has classroom routines so regularized, that he is especially adept at classroom management, even for special needs, previously distractible students.

297. That is why he is so distraught over the false accusations, when these accusations are totally subjective, come down to credibility, and specifically were in a non-Regents class, where Plaintiff's does not have the defense "whatever I did must have been the right thing because my students' mean score on the Regents exam was 12 (or whatever) points higher than the mean score on the Regents exam for any Math class in the school which took the Math B Regents exam in June 2012.

298. The last week of classes in June 2012 (on or about June 7, 2012) during period 5 the seniors at FSSA staged a prank where they ran around the building screaming with waters guns. They were running in a mob- like manner and ran through the cafeteria into the court yard when they began to take off their clothes. Some of the female students were in their underwear and bathing suits. The students were spraying streams of water. Defendant Apostolidis, finally came out into the court yard and closed the door but did very little to stop the students from carrying on.

299. All of this could be seen on a video that was put up on YouTube but then removed from the school's YouTube site on Friday 6-15-12. The video ends with the students walking undressed back into the cafeteria holding cell phones and cameras which is against school

rules. All throughout the video there are no security guards or supervisors monitoring or controlling the situation. Plaintiff has several copies of this video on DVD which he downloaded before it was taken from the site.

300. Defendant Apostolidis and Defendant Finn certainly were deficient in the categories of: "Attention to pupil health, safety and general welfare," "Maintenance of a wholesome [senior] class atmosphere," "Control of [senior] class," and "Care of equipment/[physical plant] by teacher[s, staff] and children," in their management of the incident.

301. Thus, when any teacher having no other means of relief seeks relief from the arbitrary and capricious evaluations, which when accumulated are in furtherance of terminating their vested tenure rights to salary and fully accrued pension benefits, from the Court, the Law Department has decided unilaterally that there is no standing because formal charges have not been brought.

302. If the bank categorically embezzles money from a customers account, can the defense to making claims against that bank be–well they have not stolen all or even most of the customer's money yet?

303. The Law Department also avers that it is the absolutely right, domain, and prerogative of the Administrator to evaluate the teacher.

304. The evaluations are subjective narratives of what ever the Administrator wants to write and in this case did not even describe the didactic nature of the lesson, which is very unusual even in their subjectivity, there is a descriptive non-judgmental summary of the lesson, which is then followed by a prose analysis of methodology so as to reinforce strengths and point out deficiencies, followed by "bullet" commendable features and other "bullets" for needed improvement. Finally the observation report concludes that the lesson was either deemed satisfactory or unsatisfactory.

305. Even this minimal format for a basically subjective report was not followed.

306. Apostolidis was not even paying sufficient attention to the content of the lesson to briefly describe it.

307. This was despite, Plaintiff spending an entire class period explaining and introducing the topic of Probability and developing how Bernoulli's Principle would be used to solve problems in probability two days earlier when Apostolidis and Finn attended the first class in the unit as part of the pre-observation conference.

308. Then Apostolidis returned herself, mid-week and seemed to be writing something else, as a teacher can tell when a student is doing work for another class, because the rhythm of their writing and thinking is out of synchrony with the rest of the class.

309. The first principle of administrative law is that administrative decisions cannot be arbitrary and capricious.

310. In Plaintiff's case, Apostolidis observation report was a fabricated, erroneous observation report that only noted comments that related to behaviors students should not optimally be doing, much of which never occurred, and the rest was too trivial to be mentioned or perfectly acceptable conduct she chose to report in a biased way.

311. The fallacious so-called "observation report" was compounded by a disciplinary letter to file memorializing a disciplinary meeting to which Defendant Apostolidis summoned Plaintiff, as follow up to what she alleged she observed in the one class and also she made a *post-hoc, post-facto* rule for a single student, as to limiting when he could take his lunch, which applied to no other student in the school, and therefore beset him, solely because he was in Plaintiff's class.

312. Apostolidis picked on the student, on March 29, 2012 to have something about which to harass Plaintiff and call him in for a "disciplinary meeting."

313. However, at the meeting and in the follow-up "disciplinary letter" that was placed in Plaintiff's file she focused on what was already in the observation report, because *post-facto* rule making that applied only to a single student, would not later be sustainable, so she went back to a harangue about classroom management she observed when she visited a class Plaintiff was teaching, four months earlier.

314. This is an impermissible "double jeopardy." The post-observation conference is where deficiencies in the observed lesson are discussed and it ends there because it was brought to the teacher's attention in the observation report.

315. Apostolidis, since she had nothing about which to fault Plaintiff, the first place and had made it up, wanted more mileage out of her falsehoods, so she summoned him to a second meeting to discuss her misperceptions and misstatements again.

316. Then she put the disciplinary letter in Plaintiff's file to bolster the "U" rating she already planned to give him, and to support the prosecution of disciplinary charges to which he would be subject once he received the "U" rating.

317. Since he could no longer grieve either the false observation report or the false letter he had no choice but to seek relief in the Courts.

318. The petition in the State Court can address the administrative action but not damages until converted later to a plenary action, which is at the discretion of the court.

319. Yet if a plenary action is initially brought in NYS State Supreme Court, the Law Department moves to dismiss averring in that a special proceeding pursuant to Article 78, must be brought against an government agency or official.

320. If a federal action is brought the Law Department. claims there is no standing, the policies of the DOE are being questioned, as if the DOE is above the U.S. Constitution in developing its policies. Defendant Bloomberg's speech quoted in ¶ 74 in suggesting that it would be more

cost efficient to "lay off" the senior (high paid and tenured) teachers before the newly hired, (untenured) and entry-level paid teachers, is a public admission that his policies seek to take tenured teachers property interest in their tenure without due process. That is admission that he seeks to violate the 14th Amendment Section I. and acts under color of law.

321. Since the legislature has not let him do it on a grand scale (his 2011 proposal was for 6000-8000 teachers to be removed by Principal designation and millions were spent on an advertizing campaign "keepgreatteachers" to get the public to pressure the legislature), he has settled until they allow them to do so openly, and to get rid of 50% of the teachers that are the most highly paid (much of which has been already accomplished by the methods in place), he has done this surreptitiously.[26]

322. He rewards Principals for giving "U's", for bringing teachers up on disciplinary charges, for getting high averages on Regents (covertly blessing overly lenient grading, while having to punish anyone overt enough to get caught). Rewarding Ms. Blige for getting her Fordham H.S. for the Arts rated "A" (whether or not the grade was legitimately earned), but having to take away the equivalent of one bonus, when her targeting of teachers became a public issue that could not be denied because A.P.'s offered the evidence.

323. Yet she was never removed nor brought up on charges, evidence that the DOE approves her conduct.

---

[26] While the advertizing campaign proposed that the Principals would retain the best teachers, the directives and incentives emphasized that more teachers would have to go if the payroll was not adequately reduced, and that some Principals would have to be laid off as well (the least "co-operative" ones who failed to designate sufficient teachers for the lay-off that brought their payroll down. Bonuses for reducing the mean teachers salary, for "U" ratings (all U rated teachers would be laid off, all teachers awaiting hearings on Principal's charges would be "laid-off") were still in effect. The idea that the euphemism "laid-off" teachers would ever be recalled was false, almost half of the teachers targeted had already been relegated to the ATR pool without due process (2000), another 1000 had been removed from the classroom awaiting charges or awaiting hearings or awaiting decisions, and the others were in the pipeline as Plaintiff was in the 2011-2012 school year, with the student teacher awaiting being placed in his position, in order to comply with Defendant Bloomberg and Walcott's incentivized "budgetary directives." These were the teachers Bloomberg wanted to get rid of already, replacements had already been placed in their classrooms for the most part. Therefore when the legislature kept him to the last-in, first out rule, not a single teacher was "laid off" nor were they laid off in any other the three consecutive prior years he had lobbied for the same "taking" without due process, albeit without an advertizing campaign

324. Richard Condon's [Special Commissioner for Investigation ("SCI") for DOE which is supposed to be an independent oversight agency] Office first got the Blige case as an alleged corruption (its domain is corruption) but referred it back to the internal Office of Special Investigations ("OSI") which quickly and without recommending charges or removal settled on a $7,500.00 fine to be paid over 18 months (offsetting a bonus of that amount–*i.e.* she got an interest free loan rather than a penalty).

325. Absolutely no relief was given or offered to the teachers fired and whose lives were ruined by Blige's unlawful conduct.

326. That absolutely supports the nexus between the "business model" policies which Bloomberg and Walcott mandate of their Principals, and the mendacious targeting of the teachers with the most vested and greatest property interests in their continued employment and pension benefits.

327. Mr. Mulgrew made a scathing press release against the fact that Blige was left in place, but the UFT never sued for the many teachers she had gotten fired on false evidence at that time, and Blige is still bringing teachers up on disciplinary charges–last week it was the UFT Chapter leader who has been the teachers' advocate in that school for the past 5 years.

328. The Law Department in defending its indefensible clients, know that the best defense is an offense, that distraction of the reader/listener from their clients' conduct, and attempting to focus it on the teacher's attorney, whom they aver must be sanctioned; she keeps bringing cases that question different parts of the DOE's absolute right to make its policies, unfettered (whether they are lawful or unlawful, constitutional or unconstitutional).

329. The fact, that all other cases were brought after disciplinary charges were bought, and in many cases arbitrated with the entire spectra of outcomes, that the litigation to which the City

alludes, as having been dismissed[27], had solely to do with warehousing teachers in "rubber rooms" for years so that the cases could be heard by only 20 arbitrators handpicked in the 1990's, and there is no rubber room in this case, are omitted by the City Defendants–cases opposing these very policies of the DOE must end, according to the City.

330. Does the City Attorney contend that the "Business Model" and the incentives and penalties to Principals who feel they have no choice but to comply, supercedes the U.S. Constitution?

331. There is no question that there has been and there is an ongoing wholesale "taking" of tenured teacher's property and liberty interests in their continued employment, their salary, their future pension level (or even pension at all for those tenured but not yet vested in the pension plan), without due process, or with sham due process, to such an extent that even if it was justifiable on the basis of student achievement improvement, which it is not. There has been no significant improvement in student scores (except maybe attributable to further corruption in an already corrupt system), it still could not pass constitutional muster at this time.

332. Plaintiff, claims that there are serious constitutional claims at issue in his treatment even if the system did not get all the way to a complete abrogation of all his rights.

---

[27] Pakter v. DOE et al, was present counsel's first Federal Case for a client, the ACC prided himself as being "rookie of the year" was the most overly aggressive individual ever encountered (he measured the margins and complained to the Judge that they were .04 inch more than they should have been (I doubt that, and was certainly unaware of it–therefore the memo should be stricken), his entire litigation strategy was *ad hominem* attacks by letter (in 18 months of litigation the Court never held a single in-court conference though Plaintiff made several requests). In Adams *et al*, which had a long procedural history, I entered as the last counsel to represent two of the remaining seven plaintiffs (there had been 61 in a forerunner action), there was a vendetta against the original counsel almost two years earlier by the Court which had presided over an unrelated earlier case, and who had advised the 61 that he was being disbarred and was disbarred 11 months into the action. The remaining plaintiffs of one of two factions refiled and were *pro se* for a year, were sanctioned over $11,000.00 (unprecedented for *pro se's* to be sanctioned) for refiling though it was the Court that denied severance from the other group and suggested refiling. After nine months of being *pro se,* when they could no longer tolerate the abuse they were being dealt (I shall attach the transcripts to a later declaration, but not to a pleading), first co-counsel was hired then two of my own clients who were in the case from its inception asked if I would represent them. Both counsel were assailed from the bench constantly, though we followed the Court's directions, in following said directions, co-counsel was sanctioned for claiming the Rubber Room a hostile work environment, and I was sanctioned for not removing from the fourth amended complaint co-counsel's last minute addition of a 13th Amendment claim as pertaining to my African-American and Afro-Caribbean-American clients whose confinement to the rubber rooms, demeaning and deprecating treatment by clerks there, unsafe conditions leading to serious respiratory illness in one, despite numerous citations to DOE for inadequate ventilation, and placement on the I/I list while there, so no other gainful employment could be obtained in their profession, is absolutely akin to indentured servitude and supported by hundreds of cases where the 13th amendment was successfully invoked. It is on appeal. The Magistrate (I never saw the District Judge) had an undisclosed conflict–his wife was serving as an A.P. in a NYC H.S. all during the case.

333. The false, defamatory, two items remain in his file for later use, in again attempting another "taking" in the next 2-3 years.

334. He has literally been put through hell for the last ten months, and he should be made whole for the intentional, deliberate, wilful and mendacious assault for all of the last ten months.

335. What part of bad faith "takings" when due process has been abrogated does not the Law Department not understand?

336. It is the Law Department which should be sanctioned for continuing to espouse, "It is my responsibility to defend my client, and to save the City money, not to question my client's policies."[28] DOE's continuing violation of State and Federal Constitutions and Laws notwithstanding.

337. When FSSA found itself understaffed with regard to a math teacher due to the sudden and unexpected unavailability of a Math faculty member, Mr. Ostrowsky was selected to accept a sixth class each day (for extra compensation and retirement credits).

338. This was in addition to the full-program of the five assigned classes that is contractual for high school teachers according to the CBA with Plaintiff's union, UFT.

339. This extra class carried with it not only additional compensation, but additional retirement credits, which shall accrue interest over the next many decades and positively effect his pension benefit rate.

340. Only the strongest teachers who show the stamina, organization, excellent student management and above all a virtually perfect attendance record are asked to accept a longer day, another class daily, and the rewarded with the additional compensation for the extra duties.

---

[28] Quoting personal communication between Ivan Mendez, Jr. ACC, and present counsel whom he was opposing on a case at the time and to whom, I pointed out that he was defending a blatant violation of state law, for which the statutory language could not be clearer, while the DOE kept repeating that its policy differed from the law. and it had the right to have its policies–the DOE lost, to a TRO, then lost to the Police when the TRO was lifted and the teacher showed the Police (the DOE had summoned) the Statute, and the DOE finally settled the case, in favor of the teacher more than two years later.

341. Plaintiff was tapped for such assignment, quite early in his tenured career

342. In addition, when teachers are absent not for an entire term or year but for several weeks or longer, and an occasional substitute providing "generic" lessons would seriously negatively impact instruction in a course, especially if the course ended in a Regents or Advanced Placement exam, then a licensed, experienced and highly proficient Math teacher, must be found to cover the classes and maintain the same schedule, pacing, and content as for the other sections of that class in the school; Plaintiff was always available and extensively utilized here.

343. Extra compensation is provided. Plaintiff was drafted to accept such coverage.

344. Teachers who are not performing, or whose performance is deteriorating, do not get these opportunities for extra compensation which can amount to $10,000.00-$20,000.00 per year or more.

345. This is evidence that Plaintiff was "golden" until some independent event or condition arose about 10 months ago. The entire previous portion of this amended complaint describes in detail the circumstances which impacted, each to a greater or lesser degree, the horrific treatment that was accorded Plaintiff.

346. The Law Department will ridicule the length of this pleading.

347. However if it were less specific, bringing in fewer examples of collateral evidence to support the patterns and the practices, they would argue Iqbal, and Twombly.

348. There is no defense except an offense, and the Court, it is hoped will bear this in mind.

349. Though Plaintiff was in his mid thirties at the time, being the teacher with the longest tenure at FSSA, since its inception, and whose salary compounded his years of experience with the maximum differentials allowed for his educational achievement (a full year's graduate study attained beyond the Master's Degree paid the way an earned Ph.D. is paid).

350. Was review of the salary history of Plaintiff, including all the extra assignments which have accrued to his pension credit what incentivized Apostolidis?

351. Was it the student teacher who could be hired to replace him if he was driven out?

352. Finally, as if all this were not enough Defendant Walcott, has been quoted and seen in a video posted on YouTube (but since removed, we'll find a copy), stating that there should not be hearings where "just cause" has to be demonstrated (that has not been the standard, in any event, as the DOE attorneys rale for a lesser standard and have gotten it for at least six years from the arbitrator panel, as it then existed)[29], teachers should be fired when they are charged with wrongdoing by their Principal (especially since Principals are unlawfully empowered to be complainant, investigator, finder of probable cause and chief witness against the targeted teacher, all rolled into one–where is the due process there).

353. Plaintiff seeks his property interests restored and protected, as they should be and would be, but for the unlawful acts of the DOE, and each of the specifically named Defendants.

354. His seeks the fallacious observation report and letter placed in his file which he would have always had the right to grieve as unsustainable except in the most recent CBA, removed.

355. The annual APPR rating was reversed because it too, was unsustainable, contradictory as alleged herein ¶¶ 284-291.

### AS AND FOR A FIRST CAUSE OF ACTION

**Violation of Civil Rights to Due Process, to Good Faith Government Conduct, to Promulgation of True and Accurate Official Government Records, to Non-Falsification of Official Business/Government Records by Municipal Officials, especially when all were performed in furtherance of "Taking" Plaintiff's Property and Liberty Interests without due process. All actionable as 14th Amendment Violations pursuant to 42 USC 1983**

### Subcause of Action A.
**Intent (Publicly including Testimony) and Actions (non-publically) to eliminate pre-deprivation "Just Cause" and thus encouraging conduct in furtherance of "Takings" of**

---

[29] Recently to end the long warehousing arbitrators are hired in greater numbers, but Plaintiff can present witness testimony of their intimidation by DOE attorneys, Dennis DeCosta a senior supervising attorney for one.

**Property and Liberty Interests by subordinate Principals from Teachers (against Defendant Walcott)**

356. Plaintiff realleges and reasserts paragraphs 1 through 355 as if fully set forth herein.

357. Chancellor Walcott has publicly urged for the end of the "just cause" standard, stating that being brought up on charges by the Principal should suffice and the tenured teacher should be fired[30] A declaratory judgment that this policy is enjoined is urged, full due process is necessary.

358. The video of the Chancellor urging this was found on YouTube using the following link **http://www.youtube.com/watch?feature=player_embedded&v=I_yOgCdh4BU**. This has been removed but there are sufficient copies available to play at a plenary session.

359. This is a total denial of due process and in violation of both state civil service and education law, and the Chancellor by so-stating has made tenure non-existent and unlawfully abrogated the very valuable property rights of Teachers.

360. The Principals are not Lawyers and the Lawyers they rely on are subordinate to the Chancellor and the Mayor, and are the employees that are instructed to assist Principals in drafting and promulgating false documents, and are undoubtedly incentivized and penalized if they do not go along as well. (There is no doubt that Plaintiff will find several former DOE attorneys willing to testify as to how the ATU operates and prepares Principals and A.P.'s as witnesses)[31].

---

[30] Defendants Bloomberg and Walcott refuse to recognize that by State Law 3020, 3020-a and by Constitutional precedent ***Cleveland Board of Ed. v Loudermill*** tenured public employees have a property interest in their future employment which can be only taken after due process. We herein allege that licensed professional whose professional license is taken when their job is taken and placed on an I/I list which excludes them from any position anywhere in the U.S. as a public school teacher, takes a takes a liberty interest of practicing their chosen profession from them without due process as well.

[31] Further, there are instances of School Administrators, who were prepared by the ATU attorney for the Disciplinary Hearings and we have those transcripts, and who then were told by the ACC representing them at deposition for a civil action "just tell the truth" and particularly with A.P.'s who are no longer at the same school as the Principal, the A.P.'s testimony goes vilifying the teacher at the administrative hearing, to vilifying the Principal at the civil deposition.

361. The Public Lobbying for this abrogation of due process, caused Plaintiff, grave pain and suffering as the DOE, was announcing the dissolution of Plaintiff's rights to his employment in his chosen profession, to his future salary, to his teaching license, and to his further pension accruals.

## Subcause of Action B.

362. The Mayor's urging to "lay-off" (a euphemism–these are the people he wants the UFT to let him fire, anyway–but it is not the UFT's decision which he constantly faults to the media, so as to rile public opinion against unions, and teachers unions in particular.

363. Defendant Bloomberg is dissembling to the public that it is the UFT; it is U.S. Constitution as well as NYS law which recognizes that tenured teachers (and all other permanently appointed government employees) have a property interest in their continued employment[32], in their future salary.

364. Bloomberg's incentives and penalty's to Principals are all in furtherance of ignoring that property interest. While Plaintiff's property interest for future salary and a higher pension benefit than he has accrued to date, is worth $6,000,000.00. The aggregate obligations to currently incumbent teachers, were they continue to work until retirement age and then receive a pension for life, amounts to 0.45 Trillion (450 billion) dollars ($6,000,000.00 times 75,000 teachers, older teachers with less future expectations because of shorter future careers, and younger one with more if they are allowed to continue).

---

[32] Plaintiff differentiates between the professional's right to pursue the career of choice, and the employee's right to pay for work at a job. Margaret Mead defined a career as something you would pay them to let you do, if they did not pay you to do it. That is why Plaintiff's pain was agonizing over the summer as he felt compelled to enrol in CPA preparation classes, something his background made him highly qualified to do, but his chosen profession was the joy of teaching Mathematics to students, and his satisfaction was that he got the students to be excited about Math, and excel in Math–why was he suddenly being assailed to try to drive him out–when he did it so very well.

365. Bloomberg's "Business Model" is to convert tenure into "at-will" employment, with the Principals totally incentivized to get rid of the costly teachers, the tenured teachers, the vested teachers. He says as much in ¶74.

366. The legislature denies him this right because it is an unconstitutional "taking" without just cause and without due process.

367. Then his former Chancellor Klein unlawfully further denied due process, by having DOE attorneys tell Principals that they may sign disciplinary charges (ergo write the file documents, find the probable cause, and be the star witness) when this violates Ed. L. 2590 j 7 b and thus infringes on due process as well.

## Subcause of Action C.

**Falsification of Official Government Records, Including for Pecuniary Gain against Apostolidis (Finn engaged in this conduct but then reversed the false U rating eight weeks and much suffering and anguish later)**

368. Defendant Apostolidis deliberately and wilfully, fabricated and falsified the Observation of December 7, 2011, in furtherance of a taking of Plaintiff's property interests in his position at FSSA.

369. Defendant Apostolidis deliberately, intentionally and wilfully, created false and fabricated incidents about a student's lunch and errors on Regents grading, to set-up the fabrication of two disciplinary letters to Plaintiffs file that were false, and in furtherance of either driving Plaintiff from the payroll she was supposed to lower, in coerced abandonment of his property interest, in his continued assignment to FSSA, or failing that, to soon bring him up on charges.

370. The failure to remove the false charges by the Principal on advice of counsel, indicates the reluctance to lose all the work in fabrication of the false documents that can still be used for another 2-3 years and make more compelling but false case against any later allegations.

371.    Plaintiff would return to FSSA if Apostolidis was to be removed which she well deserves.

372.    The overall pecuniary penalties and incentives that caused these shameful acts on the part of public officials to occur must be pursued during discovery.

373.    The one that can be pled with specificity and first hand absolute knowledge of having seen a writing is the directive to lower the mean teacher's salary by $10,000.00

374.    The others have other witnesses who can testify to their first hand knowledge such as "U" quotas that must be met, bonuses for bringing teachers up on charges *inter alia.*

### AS AND FOR A SECOND CAUSE OF ACTION

**Arbitrary and Capricious Maintenance of Deliberately Totally Subjective Teacher Evaluations Against all Defendants also Actionable under 42 USC 1983 as in furtherance of taking of Plaintiff's Property and Liberty Rights without Due Process and not for Just Cause**

375.    Plaintiff realleges and reasserts paragraphs 1 through 374 as if fully set forth herein.

376.    The only reason to maintain the narrative form of the Classroom Observation as the major means of teacher evaluation in NYC is to keep it subjective and corrupt.

377.    Paragraphs 131-195 detail the pitfalls, inherent corruption, inadequacy and infrastructure to have abrogated due process.

378.    Only what is in the Teacher's file can be used to substantiate "U" rating and disciplinary charges, but what is in the file, alone, cannot be grieved.  Therefore Principals are free to place unwarranted derogatory material in the teacher's file without recourse and the file accumulates with no ability to challenge it until the Principal believes s/he has sufficient material that the hearing officer will find the teacher guilty of something, which means the teacher will not be coming back to the school but will be part of the ATR pool, elsewhere. [See ¶ 74 for Defendant Bloomberg's plan to eliminate the entire ATR pool (excessed in non scarcity subjects, half the

faculty in reorganizations, and all those found guilty of some remediable misconduct or deficiency, but not fired by the arbitrator).

379.    There are monetary incentives to Principals, if senior teachers are removed, rated "U" and then removed and all Principals are expected to show progress toward meeting Defendant Bloomberg's goals to lower the mean teacher's salary by $10,000.00 and are scrutinized if they do not progress toward this goal.

380.    The only way to meet this goal is to target teachers earning top salaries and replace them with those earning entry salaries. Increasing H.S. class size above 34 in academic subjects is a violation of the CBA, the UFT would sue and the public would oppose it, besides its not class size Bloomberg is after it is future obligations (see ¶74).

381.    Since there is competition for getting a NYC teaching job, further rigor to survive the first years and acquire tenure in the first place, a learning curve that takes place over several years of career development, modeling from other teacher's strengths, the NYC teacher workforce is a very strong one indeed, those teachers who have 10, 15, 20 or 25 or more years on the job, are, with a few exceptions, is a very strong cadre indeed.

382.    Therefore the only way to meet Defendant Bloomberg's pressure to lower the mean payroll cost is to target teachers who are very good in good schools whereas weak schools can be reorganized to get rid of the most expensive 50% (at least to the ATR pool), and teachers in non-shortage areas can be excessed by either changing demographics or by discontinuing one or more electives in the department for a year excessing a department member to the ATR pool rather than releasing a probationary employee and reinstating the elective course(s) the following term or year.

383.    The subjective evaluations are the way that this is accomplished with Plaintiff.

384. All classroom observations should be videotaped such that the good or great aspects cannot be suppressed for a disfavored teacher, nor the moments of error or problematic student decorum suppressed for a favored teacher.

385. Extensive checklists incorporating positive criteria of teaching behavior but with room for entry of further comments must be developed and utilized during the classroom observation so that there is at least the opportunity for objective evaluation by checking or failing to checking the presence of indicated parameters.

386. Observations should be witnessed by both the supervisor conducting the observation and by a veteran teacher or other supervisor of the person being observed's choice.

387. Both observers would use the same checklist during the class observed. After the class, the two observers would review the checklists, and identify and reconcile all discrepancies.

388. The video tape record would be employed to assist in consensus building of what was actually heard and seen to resolve and eliminate divergent notations.

389. All Defendants work together in explicit or tacit collusion to maintain the subjectivity and facilitate the targeting of unreasonably disfavored teachers and to protect unfairly favored teachers. The underlying criterion is economic; the pretextual criterion is "excellent instruction"

390. The collusion does not have to be any more overt than already on record from Defendants Bloomberg and Walcott.

391. If there is only one way to accomplish the goal of lowering the mean salary by $10,000.00 than by finding a way to oust highly paid (tenured, senior teachers) and replacing them with lower paid entry teachers, then the Principal will find the way to meet this demand without more specific instruction to affect deniability in top management.

392.  However, if in order to get to the salaries and workforce numbers that were achieved while there was a 25% across the board raise and progress on the matrix of longevity increments for three school year beginnings added another 10%, then simple arithmetic irrefutably proves that over 30,000 senior tenured teachers were replaced by over 25,000 entry teachers for the number to come out so that the mean salary rose only 6% despite the 35% upward rise in the salary schedule and the expected automatic longevity increments on the payscale awarded over the same period.

393.  There is no way, that 37.5% of the teacher workforce voluntarily resigned over so brief a period. The teachers all know what is going on, and when Plaintiff was targeted he was not going to let them ruin his life, so it ruined his health and emotional life instead, he was terrorized because the DOE does not have the right to take what he has worked for during his education and during the 11 years he has worked at the DOE and earned his tenure and yet pushed himself to improve everyday as a teacher to better serve the students, and did progressively improve and better served his students.

394.  The Courts cannot dismiss this grand taking of tenure property rights from NYC teachers.

395.  The deliberate, wilful, intentional "taking" of teachers rights while undermining all vestiges of due process by fabricated evaluations and concocted letters to file, to which administrators all testify perjuriously to save their own positions and receive bonuses represents a concerted effort in furtherance of taking the tenured teachers property and liberty interests.

396.  Even if different defendants have separate motives, schools administrators merely to meet the goals, pressures and incentives handed down to them, by Defendants Bloomberg, Walcott and their surrogates. But Defendants Bloomberg and Walcott to "reduce spending." to ignore constitutional property and liberty interests which tenured teachers have attained.

397. It is actionable under 42 USC 1983 and Defendant Bloomberg should be held to pay personally. It is equally incomprehensible how his wealth went from three billion dollars to twenty six billion (in early 2012) or more by now while in a "blind trust" while he was in elected public office.

## AS AND FOR A THIRD CAUSE OF ACTION

**Violation of Plaintiff's Liberty Interests Pursuant to Amendment XIV Sect. I through the Defamation plus Standard of Constructively Evicting Plaintiff from FSSA and forcing him to seek employment while the malicious and false "U" rating was on the DOE database for all potential Hiring Principal to view and deselect Plaintiff, SETTING UP Plaintiff for immediate charges were he not to leave FSSA and additional bonuses to FSSA Administration.**

398. Plaintiff realleges and reasserts paragraphs 1 through 397 as if fully set forth herein.

399. Plaintiff's liberty interests per Amendment XIV Sec I. are violated by "defamation PLUS" construction of the DOE conduct. Plaintiff was defamed by the false "U" rating based on the false documents placed in file.

400. The Defamation is accorded no privilege because it was knowingly false solely for the purpose of constructively terminating Plaintiff from the school in order to replace Plaintiff while he was doing and excellent jobs, so that he could be replaced by an entry level teacher earning $33,350.00 dollars less than Plaintiff earned, whom the UFT Chapter chairperson had mentored as a student-teacher.

401. The harassment was in full force, when Plaintiff was too ill to attend the last day of the 2011-2012 school year and Defendant Apostolidis wasted no time in advising Plaintiff by email that in that case the disciplinary meeting over fabricated Regents Grading Day allegation (by the UFT chapter chair who wanted her student-teacher hired) would be rescheduled for the first you back to school. It appears that the administration was hell bent on bringing Plaintiff up

on disciplinary charges as soon as the new school year commenced. They would get additional bonuses for bringing a senior teacher up on charges.

402. Though the defense acts as is there was no damage to Plaintiff because Defendant Principal Finn rescinded the "U" rating after Plaintiff secured another position, he had to seek other work with the Defamation of the False "U" that was maliciously given, because never has any teacher been rated "U" on merely a "class management only" observation, which was overturned in effect by a subsequent "S" rated full observation by an expert.

403. Plaintiff submits record of over two hundred application he made within New York City and numerous others in Nassau and Suffolk Counties.

404. Salary was an impediment in all of them; while the Districts outside NYC are under no obligation to match plaintiff's salary, they believe that he either would not accept or not be happy with a lower salary. Outside the city he felt that the Districts interviewed him to be able to say they considered a diverse pool of applicants, but they all along planned to hire the internal candidate, especially for administrative positions.

405. Inside the city, even though he was Licensed for the highest administration positions, the form requires answering the annual ratings for the past several years, and he knew that he would not be considered, thus Plaintiff limited his applications to teacher, and teacher-line positions within the city and made likely 300 applications.

406. The "U" rating that Plaintiff was accorded, albeit later rescinded, was available in the DOE data base that every hiring officer consults in deciding whom to interview, and offer a position.

407. Thus, absent the "U," with Plaintiff's experience, accolades, education, commendations, excellent attendance and prior ratings record, he would have gotten numerous interviews and many offers, thus the constructive eviction, termination from the FSSA, was certain and the

malicious rating defaming Plaintiff on the database when Principals inquired as to Plaintiffs candidacy, meets the Defamation plus requirement in several ways.

408. The Defamation plus standard is fulfilled because the "U" rating is knowingly fallacious, was meant to set the Plaintiff up for constructive eviction or if he returned in the Fall for further harassment, and being brought up on charges as was threatened in the one Disciplinary letter, that only reiterated what was already described but false in the observation report. These defamatory actions were for pecuniary gain by Apostolidis and Finn who intentionally made these false allegations to increase their own value or remuneration.

409. "Defamation plus" is met, the Amendment XIV Section I. Liberty Interest violation is alleged.

## AS AND FOR A FOURTH CAUSE OF ACTION

### Defamation *per se* of Plaintiff Against Defendants Apostolidis and Finn

410. Plaintiff realleges and reasserts paragraphs 1 through 409 as if fully set forth herein.

411. Plaintiff has been teaching in the same illustrious manner as he has been for the past decade at FSSA; however he has been targeted by Apostolidis with the consent of Finn both when the former first arrived and again in the last year (2011-2012).

412. Apostolidis entered his classroom more often than necessary given Plaintiff's history, and more often than warranted solely to make biased and unfair notations that she intended to place in Plaintiff's personnel file after summoning him to disciplinary meeting to build a "case" against him.

413. Apostolidis wrote an unfair and unwarranted subjective classroom observation report and placed it in Plaintiff's personnel file in January 2012.

414. Apostolidis conducted an unwarranted disciplinary conference with Plaintiff.

415.  Apostolidis remarks at that conference with the UFT chapter co-chair present were unfairly and incorrectly derogatory, incorrect and embarrassing.

416.  Apostolidis follow-up with a disciplinary letter to file that was incorrect, malicious in intent and defamatory.

417.  It was placed in Plaintiff's personnel file to build a "case" against him.

418.  The intent was malicious and therefore no qualified immunity attaches.

419.  Furthermore, a higher standard is demanded of government officials not to use their position to create false official government records, and defame their subordinate.

420.  As a Public Officer Apostolidis represents the City and State of New York.  Immediate deposition of both Finn and Apostolidis is justified to determine what caused them to commit the falsification of public documents that they engaged in (though Finn did retract and reissue a corrected APPR with her signature).

421.  Apostolidis must do the same and also account for her wrongful, wilful conduct in the first place.

## AS AND FOR AN FIFTH CAUSE OF ACTION

### Intentional Infliction of Severe Emotional Distress against all Defendants

422.  Plaintiff realleges and reasserts paragraphs 1 through 421 as if fully set forth herein.

423.  Apostolidis actions, conduct and harassment have been so unrelenting as to cause Plaintiff anxiety which he never suffered absent her *ultra vires* conduct and only recently in the last year.

424.  Given the aggregate allegations that are true and continuing cited in this complaint, Apostolidis has engendered a depressed mood of hopelessness in the most senior, most lauded, and

arguably most skilled teacher in the school. This has escalated between March 29, 2012 and about June 28, 2012.

425. This has caused agitation, stress, greater susceptibility to infection and a few lost sick days to Plaintiff who in prior years had the most exemplary attendance record, albeit even now his record is still exemplary.

426. The standard for intentional infliction of emotional distress, is conduct that shocks the public conscience. For government officials to behave and conduct themselves in the manner they have in this complaint indeed shocks the public conscience and will shock and outrage the public when brought to the public's attention as to how it fits together.

427. Should Bloomberg and Walcott claim they never asked anyone to falsify records, to fabricate things that never happened, there should be even more shock, how else could the school Administrators accomplish the directives to lower the mean teacher's salary, or to receive bonuses for achieving all the directives in furtherance of removing teachers whose salary was above the mean (which also by necessity meant they had achieved tenure)

428. Should Finn and Apostolidis claim that they did not know what they were doing (*i.e.* as government officials lying and falsely evaluating teachers) was illegal, that is what they had to do to comply with directives that they were compelled to follow or jeopardize their own positions and surely be unable to maintain their own salary incentives or bonuses. That will shock the public conscience even more. Because the all to fragile "it can't happen here" will have segued to "it is happening here."

429. Given all the current conduct of Apostolidis, condonation by Finn, and at the ready to put in place all the mechanisms that the DOE has accrued to deny any due process or equal protection under federal or state law or constitutions, Plaintiff's claims are all ripe for federal adjudication

because if it continued any further Plaintiff's credibility will have been so compromised that his claims would have been unfairly devalued.

430.     Plaintiff's claims are also ripe because they are recurrent and have been perpetrated against tens of thousands of tenured NYC teachers particularly during this Mayor's tenure, and are being stepped up to reduce the ranks of NYC tenured teachers, (30,000 or more have already been lost, while actively replacing them with 25,000 untenured, inexperienced, minimally qualified new hires (See ¶¶ 43,44).

WHEREFORE, based on all the foregoing, ongoing, recurrent and actually progressing for Plaintiff, allegations, Plaintiff seeks the following relief.

1.     Expunging all negative reports, letters, notes, in Plaintiff's Personnel file placed there in the year commencing January 2012 to prevent further unwarranted and unfair harm progressing to violate Plaintiff's tenure rights.

2.     Finding all NYC Defendants have violated 42 USC 1983 by each and every one directly participating in the abrogation of due process to Plaintiffs, property interest and liberty interests both officially and personally.

3.     Ordering damages be paid to the Plaintiff, in an amount to be determined by a jury for each count of violation of constitutional, federal, and state statutory provisions to be paid by Bloomberg personally in preference to the City of New York as it was his decision replace teachers unlawfully in lieu of the RIF for which he campaigned.          .

4.     Ordering damages to the Plaintiff for defamation *per se* and intentional infliction of pain and suffering from Apostolidis to be determined by a jury at trial for each count and to be paid by Bloomberg personally and in preference to payment by the Comptroller of the City of New York.

5.     Ordering reasonable attorneys fees for prosecution of this Action and to be paid by Bloomberg personally and in preference to payment by the Comptroller of the City of New York.

6.     Ordering that all damages to Plaintiff (and possibly to others similarly situated to be paid by Bloomberg personally) for his "Business Model" promulgated to be a mass "taking" of the property interests of tenured teachers, by the innumerable ways that due process has been undermined, corrupted and circumvented under his leadership as described herein.[33]

7.     Ordering damages to the Plaintiff for defamation plus violation of Plaintiff' liberty interests.

8.     Ordering such other and additional relief in favor of the Plaintiff as may be just and proper.

New York, New York
February 22, 2013

                                                    JOY HOCHSTADT, P.C.
                                                    Attorney for Plaintiff
                                                    300 Central Park West
                                                    New York, New York 10024
                                                    212 580 9930; 212 580 9322 (fax)
                                                    joy.hochstadt.pc@gmail.com
                                                                    /s/
                                                    By: _____
                                                        Joy Hochstadt (JH 0935)

---

[33] If this is the way Bloomberg earned his 26 Billion dollars while in office, then he ought to be divested of a portion of it for reparations to tenured teachers who were injured as the reductions in future obligations of NYC impact him more than any other New York State residents, as Defendant Bloomberg is the wealthiest individual in the world who claims New York as his domicile. [No reparations would be to present counsel; as she has already settled all claims against the city related to her employment with the DOE and been paid what was due her (but Bloomberg should reimburse the comptroller for what I was paid), the legal fees for this case, should be reimbursed to Plaintiff, since he has already laid they them out, at least to date.