**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

─────────────────────────

**ANDREW OSTROWSKY,**
                            **PLAINTIFF**

v                                              **12 Civ. 2439 (RRM)(JO)**

**DEPARTMENT OF EDUCATION, NYC** *et al*,
                            **DEFENDANTS**

─────────────────────────


**PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANT'S MOTION TO**
**DISMISS THE SECOND AMENDED COMPLAINT**


**JOY HOCHSTADT, P.C.**
**ATTORNEY FOR THE PLAINTIFF**
**300 CENTRAL PARK WEST–SUITE 2E**
**NEW YORK, NEW YORK 10024-1590**

**212 (580) 9930**
**joy.hochstadt.pc@gmail.com**


**By_____**
        **Joy Hochstadt**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

POINT I:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

POINT II:      PLAINTIFF HAS STATED CLAIMS UPON WHICH RELIEF CAN BE
GRANTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

POINT III      THIS COURT SHOULD RETAIN PLAINTIFF'S SUPPLEMENTAL STATE
CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## PRELIMINARY STATEMENT

There is an ongoing policy of the City of New York in its prudent fiscal policy, to insist that School Principals lower the average pedagogical salary by $10,000.00 from its current mean. This sounds like benign prudent management in an era when government spending and indebtedness is of great public concern. For their successful efforts, the Principals are incentivized with bonuses for accomplishing substantial moves in that direction. The only way to achieve this and maintain the virtually same size educator workforce[1] demanded by the United Federation of Teachers ("UFT") is to replace high salaried teachers with low salaried teachers. There are also ancillary concomitants; the above averaged salaried teachers must be tenured because it is impossible to earn the mean salary without at least five years New York City Department of Education ("DOE") experience even if a teacher was granted the maximum pre-service salary credit for prior experience and the highest educational salary credit as would be the case for educators with doctorates or two masters degrees in field relevant to their teaching license. Further, though there was a period of time when DOE educators were pension vested in five years, it is now back to ten. While defined contribution pension plans, are neutral to the employer once the initial payment is made by the employer because vesting is usually immediate, the defined benefit pension plan, though inexpensive to the employer initially, accrue exponentially as both employee longevity and salary increments accrue [the algorithm is the number of years employed multiplied by the final salary times some constant (typically between 0.014 to 0.025) once the employee is vested]. Thus, if Plaintiff were to be actually or constructively terminated in June 2013 he could not collect any salary or pension until for another 19 years; then he would collect [13 (years of service) x $78.885 (final 3yr average) x 0.0167 (constant for Tier IV employees with less than 20 years in service DOE experience) x 0.76 (discount for retiring at age 55 rather than full retirement age of 62 (at present, the Mayor wishes to raise it (Amended Complaint ¶ 74; hereafter "C.74"). This is an annual retirement benefit of $17,125. per annum (plus accrued interest at 62 years old and for the most likely next 30 years of

_____

[1] Over the last decade tere has been a 6% reduction in educator workforce, with a concomitant 6% increase in union dues, which resulted in revenue parity to the union for its cooperation)

expected further lifespan in 2029.  For a total of $513,750.00[2].  This is compared to the cost Plaintiff working for another 26 years at a historical across the board salary increments of 5.5% per year in addition to reaching the current top scheduled salary at 22 years and the top pensionable salary for the top 3 year average at 25 years.   Therefore, in historic terms, Plaintiff would earn about $248,000.00 at retirement and would have earned $4,555,000.00 in salary until retirement.  Finally for the likely life expectancy of 30 more years, his pension would amount to $186,000.00 *per annum* or in pension payout for a total of $5,580,000 pension of grand total $10,135,000.00 over his life time.  Compared with no pension vesting, no tenure, and while the top salary continues to increase at the same 5.5% *per annum,* the average teachers salary is kept to $10,000 less than the mean because teachers are replaced before they would achieve tenure or vesting (what is already occurring). Thus there would only be an annual salaries that ranged from entry level to step five and thus averaged $53,000 *per annum* with the same expected 5.5% increments or an average of $65,000.00 per annum over the same 26 years, or a total of $1,690,000.00.  The dfference between the two paths equals $8,445,000 per teacher x 75,000 teachers = $633,375,000,000 or $78,000.00 for each person of any age in NYC when a significant portion of the NYC population do not have 78,000 cents!

Therefore, incentivizing Principals to rout teachers who are vested to lock them in for a total of half million dollars to Plaintiff who is vested rather than $10,135,000,00 over his life time is the kind of shrewd business man that has made the Mayor the 10th wealthiest American.  We know that Principals receive a bonus of several thousand dollars for removing a vested tenured teacher on charges.  We know there is a $7,500.00 bonus for improving  a letter grade on the overal school report card of one grade, another incentive bonus, for lowering the average teacher's salary, others for improving graduation and attendance rates, improvements in student achievement on standardized tests including Regents exams, *inter alia*.

Chancellor Klein founded the Leadership Academy for training Principals a decade ago.  The selection process favor young, non pedagogically trained, "business model" individuals who had and

---

[2] There would likely be adjustments for cost of living changes every five years as well if the policy continued.

would again be dogged to bottom line stringency. They were taught at the Leadership Academy how to get rid of high priced teachers by observing them and writing up the negative reports that focused on only what was not perfect even if the lesson was 95% perfect and placing letters in files that made molehills into mountains for the teacher who was going to cost the city too much in the long run . Many Principals who were new and trained in this matter, accepted the goals as routine. There was high compliance of brand new Principals such as Lorna Kahn who walked into her school the first day in Brooklyn and announced that she was there to "clean house." Iris Blige, Principal of Fordham H.S. for the Arts was fined $7500.00 for directing Assistant Principals as to which teachers to target, directing them to make observations with pre-written evaluations, but never charged with misconduct under Ed. Law 3020-a and was left in place to continue her practices, while the whistle-blowing Assistant Principal is no longer there and none of the teachers targeted for defamation were reinstated or reimbursed for lost wages. C 232-233. These are just two examples out of hundreds where administrators feel obligated out of duty to what is expected of them, or pecuniary gain to themselves or to compensate for a weak showing in some parameter by excelling in another area for which they will be rated, and awarded bonus incentives. The Mayor openly says that the veteran teachers who became ATRs upon school reorganization and were not hired for other positions (how could they be they were deselected on the basis of their higher salary–so which administrator is going to hire any of them when administrators are all under edict to lower not raise the average salary in their school) should be laid-off[3]. C. 74.

Just as before the Eastern Bloc crumbled, no one would do their government job without being bribed to do it; spying and reporting of untruths about others to advance one's own position, was rampant. So the corruption that is pandemic in the Department of Education that emanates from the Mayor's "business plan" to run the DOE as if all of its tenured public employees were at-will or annually contracted and by doing so for long enough it will become so. He has likely already saved the city 1/3 of the possible 2/3 of a trillion dollars by harassing (constant negative criticism verbally

---

[3] A euphemism for "fired" without due process or just cause, because they were long ago replaced in their school's reorganization and 50% new hires took over their classes.

and with notes in mail boxes and emails) into resignation, and if that was insufficient with false evaluations and letters to file, as the basis for awarding false U ratings. As soon as the U rating is awarded a teacher can be brought up on charges, an avaricious prosecutor can convince all administrators they must stand behind their evaluations and letters under oath or they could be charged with falsification of government/business records (none mention that perjury is a more serious crime).

The one way that disciplinary charges can be delayed is if the teacher is accepted into the Peer-Intervention Program for which there are spaces for 110 U rated teachers each year for over 1000 teachers who have been rated "U" (how much over 1000 it has climbed to, will have to come from the discovery process).

The is no question that a tenured public employee has both a property interest in the expectation of continued employment with its concomitant salary, and benefits including pension rights accrual. There is also no question that a tenured public employee, has a liberty interest in not being defamed by lies, and in not having the teaching license revoked based on false allegations, and thereby being evicted from one's profession. Deliberate harassment by false accusation of wrong doing or incompetence, to effect constructive termination in order for the Principal to achieve pecuniary gain in the form of bonus, concomitant to the removal of the teacher, is malicious, shocks the public conscious, destroys all qualified privilege, and constitutes the criminal act of falsification of both government records and business records for the purpose of pecuniary gain, and E felony.

The Defense insists that the constitutionally cognizable damage begins at the preferring of disciplinary charges, perhaps even the "U" rating because that was rescinded. Wherever did the defense ever get that idea?

When a culture develops to deliberately defame, harass, and constructively terminate/evict thousands of public tenured employees each year to achieve the above savings by either depriving those public employees of their property and liberty interests or constructively depriving them by wrongfully inducing them to abandon these interests in their public employment, then their constitutional rights have been violated under color of state law.

The falsification of government records for the purpose of defaming and abrogating the property and liberty interests of subordinate tenured public employees, is not only a crime, it is a violation of the civil rights of the victims. It is the terrorization of the teacher and in the alternative building the false evidence that will be used against the victim in a disciplinary hearing that will be lost by the teacher because the perjuring administrators are believed and the teachers are not, and because as much as three years of false evidence has been collected and cannot be challenged and removed.

When under color of state law, public officials terrorize and Plaintiff here was terrorized, defamed in order to maliciously prosecute, for their own pecuniary gain in bonuses or to keep their jobs, the victim has standing to say the process of setting him up by state officials violated his civil rights.

The worst part of the tragedy is that for the two months that the "U" was in effect, those were the very months that Plaintiff made over 300 applications and got one job offer at a start-up, unequipped "C" school that is a terrible commute, and in addition to the commuting time and expense, there is so much more work for students who have to be entertained and cajoled into engagement and mastery versus FSSA where the students were all achievement-oriented by selection through the audition admissions process, only those striving for mastery of their instrument or craft for many years were able to compete with other applicants and be admitted. Though no one is guaranteed a specific assignment, there was always such a dearth of Math teachers that they were never transferred due to excessing. In fact, there are no more transfers; teachers not needed in a specific school become ATRs[4]–but this never occurs with Math teachers–its even rare with school

---

[4] This may or may have been a double-cross to the UFT. When the UFT agreed to open market hiring replacing Seniority transfers, teachers salaries were still centralized and it was immaterial to the Principal where the candidates were on the salary matrix. The Principal would hire the best fit for the opening because there was no incentive to do otherwise. The union also agreed to the reorganizations as long as 50% of the teachers were retained in the reorganized school and this complied with both No Child Left Behind and that the other teachers would also find other jobs because it assumed that the Principals hiring them would also have no incentive than to take the best teachers. However, once this was implemented, the DOE immediately thereafter decentralized the payroll and incentivized Principals to reduce their budgets, particularly pedagogical budget by returning savings, or a portion thereof to the Principal personally in the form of bonuses. The best and highest paid teachers were almost never retained by their old schools or hired by other schools. The decentralization of the payroll was an internal accounting issue, and without the purview of the DOE and the UFT was not consulted. Then there was the going after the high paid teachers and the union had to accept this or be faced with a serious reduction in force ("RIF") so that the city met its fiscal goal. Given that Union dues are per capita assessments a RIF of 37.5% of the workforce would bankcrupt the UFT out of existence.

reorganizations due to the difficulty of finding Math teachers. The Defense claims Plaintiff voluntarily transferred from FSSA-nothing could be further from the truth, Plaintiff was deliberately constructively terminated.

## FACTUAL STATEMENT

For the first eleven years, of Mr. Ostrowsky's career with the DOE life was rather idealistic. He was in a great school in a new lovely building built for its use and financially well-sponsored by a celebrity (Tony Bennett) in Honor of his friend and colleague, Frank Sinatra. The students were competitively chosen on the basis of already developed expertise and talent in the Arts, and the school spared no expense for all the equipment, supplies, and material it obtained to support its programs and become one of the few pre-eminent small public High Schools in NYC.

Plaintiff arrvied to begin his career, in 2001 as the school began and the two thrived together. Plaintiff from an entry level teacher to a veteran teacher with tenure after three years, pension vesting after ten years and a salary level of $78,880 reflecting the 10 year longevity increment, after Plaintiff passed up the salary steps in each of the his first eight years. Plaintiff's observation reports were all uniformly laudatory, and he received may commendations and letters of appreciation each year. He was one of, if not the, most respected teachers in the school. He was chosen as school Treasurer by the Principal, to administer all non-City funds, including donations, gifts, fund raising, sponsorships, PTA projects *inter alia.*

When Ms. Apostolidis arrived as Assistant Principal, five years ago, there was something about Plaintiff or his lofty position in the school as teacher with the greatest seniority and respect which displeased her and she managed to get him sent for a psychological evaluation. Plaintiff presumes there was some back lash from the Medical Department to Apostolidis for having done that, because Apostolidis totally left him alone and totally comported herself with dignity and respect for Plaintiff for the next four years.

During those four years while he honed his teaching skills to be virtually without peer by spending many hours each day meticulously preparing for each lesson, his salary rose to above the mean (and possibly to a very high or highest percentile) at Frank Sinatra School of the Arts

("FSSA") bcause he had been there the longest, by his attainment of the highest educational pay differential (at least a full year's graduate study after the attainment of the Master's degree[5]), and the longevity increment awarded after the completion of ten full years with the DOE. After the tenth year Mr. Ostrowsky also became vested in the pension plan and would receive a pension once he reached retirement age, the size of which would depend only on his final salary level and his years of service[6].

One other event occurred which probably triggered the targeting of Plaintiff commencing in the late Fall of 2011. School letter grades were announced for all the High Schools in NYC. For whatever parameters, go into making the overall letter grades[7], for the first time FSSA was awarded a "B" instead of an "A." When a school raises its letter grade by one or more levels, there is much fanfare, the administration receives bonuses, which is assumed to continue when an "A" school maintains its "A." Likewise when a school goes down a grade, the school likely comes under scrutiny and the Administration loses its incentive bonuses. This would likely be the greatest for "A" schools, the jewels of the city, upon losing the "A" rating.

We assume it cost administrators some increment of compensation they would seek to recoup by some other types of incentive pay. It is also likely that "A" schools maybe left alone and not subject to many pressures that other schools are constantly beset by, under the theory of "do not fix

---

[5] Which may not have yet been attained by the other few teachers who joined him in "opening" FSSA.

[6] The size of which would be anywhere from a minimum of $17,000.00 *per annum* (were he to leave the DOE this June) to a maximum of over $186,000.00 *per annum* (were he to work until full retirement age) for the rest of his life. It would clearly be an enormous future savings to the City if Plaintiff's tenure could be limited to his present years of service and current final salary level, and his replacement (an entry level teacher who had started as student-teacher in his school while still an undergraduate for the school year 2011-2012) and was hired at $45,530 (see salary schedule Exhibit 1) and would be expected to be replaced before she was vested in a new Tier V much more modest retirement plan. This expectation arises from the minuscule % of teachers eligible for tenure this year who actually attained it. In fact, we posit that it is virtually totally among schools where the already tenured Principal when Mr. Bloomberg came into office and did not opt for trading that tenure for myriad incentive possibilities, that virtually no teachers are falsely harassed, no fabricated observations or letters occur and only rare teachers who truly deserve "U" ratings, or discipline, receive it. Conversely, we posit that the highest rates of these adverse actions occur in school with new Principals especially from the "Leadership Academy" and among the tried and true veteran teachers with previously stellar records for decade(s). This is a question we need the answer to as soon as possible.

[7] Attendance vs. absentee rate, % of students graduating on time, % of students passing the various subject Regents exams, AP and other specialized courses offered, % students going on to 4-year colleges, *inter alia.*

what is not broken." Thus, payroll trimming may be a goal, but is not enforced with a heavy hand at "A" schools.

If that changed rapidly once the coveted "A" rating was lost, Mr. Ostrowsky was the prime target because one (1) his salary may have been the highest among the building's teachers and (2) the free Math student-teacher was doing a creditable job and she could be offered Ostrowsky's position at a savings of $33,330.00, and would also reduce the mean salary for the building, the % tenured and the % pension-vested teachers.

Suddenly out of the "blue," the "old" Apostolidis he had seen briefly when she arrived and was trying to ingratiate herself to school and regional administrators, reappeared for the first time in four years. She began making nasty, harassing snipes again and again over nonsense, both verbally and with little notes in Plaintiff's mailbox or rarely by email. For the first time in quite a while in early December 2011 she came alone to "observe" his class.[8] Apostolidis had regularly observed Plaintiff's Regents classes, at least once a year, but it had been at least three years that she was not accompanied by the 35 year-veteran former Assistant Principal, Mathematics at Franklin K. Lane High School, once the largest in the city. Plaintiff had already reviewed his lesson plan with the consultant, and was told it was excellent. A few days after Apostolidis' observation, she and Plaintiff met for the required Post-Observation conference, but it took her another seven weeks to actually write up the rather truncated "Observation Report."

At the post-observation conference, Plaintiff was shocked; Apostolidis said the lesson was unsatisfactory. Plaintiff had never had an unsatisfactory lesson in his life, and the one she observed without benefit of a math expert to guide her through the math concepts instruction was as good as any he had ever delivered and was outstanding. She said the lesson plan was good but the students

---

[8] She typically invited a "consultant," who was usually a retired Assistant Principal in the field of the observed teacher's content license to assist her (a former English teacher), in evaluating the substance of the lesson when not her own discipline. In December 2011 she came herself, chose the class Plaintiff had been assigned for the first time comprised of students who were deselected from going on to advanced Regent's math classes (classes which would terminate in a statewide Regents exam) based on their performance on the Math A Regents. The alternative course selected for them was "Statistics." Statistics was usually a rather advanced course, however he was not part of the decision to deselect in order to keep the Math Regents score high, or what non-Regents Math curriculum would be chosen for this group of students to fulfill the number of years of Math studey required for graduation. Thus, this was a group of student who had struggled with Math and for whom Plaintiff worked twice as hard to ensure his presentations would be absolutely clear and engaging to them, so that they would not be distractable.

were talking to one another. He told her that the lesson plan called for them to work in pairs. She said a student had tossed a crumpled piece of paper into the trash basket rather than getting up. He told her that his foot could touch the basket from where he sat, the toss was no more than 15 inches, he could not have missed, it would have been more distracting for him to stand up and drop it in. She said another student got up without permission to retrieve a book from a shelf 12 feet away. He told her that the student had been absent the day before when he reminded the class to bring the text the following day and the instruction was that in such case to get it from the class collection as unobtrusively as possible not to disturb others. She complained that students called out answers without raising their hands and waiting to be recognized first. He told her that once was when he was interacting with a small group of students in one part of the room and in such private quiet discussions among three or four students and the teacher while the rest of the class was otherwise engaged, it was neither necessary nor appropriate not to have a free flowing discussion among the students that removed the undesirable "teacher-centered" element, and in the one other time he quietly reminded the student of the proper conduct and recognized another student before later recognizing that student when that student followed the proper conduct. The class was very well-behaved, how could she complain she was disappointed in his class management–she was inventing things that did not exist. Plaintiff was livid but he contained it, and maintained an even and respectful posture. He knew she knew, she was lying.

In the seven weeks that he waited for her written report, he went over every moment of the lesson; he tried to be as critical with himself as possible. But try as much as possible, it was not him; Apostolidis was lying, but why now? Why after she had behaved herself for four years, did she suddenly turn on him? He held his distraught until the written report was issued.

When it was; it was more bizarre than expected. Observation reports invariably follow a set pattern, data re: date, class, period, subject, # students enrolled, # of students in attendance, *etc.* This is followed by an objective non-judgmental description of the lesson as to the Aim: as written on the Board; "do now," the sequence of demonstrations, exercises, discussions that the teacher led the students though, often with the time allowed to each, and whether assessments, medial and final

summaries, were included in the lesson.  After that, the usual observation report listed as many positive features of the lesson that the Observer could comment on, in bullet format, and finally another set of "bullet" comments for suggested improvements.  Finally, the report rates the lesson an over all grade of Satisfactory or Unsatisfactory.  None of this format which had been used for every prior observation report Plaintiff had ever experienced or seen, was used.  It was merely a pejorative recounting of perfectly acceptable and laudable comportment twisted and defamed without any redemption.  It was further a disingenuous attempt to libel the Plaintiff, by inventing things that did not occur.  While Apostolidis knew the name of every student in the class and could have and should have identified them by name, if she were telling the truth, but she was not and in identifying any student she could have been absolutely refuted by the student, those sitting around that student and Plaintiff.  She mentioned no student by name.

Plaintiff brought this libelous[9] report home to parents, who were aghast.  They had also seen over three dozen observation reports that their son, the Plaintiff had received over the past more than a decade and each one was more glowing than the last.  Plaintiff's father is a retired teacher, who retired many years ago.   He lamented that the career that he had with the DOE, and being a UFT member when it was something of which to be proud was gone, and the joy of public school teaching for the satisfaction of students learning and progressing with teachers supported by their Administrators and the UFT was long gone and replaced by malice.

The following week Plaintiff sought counsel to commence a proceeding.  This false and malicious attack on plaintiff without reason could not be left to stand.  Apostolidis worked under color of state law and she was signing falsified government documents.  This should not be occurring in the world's greatest democracy.  This was criminal.  Plaintiff was the victim and his civil rights

---

[9] Libel was not previously claimed, until counsel realized that all 300 Principals to whose schools Plaintiff applied had access to and undoubtedly consulted with Plaintiff's entire rating history in order to consider whether to offer him an interview prior to the "U" being rescinded only once he accepted a position.  Math teachers are in such short supply and Plaintiff applied only to High Schools with announced Math vacancies.  Between the high salary and the "U," he may have been fortunate that this new Principal in this newly reorganized school may have been the only administrator who did not consult these data; without the "U" even with his salary only about $4,000.00 above the mean he should have gotten offers from many, if not most, of the schools to which he applied.  Now that the libel has been detrimental even though the "U" was rescinded, the Second Amended Complaint was filed since the intentional and false "U" rating was to drive him from the school, and thus was malicious.  The "U" did indeed affect the alternative opportunities available to Plaintiff; our second amended complaint merely alleges the malice which we fully believe we can prove with clear and convincing evidence obtained through Discovery.

were being violated, if he was being harassed and maliciously and falsely assailed by government officials, under color of state law. Of course, what he was most concerned with was that he was being set up for a "U" as an annual rating. What were the consequences of getting a "U"? How soon? What could he do about it? I was very encouraging that he had come to me early and there were strategies that could limit the damages he had to endure. Most of my DOE clients had already lost their credibility by accepting and shrugging off, numerous erroneous, fabricated observations that complained about issues that were occurring in every classroom were non-disruptive and occurred in every well-managed classroom. Who was going to believe that administrators, always lied, that successive Assistant Principals (albeit for the same Principal) could all be lying, or wrong, or delusional. They teachers all believed that there was vendetta against them or against certain teachers. Each protected group believed their Principal discriminated against their group that was different from the Principal's and could show that when a new Principal arrives, the newly hired faculty over time significantly resemble the new Principal, come from a similar early childhood environment, and even worship in the same or a similar congregation.

Over the next two months, Apostolidis grimaced at Plaintiff, left him notes as to what she saw in his classroom. She had not done this in the four prior years. Plaintiff was meticulous about making sure that his students cleaned up every room before leaving; he always checked every desk for marks and the floor for debris. It was totally uncalled for, to be excoriated about the way Apostolidis alleged some teacher later in the day alleged she found a paper on the floor, or a desk sticky, when Plaintiff carefully checked and washed the desks if needed and checked the floor; it just was not his classes.

Until the last semester at FSSA, he was always assigned his own room not used by other's classes. The Spring 2012 term, Plaintiff, did not have his own room; at first it was just an inconvenience, but he assumed on a rotating basis that he'd have to endure that situation as there were not enough rooms for every teacher to get a room that would not be used except for the five periods that the particular teacher taught and would be empty for the other three to five periods depending on the school's schedule. However, when the untrue complaints began to be reported to

Plaintiff by Apostolidis, he began to believe that he was intentionally placed in rooms used by other teachers, especially those who were almost as fastidious as he was but who could be coaxed into false complaints by teachers wishing to curry favor with the administration.[10]

Besides the snipes, there was a conference to which Plaintiff was summoned to attend with Apostolidis, and told to bring his union representative as further disciplinary action might ensue. The conference was delayed several times between February and April, possibly to heighten Plaintiff's anxiety about it. It took place on or about April 4, 2012. The subject of the summoning was to be "poor classroom management." It was a total hoax, lie and fabrication. First of all, being summoned to a disciplinary conference is a serious matter, it is usually an immediate response to some serious breach of conduct or dereliction of duty, like not taking seriously when a malingerer reports serious pain and the child was indeed in need of emergency care; or when the teacher does not return the students to the school after a field trip but allows them to proceed to their best commute home, without have gotten special parental permission for that type of dismissal from parents who allow it and something goes awry.

The fact, that Apostolidis called a disciplinary conference in April to review what she alleged she saw at an observation the first week in December and had already written up in late January was crazy, and it was the proof of being targeted. It was a "catch-22." Before 2007, a teacher would complain that they were being harassed, they would grieve it. The administrator would tell the teacher to be patient maybe it would just be an informal talk and there would be no letter to file; the teacher could grieve that it was more than 60 days ago, already written in an observation, and observations were not subjects for disciplinary letters. However, since October 2007 neither observations nor letters to file could be grieved. This was totally unfair because it was only the observations and the letters to files that would be the major admissible documentary evidence that would be used to terminate any teacher at disciplinary hearings. That was why allowing false

---

[10] Unfortunately the DOE has become akin to the last days of the Soviet Union, where if you were not spying and reporting (often falsely) about your neighbors and colleagues to gain favor among those with perceived greater power, then it would be those neighbors and colleagues who would be approached to spy and report you. It is a shame because reduced spending and reduced taxes for the moneyed is undermining the education our great resource, our developing human resource.

documents to file not to be grievable was mean-spirited as well as outrageous.

At the "disciplinary" conference, Apostolidis brought up the identical issues that she had already covered at the post-observation conference, at which time she was told that she was mistaken, imagining things, criticizing good comportment, and being ridiculous (as when she complained that a student in a small group of three other students and the teacher while the rest of the class was involved in other tasks, should have raised his hand and waited to be acknowledged before he participated the discussion). Nevertheless, she wrote it up as a disciplinary letter, not even a counseling letter, and there was nothing that he could do about it but rebut it and go to Court. This was so Kafkesque; he knew these two fabricated additions to file would the basis of a "U" for the year and being brought up on charges. Plaintiff's parents, who were involved in the UFT, in days when the Administrators did not even try such malicious nonsense, much less get away with it, were enraged because there was no recourse except for the Courts.

Next Apostolidis, informed Plaintiff, he would next be observed by a Superintendent's repesentative. This is what they do, to get corroboration for the school administration's intent to rate the teacher "U" for the year. Apostolidis again wanted to take the specialist to the Statistics class, but the expert said she wanted to observe the Regents Geometry class. Apostolidis and Jie Zhang[11] observed the class together. After the class was over Zhang was effusive in her compliments. She said with his skill set, he ought to be teaching at a school like Stuyvesant; that she enjoyed the lesson, immensely.

By convention, Zhang would have written the report had she found the lesson to be unsatisfactory, to offer a second opinion, but since she was directing Apostolidis to rate the lesson satisfactory, Apostolidis would write it up according to the conventional format, described above.

Plaintiff eagerly awaited the report, he thought that would have to clear him. No one he has ever known, nor his counsel has ever known, has had the Superintendent's Representative find the lesson they observed to be satisfactory and the teacher get a "U" for the year nevertheless Plaintiff

---

[11] At the time Ms. Zhang was the Network leader for Math for District 19 and beyond, but Plaintiff noticed the announcement in August 2012 that she was appointed the incoming Principal of Stuyvesant High School which she began in September 2012.

was rated "U" for the year. Especially this would be inconceivable if there was only one other observation during the year and that observation was for class management only. and did not mention lesson content, since the content specialist appeared to be unavailable that day.    Finally, Apostolidis must have felt she had to cook up some other hoax to bolster the "U" rating.  After the rating was given (the Zhang specified report came later the same day), Apostolidis was really out on a limb to give Plaintiff the "U" she intended all along.  Therefore, she induced a group of other Math teachers to say on Regents grading day Plaintiff, looked pale, was error-prone in grading the Regents, perhaps he was not able to be grading exams as important as the Regent's on a day he was "under the weather." Nonsense; another hoax, he was fine; he was not error-prone, in fact, he was finding errors that his colleagues had made and was correcting  them.  Further, he had just received a commendation the year before for his helpfulness and extra efforts in making the Math Regents and their grading go so well.

Finally, Apostolidis, arranged another disciplinary meeting on the final day of the school year in June 2012, at which she undoubtedly intended to follow up with a second disciplinary letter to file again about a fabricated situation that never occurred.  Plaintiff was so overwrought, his stomach was in knots, he could not hold down food, nor sleep; he made an appointment to see his physician and reported to the school that he was sufficiently ill that he made an appointment to see his physician and  would not be at school that day.   Apostolidis sent him an email that the disciplinary conference was rescheduled for the beginning of the Fall term.  He avoided that second letter to file by resigning once he obtained the only one job out of over 300 within the DOE High Schools in all NYC Counties, other than Richmond, which he felt he could commute from Southeastern Nassau county where he resided.

The damage that he suffered was not only the pain and suffering of knowing that government officials under color of state law were falsifying government documents to maliciously defame and libel him, but that "U" was maintained on the DOE database which every decision-maker to whom he applied for a new position had access to it and undoubtedly referred to it and thus decided against even calling him in for an interview, while Jie Zhang, the new Principal at Stuyvesant (he learned

about her appointment after he agreed to take his present position), had really loved his work and said he belonged at the best of schools.

It was a miserable summer, instead of rest an recuperation from 18-19 hour days, all year getting up before 5AM to further prepare for the day to make the lessons as good as they could be, he had commuting, xerography to facilitate organizing the student's tasks for them, *etc.* He sent 300 applications to every High School in the four boroughs to which he applied which announced a Math Vacancy, at least 10 or more a day every day for all of July; complete with sample lesson plans, student work, transcripts *inter alia.* Plaintiff, enrolled in, and paid for CPA exam preparation courses, in the event that he did not obtain any job in the DOE. He was terrified by the dire circumstances of teachers he had heard about and met numerous other teachers, railroaded, brought up on charges, and terminated on this type of nonsensical allegations, who lost their jobs, their homes were foreclosed, their families destroyed by abandonment and divorce, and they are still living dependent on the generosity of others, family and friends, four to five years later as the economy hobbles to start-up again.

Life has become even more stressful, a longer, more expensive commute with more changes and backtracking even with the best connections. Students less inculcated with the drive to mastery and the hours of extra hard work each night to find a way to get them excited enough about math that they yearn to do it rather than merely have to do it. A reorganized school that will take years to acquire all the teaching materials and impliments to facilitate the work. To form a Math Club, that once established and competitive throughout the city will be something each student hears about on arrival and covets being selected for and makes the job of instilling a drive for mastery much less difficult and time consuming than it is now. To heal from the terror which Apostolidis inflicted for her own greed or preservation or sadism or a combination of all three. To pray, he does not find it again with some administrator targeting him or any other teacher for the nefarious reasons endemic in the 21st Century NYC DOE, and so detrimental to the city's students and destructive of their education. And especially if the rot that has been brought to the Public Educational system of NYC can be enjoined, so that there can be open debate, hearings before the NYS legislature and

involvement of the NYS Governor, and a cessation of pretexts of discipline where there is no wrong, reorganization where what needed to be fixed were the administrators not the teachers while the administrators are returned, the teachers are gone and the children's education suffers. From the Mayor's desire to save money on the teacher's the budget has not been reduced, instead it is being allocated, to a plethora of lawyers, gimmick creators, whom I can't believe really beleive themselves that drone or robot teachers with the excitingly programmed computers will better teach the children and at lower cost, and it isn't the role models, the socialization, the character building and the imbuing of the love of scholarship for its own sake, for the sake of understanding, wisdom and love of humankind, country, and all that came before that is best taught by mature caring teachers who over the years have developed it themselves.

## ARGUMENT

**POINT I.**     **PLAINTIFF HAS STANDING BECAUSE GOVERNMENT OFFICIALS FALSIFIED GOVERNMENT BUSINESS RECORDS TO HARASS HIM OUT OF THE SCHOOL AND CLOSED VIRTUALLY ALL COMPARABLE OPPORTUNITIES TO HIM BY HAVING THE UNCONSCIONABLE, MALICIOUS, AND UNLAWFUL U-RATING AVAILABLE TO ALL HIRERS, DURING THE ENTIRE TIME HE WAS JOB HUNTING. THIS CRIMINAL INTENTIONAL FALSIFICATION,VIOLATED HIS CIVIL RIGHTS, BECAUSE GOVERNMENT OFFICIALS INTENTIONALLY DID THE DEFAMATION.**

Defense appears to be of the impression that unless Plaintiff was brought up on disciplinary charges, he has no standing to claim he was injured by what Apostolidis did in placing two maliciously false documents in Plaintiff's file, both reiterations of the same falsities. She was about to place a third totally fabricated allegation, but the due process required by the CBA is that he be given notice and an opportunity to respond. She had gotten him so ill over the prospect that she was deliberately falsifying another instance of slander soon to become libel, that he felt it necessary to see his physician, for anti-anxiety, indigestion, and insomnia relief instead of going to school on that last day of the year. Apostolidis wasted no time in informing him by email within an hour, that the

meeting was merely deferred to the opening of the following school year. However, he had "resigned"[12] before school reopened.

Of greater import however is that the two documents (really one reiterated) were the basis for wrongly, irrationally and deliberately false rating of Plaintiff as unsatisfactory, in his performance for the entire 2011-2012 school year. This rating appeared on the DOE data base available to all hiring personnel (i.e. Principals) for all of June, all of July and almost all of August 2012. Only when Plaintiff informed his Principal that he wished to be released to another school, was she willing to rescind the "U" rating. Thus, the "U" rating was in effect throughout Plaintiff's application process to every high school to which he could commute (i.e. all but Richmond) from his home in Southeast Nassau county. With Jie Zhang's opinion of his work, he should have had his choice of schools, especially well-established schools with stable faculties. In schools where the average faculty member was incumbent more than a decade, his salary might not be the highest, in fact, it might not be above the mean. These were also likely where the Principal was also in place for more than a decade, did not trade her tenure for Bloomberg-Klein's "business-model" incentives, and ignored all the nefarious directives to lower the average salary by $10,000.00 knowing well that could only be done by getting rid of tenured teachers and replacing them with entry level teachers. They knew that was neither legal because tenured teachers cannot be deprived of their jobs without serious cause, and because it is pedagogically unsound. But all these veteran Principals knew to check the data base and chose candidates if they had openings, who never had a "U" rating. That would have been Plaintiff before June 2012 or after August 2012, but it was not the case for the only three months that he was seeking a new assignment within the DOE.

That rises to the level of a constitutional abridgement of his liberty interests because it is not merely defamation, it is defamation plus the criminal act of falsifying business records about him that was entered onto an official government data base, which meets the defamation plus standard. It was analogous to deliberately and falsely being wrongfully placed on a sex offender list, just when

---

[12] It was constructive termination to be so harassed, so beset with falshoods, so unprecedented was the unsustainable "U" he was rated for the whole year though lavishly praised by the incoming Principal of Stuyvesant High School that at his request Principal Finn equally unprecedently reversed it. It was not voluntarily that Plaintiff resigned. In fact, at his first meeting with me, Plaintiff believed he had a superior right to remain in the school as he had the greater seniority.

you've sought to buy a house in the area. Here it was clearly defamation plus the entering of false official government records into a data base. The Fourteenth Amendment provides that a governmental entity may not "deprive any person of ... liberty ... without due process of law". U.S. Const. amend. XIV, §1. A cause of action for deprivation of a liberty interest without due process of law arises when an alleged government defamation occurs in the course of dismissal from government employment. This type of claim is commonly referred to as a "stigma-plus" claim. *Patterson v. City of Utica*, 370 F.3d 322, 330, (2d Cir. 2004). But does it not also occur when other adverse actions even criminal actions are taken against the victim, such as the falsification of government records and the entry of the false and defaming data not only into the public domain but into an official government data base that is referred to and can be shown through discovery and at trial that the false and malicious wrongful datum was an actual deterent to the obtaining of a comparable assignment for the victim?

On this topic we hear from the Civil Rights Commission in proposing rules for how government officials shall conduct themselves "...The maintenance of unusually high standards of honesty, integrity, impartiality, and conduct by Government employees and special Government employees is essential to assure the proper performance of the Government's business and the maintenance of confidence by citizens in their Government....67 FR 17528-01 COMMISSION ON CIVIL RIGHTS in the Federal Register Wednesday April 10, 2002: PROPOSED RULES.

Moreover, the false documents were the basis of the "U" rating. The false "U" rating was irrational itself. As explained in the Complaint the choice of parameters checked as unsatisfactory and the choice of parameters left as satisfactory were contradictory, arbitrary and irrational. Yet all that was entered into the database was that Plaintiff had received a "U," and not only was it available to every hiring Principal, but it was the intentional falsification of a government record, under directive "to lower the average salary" for bonus or for making up the for the bonus lost in losing the "A" rating, or to save the FSSA administration's own jobs by implementing one directive having failed to maintain a very valuable positive parameter.

The most invidious aspect is that the directive to lower the average teacher's salary comes

from the top, without a legal mechanism to do so. So to follow the directive, to do so for any or all of the three just aforementioned reasons, administration after administration, is falsifying official government records. The ones most prone to do so, which we shall prove at deposition and at trial are where members of the administrations from the Leadership Academy to train new "business model" Principals. Principals used to be trained in how to support teachers, how to organize staff in support groups or pairs to assist each other's development, how to model good classroom management for new teachers. All that is taught at "Leadership Academy" is "How to Fire Teachers," much of which are placed before the Court through my declaration. See Exhibits A-K. These presentations represent specific "lessons" taught to the incipient "Principals" with no pedagogical background or professional educational training, but instead chosen on their bottom line performance in the private sector. See Exhibits 2-6. Thus, what they were taught was not how to build a cohesive school but how to dismantle a faculty. They come in with the concept that they are "turnaround experts" not "buy-out" professionals because they are taught to kick out without any money incentive, and they are told if they are good at this, they can earn up to $200,000.00 a year in incentives and base pay that starts at about $100,000.00.

Therefore, plaintiff was constructively evicted from his school. It is to Plaintiff's credit that despite all the harm, one Principal didn't look at the data base, or she did look and she wisely did not believe that after a decade of excellence, Plaintiff suddenly deteriorated. We'll have to ask her at discovery or later. Therefore, in reading the next quote I replace terminated with constructively evicted, because I do not believe there is any reader who believes that the actions of the FSSA administration were to do anything else but to absolutely induce Plaintiff to leave.

The elements of a stigma-plus claim arising from the [constructive eviction] from government employment are (1) "the government made stigmatizing statements about [plaintiff]- statements that call into question plaintiff's good name, reputation, honor, or integrity" . . .[as the award of the "U" accomplishes (2) "these stigmatizing statements were made public" and (3) "the stigmatizing statements were made concurrently in time to plaintiff's [constuctive eviction] from government [place of] employment." *Patterson*, 370 F.3d at 330, (Internal citations and quotations

omitted). As to the first element, "[s]tatements that denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession may also fulfill this requirement." *Id.* (Internal citations and quotations omitted). Indeed the false "U" that was placed on the DOE data base and stayed there for almost three months during the very time he was seeking new employment and that the prospective employers were referring to the data base in order to evaluate him as a candidate. Thus, the removal of the "U" was too little too late. There is also no question that he did not have a choice of positions that he would have otherwise had, that the one position that he did obtain was inferior to the one he had, that the working conditions were more stressful and strenuous, in that he must work several hours longer per day to accomplish what he accomplished at FSSA, because the students are more difficult to engage and do not come already inured to a tradition of mastery, practice until perfect, competition to a standard to be met, and achievement in a judged discipline as FSSA students do in winning their auditions to be admitted to FSSA. It also costs more, takes more time, requires more connections just to get there and it will take years for the new Math Department to acquire all the materials and equipment to fully facilitate the teaching of Mathematics to adolescent students.

Defense tries to make this ordeal to be less severe than an involuntary transfer, which has been upheld. This was not any transfer; this was a constructive eviction or termination. When the intentional infliction of unlawful, false, and fabricated allegations and suffering rises to the level that a dedicated public servant who typically misses fewer than four days of work per year, is so terrorized that he cannot hold down food, sleep, or relax, and it is intentional so that he will leave and be replaced by an entry level teacher at little more than half his salary who was the student-teacher of the UFT representative, that is not any transfer, that is constructive termination, Having to seek employment with the false and defamatory "U" on the database for all hiring personnel to view, merits the stigma plus level of damages and cannot be compared to "transfers" voluntary or involuntary.

How dare the Defense even suggest that Plaintiff has no standing. The statements of the Mayor and testimony of Chancellor Walcott when compared with the announced average salary in 2007 and in 2011 and the change in the salary schedule over that interval unequivocally and irrefutably demonstrate that over 30,000 and probably 40,000 or more veteran tenured, pension-vested teachers have been replaced by inexperienced entry level individuals by exactly the means used against Plaintiff. It is only because Plaintiff is such a very outstanding teacher that he would not tolerate even the first malicious, lying, observation he ever got. It is only because Plaintiff, came pleading for relief before his reputation and credibility was totally decimated, and even applied to every High School he could even think of commuting to that he obtained a single alternative placement, that shores up his stature, and the tack the Defense has taken was that these two defamatory documents which were the basis for the "U" although they fall far short of being sufficient and the "U" was publicized and the "U" prevented him from getting any other job when he should have had offers all over the place. There is no qualified privilege to the documents or the "U" because they were maliciously issued in order to constructively evict him in order to give his $78,880.00 position with tenure and obligations for accruing pension credits to a students-teacher placed in the school while a college senior, who now has Plaintiff's job at $45,550, with no tenure (ergo not cost of tens of thousands to an arbitrator to listen to all the defamation, false reports and letters, and perjured testimony to back them up) and then find them sufficient to terminate. Also without vesting to worry about for a decade while we a talking millions of dollars to plaintiff at retirement age. This was a false defamatory and malicious constructive eviction from FSSA. It was as much a taking as if Plaintiff, was able to obtain employment only with another employer rather than in another borough.[13]

Plaintiff has alleged that Defendants have made false allegations of incompetence and professional misconduct against him. These false allegations and charges impugn his good name, particularly as he has served for many years with an unblemished, and even laudatory reputation.

---

[13] If Brooklyn and Queens are ranked separately among U.S. Cities, Brooklyn would rank just under Chicago, the third largest city in the U.S. with just 100,000 fewer persons than Chicago's 2,695,000 inhabitants and Queens would rank just above Houston the fourth largest U.S. city 2.1 million while Queens population is 2.2 million. So the idea that he still has a position for the same employer is an anomaly.

The stigmatizing statement is made "public" by placing the "U" on the DOE database which is available administrators in all 1700 schools in the system and likely to grant access to this information to potential employers, even employers who are not hiring teachers. The rating functions as the ultimate determination of the quality of plaintiff's service with NYCDOE. As a result, the rating functions as more than a constitutionally impermissible significant roadblock to future employment; the rating functioned as a virtual dead end to Plaintiff in seeking other employment. Was it a mistake or lack of inquiry by one out of 300 Principals? Does this mean without the "U" he would have been offered 299 additional positions to choose from? This will all be determined at discovery and trial, however, I doubt there is anyone who would contend that Plaintiff was not constructively evicted from his school, especially if the allegations are totally untrue and undeserved as we allege that they are. The Defense takes the position that no one is guaranteed a position in a particular school. But the DOE did not transfer him because because fewer math teacher were needed at FSSA, or even because they wanted a senior teacher at a school with no experienced math teacher. He was to come back for them to continue to torture him with a disciplinary meeting and another fake letter to file the day school reopened. And whole idea was to take his job for the student teacher who now has graduated and holds his job for $33,330 savings to the school budget to be used for other purposes plus bonuses to the administration for lowering the payroll, reducing the tenured faculty and reducing the pension vested faculty. And had he returned, there is no doubt the torture would have been stepped up because Plaintiff foiled the attempt to make this savings and improve the other "stats" until he either quit or the Administration was told by the DOE lawyers (the one's who told the Principal not to remove the letters) that they had enough to bring charges. The pressure to replace the veteran teachers is so strong that the reason that the DOE lawyer would not permit the removal of the letters is that she can use them for three years to bring him up on charges anywhere in the city system. There are many teachers who have been virtually or even completely exonerated by arbitrators whom the DOE is going after again and bringing up on new charges ("if at first you do not succeed . . .").

**Point II PLAINTIFF HAS STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED**

Plaintiff, has stated several federal claims of pertinent to his property and liberty interests in his continued employment and continued accrual of pension credits which the Defendants have worked in concert to first constructively ablate and if that did not work to actually "take." No matter how minimal the due process guaranteed; there can be no due process, if the allegations are all purposefully and deliberate falsehoods and there has been a stream of fraudulent and intentionally fallacious statements, documents, and ratings, that are defamatory, maliciously meant to either constructively terminate or provide the basis for actually terminating, not only Plaintiff but tens of thousands of other similarly situated dedicated teachers, many of whom, have had their lives destroyed by this Mayor's, Defendant Bloomberg's "business model" of firing teachers, hiring Principals to fire teachers–almost all on perjured testimony and evidence because that is the way they understand their jobs. However, the Principals are government officials who whether in the government or in the private sector are committing crimes when they perjure themselves falsify business documents, and there is no common interest privilege when what they are doing they know to be false. "The defense of common interest privilege is defeated by a showing that the defendant spoke with malice, i.e., where it is shown that "the motivation for making such statements was spite or ill will (common-law malice) or [that] the statements [were] made with [a] high degree of awareness of their probable falsity (constitutional malice)" <u>Foster v Churchill</u>, 87 N.Y.2d, at 752.

There is constitutional malice because the false statements that are deliberately false to obtain the result of either constructive termination/eviction from that school or to gather the evidence that will be used to make an intentionally false case against Plaintiff so that he can actually be terminated. In either case a "taking" is the goal so that an entry level, never to be tenured, never to be pension-vested student-teacher could be, and was hired into Plaintiff job.

**POINT III    THIS COURT SHOULD RETAIN PLAINTIFF'S SUPPLEMENTAL STATE CLAIMS BECAUSE THE STATE COURTS ARE NOT WELL-SUITED TO ADJUDICATE A CLAIM OF THIS SCOPE AGAINST THE CITY.**

We did bring just the issue of the two documents to be removed from the file to the state court. During oral argument, the judge pointed out that if the State Courts could be used for this

purpose, Her Honor would have a queue around the block. Indeed the city need not worry about the legality of its actions if they can never be challenged in Court. The decision of State Court with an Acting Justice, who needs to be on the ballot, id being Appealed The whole idea of changing CBA was to disempower the educators, while giving absolutely free reign to the DOE. Even if the Courts acted on each case, how many teachers could afford to go to court to challenge the policy. The policy of packing the file with defamatory and knowingly false letters to either so revile the veteran high paid teacher that he goes away or they will be used to terminate him. Taking the right to grieve letters and observations to the file away from NYC teachers is turning them into fish in a barrel waiting to be killed off. This was the final taking after along list of prior takings over the last decade that have in essence taken the all the rights and protections away from their processes to protect themselves from unlawful takings. If the Mayor can only get through the other 40,000 teachers who have property interests in the their tenure and in their vested pensions, then there will be no teacher with property right to take and he will be home free after a 2/3 TRILLION DOLLAR UNLAWFUL TAKING–PERHAPS THE LARGEST CRIME IN HISTORY WHEN COMPOUNDED WITS COMPONENTS OF FALSIFYING GOVERNMENT RECORDS *INTER ALIA*. We cannot expect the State Courts with overburdened dockets, five-minute conferencing, and especially lack of independence of judges who have to be nominated by their party to get on the ballot, and in this case an acting Supreme Court Judge. The last time a J.S.C. enjoined this Mayor from firing six deputy sheriff's because they showed their services were needed, Defendant Bloomberg, said for weeks that Emily Jane Goodman J.S.C. ought to be fired. Even Defendant Bloomberg might think twice about demeaning an Article III Judge, similarly. The Federal Courts and the Federal System is necessary to tackle this effrontery to the U.S. Constitution, this arrogating to himself to be above the Constitution and to attack the lawful property and liberty interests of what were 50,000 tenured teachers. We will need discovery to determine how many are still employed and what happened to those who are no longer in their former positions. The power of the Federal Courts is necessary to tackle this massive taking. This is just one Plaintiff, seeking redress in the Federal Courts from the power to the Municipal Government, the most powerful in the world, to right his very serious wrong.

## **CONCLUSION**

This Plaintiff has standing, the Plaintiff has several causes of action, the State Courts are ill equipped to deal with this serious problem as real harm could be inflicted on a state justice, who even had the time resources to undertake it.   The standard for dismissing a complaint, is that even if every thing alleged is true, the complaint fails because nothing is alleged that is tortious.  That is not the case here.  State officials are accused of intentional falsification of business records in furtherance of carrying out unlawful orders from the Mayor and the Chancellor to substitute entry level teachers for experienced, tenured high paid pension-vested teachers, and to be rewarded for having done so.

New York, New York
March 13, 2013

JOY HOCHSTADT, P.C.
Attorney for Plaintiff
300 Central Park West
New York, New York 10024
212 580 9930; 212 580 9322 (fax)
joy.hochstadt.pc@gmail.com
/s/
By: _____
    Joy Hochstadt (JH 0935)
